# EXHIBIT A

UNITED STATES DISTRICT COURT

DISTRICT OF CONNNECTICUT

MARYANNE ZADROWSKI             :        CIVIL ACTION NO.

                                        3:09CV-1367 (MRK)

vs.                           :

TOWN OF PLAINVILLE, ET AL     :        APRIL 12, 2010


DEPOSITION OF:  MARYANNE ZADROWSKI



APPEARANCES:


        SPINELLA & ASSOCIATES

                Attorneys for the Plaintiff

                One Lewis Street

                Hartford, CT 06103

        BY:   A. PAUL SPINELLA, ESQ.


        GORDON, MUIR & FOLEY, LLP

                Attorneys for the Defendants

                Ten Columbus Boulevard

                Hartford, CT 06106

        BY:   JON BERK, ESQ.



                Christine E. Borrelli

            Connecticut License No. 117

              Registered Merit Reporter

        NIZIANKIEWICZ & MILLER REPORTING SERVICES

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 2

1  ...... Deposition of MARYANNE ZADROWSKI, a Plaintiff,
2  taken on behalf of the Defendants, in the herein before
3  entitled action, pursuant to the Federal Rules of Civil
4  Procedure, before Christine E. Borrelli, duly qualified
5  Notary Public in and for the State of Connecticut, held at
6  the Law Offices of Spinella & Associates, One Lewis Street,
7  Hartford, Connecticut, commencing at 1:10 p.m. on Monday,
8  April 12, 2010.
9
10           S T I P U L A T I O N S
11
12     It is hereby stipulated and agreed by and among counsel
13  for the respective parties that all formalities in
14  connection with the taking of this deposition, including
15  time, place, sufficiency of notice, and the authority of the
16  officer before whom it is being taken may be and are hereby
17  waived.
18     It is further stipulated and agreed that objections
19  other than as to form are reserved to the time of trial.
20     It is further stipulated and agreed that the reading
21  and signing of the deposition transcript by the deponent is
22  hereby not waived.
23     It is further stipulated and agreed that the proof of
24  the qualifications of the Notary Public before whom the
25  deposition is being taken is hereby waived.

Page 3

1              I N D E X
2
3
4  WITNESS          DIRECT  CROSS  REDIRECT  RECROSS
5
   MaryAnne Zadrowski        4
6
7
8
9
10  EXHIBIT                   PAGE:
11
    Defendant's Exhibit 1, Statement .................. 42
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1       MARYANNE ZADROWSKI, called as a witness by the
2  Defendants, having first been duly sworn by the Notary, was
3  examined and testified on her oath as follows:
4
5       DIRECT EXAMINATION BY MR. BERK:
6
7     Q.  Ms. Zadrowski --
8     A.  Correct.
9     Q.  -- I want to make sure I get the pronunciation
10  correct.  I represent the defendants in this matter in
11  regards to an incident that took place October 27, 2008, in
12  the early morning hours or late morning hours.  If I ask you
13  a question and you don't understand it or you want me to
14  repeat it, I'll be happy to do so.
15     A.  Okay.
16     Q.  And if you don't, I'll assume that you have
17  understood the question that I have asked and the answer
18  that you have given is in response to that question.  Okay?
19     A.  Okay.
20     Q.  Have you ever been deposed before?
21     A.  No.
22     Q.  Where do you currently live?
23     A.  17 Old Waterbury Road, Terryville, Connecticut.
24     Q.  And how long have you lived there?
25     A.  Three years, maybe, going on four.

Page 5

1     Q.  Is that a home that you own?
2     A.  I do not own it.  My fiance does.
3     Q.  And what is the name of your fiance?
4     A.  Joseph Mone, Junior, M-O-N-E.
5     Q.  And, currently, does anyone live with you other
6  than your fiance and yourself?
7     A.  Yes.
8     Q.  And who is that?
9     A.  My daughter, Amber Bright; my daughter, Chelsea
10  Bright.
11     Q.  I'm sorry.  Did you say Chelsea?
12     A.  Chelsea Bright; Matthew Bright, my son; Joseph
13  Bright, my other son; and Richard Bright, my other son.
14     Q.  Five children?
15     A.  Yes.
16     Q.  And how long have they lived with you?
17     A.  Since birth.
18     Q.  What is the age of -- is Joseph sometimes known as
19  Joey?
20     A.  Yes.
21     Q.  And what is the date of birth of Joey?
22     A.  3/11/1991.
23     Q.  And Richard?
24     A.  6/20/1989.
25     Q.  Matt?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 6

1   A.  4/26/1995.
2   Q.  Amber?
3   A.  9/1/92.
4   Q.  And Chelsea?
5   A.  3/15/1996.
6   Q.  Your mother lives at 129 Shuttlemeadow Road?
7   A.  Yes, she does.
8   Q.  And does she live with anyone there?
9   A.  My brother.
10  Q.  And that's Walter?
11  A.  Walter Zadrowski.
12  Q.  And does she live with anyone else?
13  A.  No.
14  Q.  On October 27, 2008, did you live at 129
15  Shuttlemeadow Road?
16  A.  No.
17  Q.  On October 27, 2008, did Richard live at the Old
18  Waterbury Road address?
19  A.  Yes.
20  Q.  And did he stay for a while at the Shuttlemeadow
21  address in the time immediately prior to this incident?
22  A.  Yes.
23  Q.  Why was that?
24  A.  He was staying there to help my brother on the
25  farm.

Page 7

1   Q.  What's there to help on the property?  Doing what,
2   you say help with the farm?
3   A.  Raking leaves, cutting trees.  He was there to
4   bond with his uncle and discuss some issues he was having.
5   Q.  Was part of the reason he was there to have a
6   father figure talk to him?
7   A.  To have — yeah, yeah.
8   Q.  And whose idea was that?
9   A.  Mine.
10  Q.  And what kind of issues was Richard having at that
11  time?
12  A.  Drugs and alcohol.
13  Q.  So in October of 2008, your son was how old?
14  A.  He was 18, 19.
15  Q.  After this incident occurred and he was on bail,
16  which address did he live at?
17  A.  At 17 Old Waterbury Road, Terryville.
18  Q.  So that ended the stay at the uncle and brother's?
19  A.  Yes.
20  Q.  I'm sorry.  The grandmother and uncle's house?
21  A.  Yes.
22  Q.  On the night of this or the early morning of this
23  incident, other than yourself, your mother, Richard and
24  Walter, was there anyone else present, put aside the police
25  officers for now?

Page 8

1   A.  Yes.
2   Q.  And who was that?
3   A.  My son, Joey.
4   Q.  And was he there with anyone?
5   A.  His now ex-girlfriend, yes.
6   Q.  And what is the name of his now ex-girlfriend?
7   A.  Brittany Damboise.
8   Q.  Damboise?
9   A.  Yes.
10  Q.  Do you know how to spell that?
11  A.  D-A-M-B-O-I-S-E.
12  Q.  Just as it sounds.  Now, you mentioned that your
13  son Richard was having alcohol and drug issues.  What kind
14  of drug issues was he having?
15  A.  Smoking marijuana.
16  Q.  Was he in school at the time?
17  A.  No.
18  Q.  Had he dropped out?
19  A.  Yes, he did.
20  Q.  And why were you over there that night?
21  A.  Because my brother called me to pick him up.
22  Q.  And did your brother tell you why he wanted you to
23  pick him up?
24  A.  He said that they had an argument.
25  Q.  Did you have a cell phone or a land line that he

Page 9

1   called you at?
2   A.  That my brother called me on?
3   Q.  Yes.
4   A.  My cell phone.
5   Q.  What is your cell phone number?
6   A.  860-819-7391.
7   Q.  Is that still your cell phone number?
8   A.  Yes, it is.
9   Q.  And that was the cell phone you had on October 27,
10  2008?
11  A.  Yes, it is.
12  Q.  Do you remember what time your brother called you?
13  A.  Oh, probably about a half hour before I got to
14  call the Plainville Police.
15  Q.  Do you remember approximately when you made your
16  first call to the Plainville Police?
17  A.  It was about 10:30, quarter of eleven — no.
18  11:30, quarter to twelve.
19  Q.  How did you get over to Shuttlemeadow?
20  A.  My fiance's car.
21  Q.  And was anyone in the car with you?
22  A.  My son and his girlfriend, ex-girlfriend.
23  Q.  So Joey and Brittany were in the car with you?
24  A.  Yes.
25  Q.  And why were they coming with you?

Page 10

1   A.   Because my son Joey and my son Ricky are very
2   close in age, and Joey and Ricky talk to each other.
3   Q.   When your brother called you, did he indicate
4   whether your son Richard was intoxicated?
5   A.   Yes.
6   Q.   And what did he indicate?
7   A.   That he was drunk.
8   Q.   Did he indicate whether he was in or out of
9   control?
10  A.   He said -- he just said that he wouldn't listen.
11  Q.   Did he indicate whether he had a raised voice or
12  was using profanity?
13  A.   No.
14  Q.   Had your son Richard before this been intoxicated
15  or out of control so that you had to go calm him down or
16  take care of him?
17  A.   Before this incident?
18  Q.   Yes.
19  A.   At another address?
20  Q.   Yes.
21  A.   Yes.
22  Q.   And what was the issue at that time?
23  A.   Drugs and alcohol.
24  Q.   Being intoxicated and out of control?
25  A.   Yes.

Page 11

1   Q.   By the way, was your son before this incident
2   seeing any therapists or medical personnel?
3   A.   No.
4   Q.   Had he ever had been taken to a hospital because
5   of fear he had taken excessive amounts of alcohol or drugs?
6   A.   No.
7   Q.   When you got to 129 Shuttlemeadow, where did you
8   park?
9   A.   In the backyard.
10  Q.   And how far is it from the street to the backyard?
11  A.   About 100 to 150 feet.
12  Q.   It's set back from the street?
13  A.   Yep, yes.
14  Q.   Are there any neighbors to the left and right?
15  A.   Yes.
16  Q.   You said you parked in the back.  Is there a
17  garage or detached garage at the premises?
18  A.   Yes.
19  Q.   Did you park your car there?
20  A.   No.  I parked it in the backyard.
21  Q.   And how far is that from the garage?
22  A.   Twenty-five feet.
23  Q.   When you got there, what did you observe, if
24  anything, about your son?
25  A.   I didn't know where he was.

Page 12

1   Q.   Was there anyone in the backyard when you got
2   there?
3   A.   No.
4   Q.   What did you do after you got out of your car?
5   A.   Went into my mother's house.
6   Q.   And is there a front door and a back door?
7   A.   Yes.
8   Q.   And which door did you go through?
9   A.   Back door.
10  Q.   Is that the usual door people usually go in and
11  out of the house?
12  A.   Yes.
13  Q.   And does the back door of the back of the house
14  look out towards the street or look out towards a different
15  area?
16  A.   It looks out towards a different area.
17  Q.   And would that be the fields behind you, or would
18  it look to the left or right where the garage was?
19  A.   It's to the back of where the garage is.
20  Q.   All right.  So if you're at the back door, the
21  back of the house, can you see down the driveway?
22  A.   If you walk around the corner, yes.
23  Q.   But you have to walk around the corner?
24  A.   Yes.
25  Q.   That's my whole point --

Page 13

1   A.   Yes.
2   Q.   -- because the house to your left is blocking you?
3   A.   No.
4   Q.   We'll get this right.  Is the house to the right
5   blocking you?
6   A.   No.
7   Q.   What's blocking your view down the driveway?
8   A.   My mother's house.
9   Q.   By the way, do you have any photographs of the
10  scene that you have, either of the house, the driveway,
11  anything along those lines?
12  A.   From that evening?
13  Q.   Yes --
14  A.   No.
15  Q.   -- or that you have taken to show where the
16  relative location of everything is?
17  A.   I can take a picture, yeah.
18  Q.   Oh, no.  Have you taken a picture?
19  A.   No.
20  Q.   All right.  So you went into your mother's house.
21  Did Joey and Brittany go in with you?
22  A.   Yes.
23  Q.   And what did you observe when you entered the
24  house?
25  A.   My brother sitting in the living room.  My mother

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 14

1  sitting on the computer.
2     Q.  Okay.
3     A.  My son was not there.
4     Q.  Okay.
5     A.  My son Richard was not there.
6     Q.  Right.  And did you have a conversation with
7  either your mother or Walter?
8     A.  My mother.
9     Q.  And what was the conversation you had with your
10  mother?
11     A.  I told her that I had to call the police to have
12  my son put in the hospital and I was requesting an ambulance
13  and would that be okay with her.
14     Q.  You had made a decision that he should be taken to
15  a hospital?
16     A.  He told me he was going to kill himself.
17     Q.  When did your son tell you that?
18     A.  After my brother called me and told me to pick him
19  up.
20     Q.  And before you left the house, did he call you?
21  How did you know he said he was going to kill yourself?
22     A.  Because I called my son's cell phone.
23     Q.  So after Walter called you and said you have to
24  come pick him up because he's drunk or intoxicated, you
25  placed a call directly to your son?

Page 15

1     A.  Yes.
2     Q.  All right.  And was that before you had gotten in
3  the car?
4     A.  Yes.
5     Q.  And when you called him, what did you say to him,
6  and what did he say to you on the phone?
7     A.  What's going on, and he told me that he was going
8  to Hartford to get a gun to kill himself.
9     Q.  Had he ever threatened suicide before?
10     A.  Not to my knowledge.
11     Q.  When he told you that, was his voice elevated or
12  just normal conversational tone?
13     A.  Irritated.
14     Q.  Did he appear to be upset?
15     A.  Yes.
16     Q.  Was he crying?
17     A.  I don't know.
18     Q.  All right.  Was he using profanity?
19     A.  Not to me.
20     Q.  Did he use profanity to anyone during that first
21  phone call?
22     A.  No.
23     Q.  All right.  So he said he was going to go to
24  Hartford and kill himself?
25     A.  No.

Page 16

1     Q.  All right.
2     A.  He said he was going to go to Hartford and get a
3  gun.
4     Q.  Oh, and get a gun.
5     A.  To kill himself.
6     Q.  So when you got in the car, you had made a
7  decision what you were going to have done with or to help
8  your son?
9     A.  Yes.
10     Q.  And you made that decision driving over?
11     A.  Yes.
12     Q.  All right.  And did you while you were driving
13  over call the police or ambulance service?
14     A.  No.
15     Q.  Did you want to see what the scene was like once
16  you got there?
17     A.  I didn't know where my son was.
18     Q.  He had answered the phone, and that was it?
19     A.  Correct.
20     Q.  Did he hang up on you, was he mad at you?
21     A.  No.  We have a two-way walkie-talkie.
22     Q.  So it's like one of those Nextel?
23     A.  Nextel.
24     Q.  And do you have to dial that phone number that you
25  gave me, 860-819-7391, is that from where you were talking

Page 17

1  to him?
2     A.  Same phone, yes.
3     Q.  And does that keep track of the records of how
4  long the phone calls are?
5     A.  It was direct connect.
6     Q.  So if I went to look at your phone records, would
7  it indicate for that date the time?
8     A.  I don't know.
9     Q.  Who was the service through?
10     A.  Sprint Nextel.
11     Q.  All right.  You got there and you had a discussion
12  with your mother?
13     A.  Yes.
14     Q.  All right.  And what did your mother say to you?
15     A.  If you feel that's right, then do it.
16     Q.  And did you have any discussion with Walter?
17     A.  No.
18     Q.  So one is watching TV and one is on the computer?
19     A.  Yes.
20     Q.  And is that in a room that is directly adjacent to
21  the back door, back area?
22     A.  Which room?
23     Q.  The room that you were in talking to Walter and
24  your mother?
25     A.  I wasn't talking to Walter.

Page 18

1    Q. The room that you were talking to your mother and
2 that Walter was seated in, was that a room that was directly
3 adjacent to the back porch area?
4    A. My mother was on the back porch. My brother was
5 on the other side of the house.
6    Q. So when you came in, you didn't even see Walter?
7    A. No.
8    Q. All right. What happened next?
9    A. I called the police, asked for an ambulance and an
10 officer.
11    Q. All right. And from where did you call the
12 police?
13    A. I believe it was my mother's house, and I asked
14 them to meet me at the Getty Gas Station.
15    Q. And at any time before you made that first call,
16 had you talked to your son?
17    A. I don't remember.
18    Q. Now, just some preliminaries before we get back to
19 the incident. Are you currently taking any medications?
20    A. Yes.
21    Q. And what medications are you taking?
22    A. Motrin, 600 milligrams, Imitrex as needed,
23 Effexor, 75 milligrams, and that's it for -- on a daily
24 basis.
25    Q. You take Imitrex as needed?

Page 19

1    A. As needed.
2    Q. And is there anything else that you take on a
3 periodic basis?
4    A. Muscle relaxers.
5    Q. And who prescribed that for you?
6    A. Dr. Behjet.
7    Q. Anything else?
8    A. No.
9    Q. And how often have you taken -- why do you take
10 the muscle relaxers?
11    A. For the bulging disc in my neck and the spasms
12    Q. How often do you take the muscle relaxant?
13    A. It depends.
14    Q. Well, over the course of the last 30 days, last
15 month?
16    A. I've taken it probably five to ten times in the
17 last 30 days.
18    Q. Any other medications?
19    A. No.
20    Q. And how many pills come in a prescription?
21    A. Thirty.
22    Q. And when was the last time that you renewed your
23 prescription?
24    A. A couple months ago. For the muscle relaxers?
25    Q. Yes.

Page 20

1    A. The Motrin is every few weeks.
2    Q. Did you ever take Lexapro?
3    A. Yes, I did.
4    Q. And that was before this incident?
5    A. Before this incident, I was on something else
6 prior to that, then I was off. Then I was on Lexapro again,
7 and then he increased my dosage, and then changed it because
8 it wasn't working.
9    Q. Changed you to Effexor?
10    A. To Effexor.
11    Q. But prior to this incident, you were taking
12 medication for depression and anxiety?
13    A. I took it after my children's father died, yes.
14    Q. The medical records indicate that -- well, as
15 of --
16    A. I was still taking it, yes, because it's not
17 something that you can just stop taking.
18    Q. And was that something that you would take on a
19 daily basis?
20    A. Yes.
21    Q. And you took the Lexapro and now the Effexor for
22 that depression and anxiety or --
23    A. It's not for depression. It's for anxiety.
24    Q. Again, due to the loss of your husband?
25    A. Oh, no.

Page 21

1    Q. You were taking it up until the time of the
2 incident. Did you continue to take it for the same reasons
3 afterwards?
4    A. I continued taking it because it was prescribed to
5 me. It's not a medication that you can just stop taking.
6    Q. I got you. You have to continue taking it --
7    A. Correct.
8    Q. -- unless you're weaned off of it?
9    A. Correct.
10    Q. And were you weaned off the Lexapro by being put
11 on the Effexor?
12    A. Actually, the Effexor is a higher dose.
13    Q. And you mentioned you take Imitrex as needed?
14    A. Yes.
15    Q. And what is that for?
16    A. Migraine headaches.
17    Q. And approximately over the course of the last
18 month, how often did you take the Imitrex?
19    A. A couple times.
20    Q. And who prescribed that?
21    A. Dr. Behjet.
22    Q. And the migraines, have you had those before this
23 incident?
24    A. No.
25    Q. They first developed after this incident?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 22

1    A.  Yes.
2    Q.  When is the last time you saw a doctor
3  face-to-face for any of the injuries you sustained in this
4  matter?
5    A.  This morning.
6    Q.  And who was that?
7    A.  Dr. Behjet.
8    Q.  And what was the reason you saw him or her?  I'm
9  sorry.
10    A.  Yeah, it's a him.
11    Q.  This morning?
12    A.  Because of my high anxiety and panic attacks.
13    Q.  And what did he do for you?
14    A.  He upped my Effexor to 75 milligrams from 37
15  and-a-half and is recommending that I go see a psychiatrist.
16    Q.  And what are the sources of your high anxiety?
17  Well, let me ask you this way.  Does your anxiety have
18  anything to do with Richard?
19    A.  No.
20    Q.  Does it have to do with any of your other
21  children?
22    A.  No.
23    Q.  Does it have anything to do with your family life?
24    A.  No.
25    Q.  So what does it have to do with?

Page 23

1    A.  The Plainville Police Department.
2    Q.  What specifically?
3    A.  I don't understand why the officer choked me.
4    Q.  Anything else?
5    A.  No.
6    Q.  Other than seeing Dr. Behjet this morning, who
7  increased your level of medication, when is the last time
8  that you saw anyone for treatment of the injuries sustained
9  in this matter?
10    A.  I don't know offhand.  It's as needed.
11    Q.  The last record I have, and it's not a memory
12  game, but --
13    A.  I know.
14    Q.  -- it is what it is.  The last record I have is
15  that you got an MRI in June of 2009.
16    A.  That was from Dr. Greenspan.
17    Q.  Right.
18    A.  I have seen Dr. Behjet after that a few times.
19    MR. BERK:  I'll get those report if they're
20  related, Paul.
21    MR. SPINELLA:  Yeah.
22    MR. BERK:  Thanks.
23    Q.  (By Mr. Berk)  And you stated that you don't
24  understand why you were choked.  Was there anything else
25  about that episode that causes you anxiety?

Page 24

1    A.  The whole evening.
2    Q.  Which includes the way your son was acting?
3    A.  No.
4    Q.  Well, how often has your son threatened to kill
5  himself?
6    A.  That was the first time that I'm aware of.
7    Q.  Did the fact that your son threatened to kill
8  himself cause you any anxiety?
9    A.  Yes.
10    Q.  Is your son having any problems with drugs today?
11    A.  No.
12    Q.  Does he have a job?
13    A.  No.
14    Q.  Is he going to school?
15    A.  No.
16    Q.  Does he have any problems with alcohol?
17    A.  No.
18    Q.  Does he have any problems whatsoever?
19    A.  Just everyday problems.
20    Q.  Do you have any anxiety about how life is going to
21  work out for Richard or Ricky?
22    A.  No.
23    Q.  Were you having any anxiety that night that
24  your -- withdrawn.  Your son did tell you that Walter gave
25  him a rifle to shoot himself?

Page 25

1    A.  No.
2    Q.  Your son never told you that?
3    A.  No.
4    Q.  Did Walter tell you that?
5    A.  No.
6    Q.  So this is the first you have ever heard of it
7  from me?
8    A.  And in a police report.
9    Q.  What did your brother say happened with the gun or
10  the rifle?  I mean, have you discussed this with your
11  brother since that time?
12    A.  Oh, yeah.
13    Q.  What did he say happened?
14    A.  He said that he gestured to Ricky that if you
15  wanted to kill yourself, there's a gun.  Go ahead.
16    Q.  And when did he tell you that?
17    A.  After.
18    Q.  When after?
19    A.  After he was arrested.
20    Q.  After Walter was arrested or Ricky was arrested?
21    A.  Walter.
22    Q.  And when was it?  Was that that night?
23    A.  No.  Actually, it was -- I heard it during the
24  time the police were at the house, and it was after he came
25  home.

7 (Pages 22 to 25)

Page 26

1   Q.  After he came home.  The police had driven him
2   home?
3   A.  Yes.
4   Q.  And where did you hear this -- overhear this
5   conversation?
6   A.  I was standing right next to my brother.
7   Q.  So did he tell you?
8   A.  No, he did not --
9   Q.  Who --
10  A.  -- at that time.
11  Q.  -- did he say it to?
12  A.  One of the officers.
13  Q.  And was this in the room where that television
14  was?
15  A.  It was outside in the backyard.  There was no
16  officers in my mother's house ever except when my brother
17  walked them in.
18  Q.  Right.  So this was after the officers had brought
19  him home?
20  A.  Yes -- no.
21  Q.  Sorry.  The conversation that you overheard about
22  Walter saying to one of the officers if you want to shoot
23  yourself, there's a rifle over there, did that occur before
24  or after your brother was arrested?
25  A.  He didn't offer a gun to the officers to shoot

Page 27

1   themselves.
2   Q.  I asked when you learned that your brother had
3   offered him a rifle.
4   A.  Offered who a rifle?
5   Q.  Your son Ricky.
6   A.  Okay.
7   Q.  And what I'm trying to determine is you said that
8   you overheard that conversation.
9   A.  Well, yes.
10  Q.  When did you overhear that conversation?
11  A.  When the officers were asking my brother what was
12  going on.
13  Q.  So was this before or after your brother Walter
14  was arrested?
15  A.  This was before he was put in handcuffs.
16  Q.  Oh, okay.  Did you ever have -- and that took
17  place in the back?
18  A.  In the backyard.
19  Q.  And later in the evening, the officers brought
20  your brother back to the house?
21  A.  Yes.
22  Q.  And did he and the officers go someplace in the
23  house?
24  A.  My brother walked in the house the officers
25  followed him in.

Page 28

1   Q.  And what did the officers retrieve, if you know?
2   A.  Three rifles that my brother gave them.
3   Q.  And do you know why your brother gave those guns
4   to the officers?
5   A.  Because the sergeant told him he had to.
6   Q.  Did you hear any discussion about making sure that
7   nothing happens with Ricky taking one of those guns?
8   A.  Oh, no.  Sergeant Marques called me.
9   Q.  Sergeant Marques called you?
10  A.  At my mother's house.
11  Q.  Right.  And he said that?
12  A.  My brother was --
13  Q.  Walter was willing to do that, just to prevent any
14  problems?
15  A.  He told me that my brother agreed to leave -- give
16  the guns to the police department for safety.
17  Q.  Do any of your other children living with you have
18  any drug or alcohol problems?
19  A.  My son Joseph used to, but he doesn't any longer.
20  Q.  When did he have that problem?
21  A.  A year ago.
22  Q.  So that was in 2009?
23  A.  Yes.
24  Q.  And how long did he have it?
25  A.  He went through a drug rehab.

Page 29

1   Q.  And when was the drug rehab?
2   A.  He was gone from July of '09 until November,
3   December -- December '09.
4   Q.  So about four months ago, three months ago?
5   A.  Yes.
6   Q.  Did that cause you anxiety, having your son Joey
7   in drug rehab?
8   A.  No.  Actually, it was a relief.
9   Q.  When did he start having problems with drugs and
10  alcohol causing him to be put in drug rehab in July of '09?
11  A.  When him and his ex-friend broke up.
12  Q.  When was that?
13  A.  I don't remember what month it was.  It was around
14  the time of June, July.
15  Q.  Did you have any anxiety over the fact that your
16  son Joey was having drug and alcohol problems in 2009?
17  A.  Of course.
18  Q.  And did the medications that you were taking help
19  to relieve that anxiety?
20  A.  I don't know.
21  Q.  Have any of your sons graduated from high school?
22  A.  Yes.
23  Q.  Which one graduated?
24  A.  Joey.
25  Q.  Does Joey have a job?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 30

```
1     A.  He's looking.
2     Q.  Have either Joey or Ricky gone on to get any
3  specialized training?
4     A.  Joey is afraid to.
5     Q.  He's afraid to?
6     A.  Yes.
7     Q.  To get any specialized training?
8     A.  Yes.  He thinks he's not smart enough for it.
9     Q.  Does that cause you any anxiety?
10    A.  No, because I know that he can do whatever he
11 wants to do when he puts his mind to it.
12    Q.  Ricky, does he just stay around the house?
13    A.  Right now?
14    Q.  Yeah.
15    A.  Ricky is in jail because of his drinking problem.
16    Q.  Where is Ricky in jail?
17    A.  Bergin.
18    Q.  And what is the charge?
19    A.  Violation of probation.
20    Q.  And what was the original charge?
21    A.  I don't know.
22    Q.  So he's not living physically with you right now?
23    A.  No.  He'll be coming home in a couple months.
24    Q.  How long has he been in prison?
25    A.  Since January.
```

Page 31

```
1     Q.  Of 2010?
2     A.  Yes.
3     Q.  And when was he arrested originally?
4     A.  I don't know, 2008, 2009.
5     Q.  Was it before or after this incident in October of
6  2008?
7     A.  It was all around the same time.
8     Q.  Did the fact that your son had been arrested and
9  then found to have violated probation so that he was put in
10 jail cause you any increased anxiety?
11    A.  No.
12    Q.  Did it cause you any anxiety at all?
13    A.  No.  It caused relief because somebody finally was
14 going to help my son.
15    Q.  Before January, 2010, when he was put in jail, did
16 you have any anxiety because your son had been arrested?
17    A.  No.  That's not my problem.  It's his.
18    Q.  Do any of your other children work?
19    A.  No.  They're minors.
20    Q.  What is the grade of the next oldest one after
21 Joey?  Is that Matt?
22    A.  Amber is going back to adult education.
23    Q.  How old is she?
24    A.  Seventeen.
25    Q.  Did she graduate from high school?
```

Page 32

```
1     A.  No.
2     Q.  Did she drop out?
3     A.  Yes.
4     Q.  Did that cause you any anxiety?
5     A.  No.
6     Q.  Has she ever had any drug or alcohol problems?
7     A.  No.
8     Q.  Has she had any other problems for which she had
9  to seek medical or psychiatric attention?
10    A.  Yes.
11    Q.  And what was that for?
12    A.  Her father died.
13    Q.  Back in 2002?
14    A.  2002.
15    Q.  Let's just trying keeping it in the last three
16 years from 2007 forward.
17    A.  No.
18    Q.  And your other child's name is Matt?
19    A.  Yes.
20    Q.  And what grade is Matt in?
21    A.  Ninth.
22    Q.  And the last one is one other girl?
23    A.  Chelsea.
24    Q.  Chelsea.  And what grade is Chelsea in?
25    A.  Eighth.
```

Page 33

```
1     Q.  And does your fiance have any children?
2     A.  Yes.
3     Q.  And are they living with you?
4     A.  No.
5     Q.  What is your height?
6     A.  5'8".
7     Q.  Is that without any shoes on?
8     A.  I believe so, 5'8", 5'9".
9     Q.  And what is your current weight?
10    A.  Two-sixty.
11    Q.  And in October of 2008, what was your weight?
12    A.  Two-fifty, Two-forty.
13    Q.  Have you set a date for your marriage?
14    A.  No.
15    Q.  So despite the problems that Joey and Ricky have
16 had with drug and alcohol abuse, and despite the problems
17 that Ricky has with the law and despite the fact that Joey
18 has not gone back for any job retraining, the only source of
19 anxiety that you have currently is why did the officer choke
20 you?
21    A.  I have everyday anxiety, but yes, that's a source
22 of my anxiety.
23    Q.  Do you have any day-to-day anxiety from the
24 situation with your two eldest boys?
25    A.  Not that requires medication.
```

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 34

1    Q.  But before this incident, you were taking Lexapro?
2    A.  Because my children's father died.  I was left
3  with five small children --
4    Q.  Right.
5    A.  -- and no job and he was the sole supporter of the
6  household, and I didn't know how to handle things.
7    Q.  All right.
8    A.  And then I had to continue taking it because you
9  can't just stop taking medication unless you're weaned off
10  of it.
11    Q.  So you had continued taking this anti-anxiety
12  medication right up to the time of this incident?
13    A.  Yes.
14    Q.  Again, so I understand and it's clear, you have no
15  anxiety on a day-to-day basis because of the situation with
16  your sons?
17    A.  No.  My sons are good now.
18    Q.  Now, presently, what are the problems that you're
19  currently having from the episode that took place in October
20  of 2008?
21    A.  Headaches, numbness in my face.
22    Q.  Is that your left or right side?
23    A.  Right.  Bulging discs in my neck.  I can wake up
24  in the morning and have my whole head numb, and then it will
25  slowly go away.

Page 35

1    Q.  Any other recurrent problems?
2    A.  Anxiety.
3    Q.  Right.  Do you have any other medical conditions
4  that you are taking medicines for?
5    A.  Once in a while a puffer for asthma.
6    Q.  Any problems with your carpal tunnel?
7    A.  No.
8    Q.  Are you currently employed?
9    A.  Nope.
10    Q.  And when was the last time you were employed?
11    A.  July, 2008.
12    Q.  Before this episode?
13    A.  Yes.
14    Q.  And what is the source of your income presently?
15    A.  Unemployment and Social Security.
16    Q.  Social Security through your husband?
17    A.  Through my children's father.
18    Q.  Have you applied for Social Security disability
19  benefits?
20    A.  No.
21    Q.  And when does your unemployment run out?
22    A.  I don't know.
23    Q.  And have you been looking for a job for the last
24  two years?
25    A.  Yes, I have.

Page 36

1    Q.  Have you been able to find one?
2    A.  No, I haven't.
3    Q.  Has that caused you any anxiety?
4    A.  No.
5    Q.  And your prior job was in the mortgage business?
6    A.  Insurance.
7    Q.  Insurance.  And why did you stop that job?
8    A.  I was fired.
9    Q.  And the reason for that was?
10    A.  Because the owner said that I -- me and a coworke[r]
11  didn't like them.
12    Q.  Did you know what that meant?
13    A.  I didn't care.
14    Q.  And how long had you worked at that job?
15    A.  Three years.
16    Q.  The house that you're living in now, whose name is
17  it in?
18    A.  Joseph Mone and his sister and his brother.
19    Q.  With respect to the effects that you have, the
20  numbness on the right side of your face, how often do you
21  have that?
22    A.  It's been there since October 27, 2008.
23    Q.  Can you show me where it is?
24    A.  It's right here and down.
25    Q.  So what you're pointing to, just so I describe it

Page 37

1  for the record, is the lower part of your jaw going from
2  your chin backwards and down into your neck area?
3    A.  Down into my neck, yes.
4    Q.  The headaches are self-explanatory when you do
5  have them.  You said something about a bulging disc.
6    A.  Bulging discs, yes.
7    Q.  Discs, yes.  Do they cause you any discomfort?
8    A.  Yes.
9    Q.  And where is that?
10    A.  In the middle of my neck.
11    Q.  When you say in the middle of your neck --
12    A.  Right at the base of the shoulder blades.
13    Q.  Does it go up?  Does it go down?  To the side?
14    A.  You want to see it?
15    Q.  Sure, if you want to point it out to me.
16    A.  Right there.
17    Q.  So it's right below the neck line?
18    A.  Yes.  Right at the shoulder.
19    Q.  Now, is that something that comes and goes
20  depending on activity level?
21    A.  Yes.
22    Q.  So sometimes you don't have any problem at all an[d]
23  sometimes you have a problem?
24    A.  Yes.
25    Q.  And would you say that -- within the last month,

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 38

1  how often have you had it?
2      A.  It's there now.
3      Q.  So that's today.  Before then, when was the last
4  time that you had it?
5      A.  It's there every day.
6      Q.  And do you take anything for it?
7      A.  Motrin.
8      Q.  And does that help?
9      A.  Sometimes.
10     Q.  Are there any activities that you do around the
11 house or for recreation that you couldn't do now that you
12 used to do?
13     A.  Yeah.
14     Q.  And what's that?
15     A.  I can't rake my yard.  I can't mow my lawn.  I
16 can't go to my mother's house and help my brother on the
17 farm.
18     Q.  And why is that?
19     A.  Because if I do, I'm laying in bed for three or
20 four days afterwards.
21     Q.  And why is that?
22     A.  Because my neck hurts.
23     Q.  Okay.
24     A.  I grew up on a farm.  I used to throw 20-pound
25 bales of hay like nothing.  And I can't even lift a 5-pound

Page 39

1  bag of potatoes now.
2      Q.  Prior to the episode of October of 2008, were you
3  working on the farm on a regular basis with Walter?
4      A.  Whenever he needed help.
5      Q.  And was that on a regular weekly basis or only
6  from time to time?
7      A.  From time to time.
8      Q.  In regards to mowing the lawn, do you have a push
9  mower or is it self-propelled?
10     A.  Push mower.
11     Q.  Do either of your boys do any of the lawn cutting?
12     A.  Yeah, but I grew up on a farm and I enjoy working.
13     Q.  Okay.
14     A.  I enjoy working with my children, not having my
15 children work for me.
16     Q.  And in regards to those -- have any of the doctors
17 given you any exercises to engage in?
18     A.  No.
19     Q.  Have any doctors suggested anything to alleviate
20 your periodic problems with headaches or in your neck?
21     A.  Yeah.  Muscle relaxers, warm or cold compresses
22 and deal with it because there's nothing that can be done.
23     Q.  Do you do any exercising at all?
24     A.  I walk.
25     Q.  You're currently not working and don't have a job.

Page 40

1  What do you do on a day-to-day basis?
2      A.  Not much.
3      Q.  Okay.
4      A.  Look for a job.
5      Q.  Yesterday was a beautiful day.  What did you do
6  yesterday?
7      A.  I slept for about four or five hours in the
8  morning because I can't sleep at all, and then I went to
9  see my mother.
10     Q.  Following this episode in October of 2008, did you
11 personally make any written complaint to the police
12 department as to the actions taken that night?
13     A.  No.
14     Q.  Now, when you first called the police, you
15 informed them that you were afraid that your son would kill
16 himself?
17     A.  I requested an ambulance because my son said he
18 was going to kill himself.
19     Q.  And did you tell the officer that you were on your
20 way to the Getty station?
21     A.  I told them I would meet them at the Getty Gas
22 Station on the corner of Whiting Street and East Street,
23 yes.
24     Q.  Did you tell the officer that you talked to, or
25 the dispatcher, that you were already in the car on the way

Page 41

1  to the Getty station?
2      A.  I don't recall.
3      Q.  Prior to testifying today, did you review any
4  documents?
5      A.  A few.
6      Q.  What few did you review?
7      A.  The police report.
8      Q.  Did you review the statement from your brother?
9      A.  Yes.
10     Q.  Was there anything in that statement from your
11 brother that you did not know before today?
12     A.  No.
13     Q.  Do you disagree with anything that your brother
14 puts in his written statement?
15     A.  No.
16     Q.  Did you know the substance of what your brother
17 put in the written statement at the time that your brother
18 was arrested?
19     A.  Repeat that.
20     Q.  Sure.  Did you know the substance of the
21 information contained in your brother's written statement at
22 the time that he was arrested?
23     A.  Did I know what my brother was going to say before
24 he was arrested?
25     Q.  No.  Did you know, for instance, he said that he

Page 42

1  had pointed him to a gun? Did you know that before he was
2  arrested?
3      A.  I overheard him talking to the officers.
4      Q.  Maybe we can do it this way so it's faster.
5
6          (Defendant's Exhibit 1, Statement, marked for
7          identification)
8
9      Q.  (By Mr. Berk)  Is that the statement that you
10 reviewed before today?
11     A.  Yep.
12     Q.  Let me just read a portion from it.  In this
13 statement, it says that Richard had been staying over at
14 Walter's house for about a week.  Is that accurate?
15     A.  Uh-huh, roughly, a few days.
16     Q.  "Tonight Richard was out with friends and returned
17 to my house about 9:00 p.m.  Richard was drunk, and as I
18 began to talk with him, he became very agitated."  Were you
19 aware of that before your brother was arrested?
20     A.  No.
21     Q.  When did you become aware of that?
22     A.  Today.
23     Q.  So you had never --
24     A.  I have never seen that police report before today.
25     Q.  I just asked you whether -- showing you what's

Page 43

1  been marked as Exhibit 1 for identification, which is
2  Walter's statement, whether this is one of the documents you
3  reviewed in preparation for today's deposition?
4      A.  Yeah.  It was about an hour ago before I came
5  upstairs.  I was downstairs and I read that.
6      Q.  You have seen this statement, before?
7      A.  About two hours ago, yes.
8      Q.  You had never seen it before that?
9      A.  No, I did not.
10     Q.  And you weren't aware -- let's do it this way.  At
11 some time did you discuss what happened between your brother
12 and your son with Walter?
13     A.  Yes.
14     Q.  When?
15     A.  Almost once a week.
16     Q.  Okay.
17     A.  Because that's how much it irritates us.
18     Q.  What irritates you?
19     A.  That he was arrested.
20     Q.  That Walter was arrested?
21     A.  Yes.
22     Q.  But what I'm trying to ask is, what did Walter
23 tell you about what happened between him and Ricky on the
24 night of this incident?
25     A.  The only thing that happened was that Ricky came

Page 44

1  home drunk.  My brother was trying to talk to him.  My son
2  said that he didn't like his life and was going to kill
3  himself.  My brother has a .20 gauge shotgun or .22,
4  whatever it is, in the garage -- and mind you, no clip is
5  ever in any weapon in the house.  And he said, There you go.
6  If you want to kill yourself, go ahead.  And it was a
7  gesture to make my son feel stupid and think about what he
8  was saying.  He never intended harm on my son, and he never
9  handed him a gun.  He just gestured.
10     Q.  What's the source of that information?
11     A.  From my brother and my son.
12     Q.  And when did you get that information?
13     A.  That night standing with the police officer.
14     Q.  Were you aware that a clip of ammunition was found
15 on your brother's person?
16     A.  Yes.
17     Q.  When did you learn about that?
18     A.  When my brother got home from the police station.
19     Q.  That evening?
20     A.  Yes.
21     Q.  And how did you learn about it?
22     A.  Because he told me that he had the clip in his
23 pocket.
24     Q.  Right.  And why did he have the clip in his
25 pocket?

Page 45

1      A.  So that my son couldn't hurt himself.
2      Q.  Did your son tell you that he knew the rifle was
3  unloaded?
4      A.  No.
5      Q.  Did you know that your brother had given your son
6  a rifle?
7      A.  My brother did not give my son a rifle.
8      Q.  He offered him to go use it?
9      A.  He gestured to him to go use it.
10     Q.  And did you learn that before or after your
11 brother was arrested?
12     A.  When my brother was telling the officers standing
13 there.  It was before he was put in handcuffs.
14     Q.  So you knew that your brother had offered or held
15 it in front of your son?
16     A.  No.  He did not hold a gun in front of him.
17     MR. SPINELLA:  I'm going to object.  This has been
18 asked and answered about ten times now, Jon.  She's
19 explained what her interpretation is of what her
20 brother said to the son; that it was an ironic
21 statement or a statement to get him not to do what he
22 did.  How many times can she say that?  You know, I
23 mean, this is -- there's no jury here.  You made the
24 point about ten times.
25     MR. BERK:  Paul --

12 (Pages 42 to 45)

Page 46

1    MR. SPINELLA:  You know, I'm going to instruct her
2  not to answer.  I mean, I think it's harassment at this
3  time.
4    MR. BERK:  Paul, I'm not trying to harass anyone.
5  I'm too old to harass anyone.  If you could see my
6  knees, Paul, you'd know that I can't harass anybody.
7    MR. SPINELLA:  But, I mean, she's made the point,
8  Jon.  You're a smart guy.  You understand that.
9    MR. BERK:  Paul, I'll move on, just in deference
10  to you.  How's that, Paul?  Can't do much better than
11  that.
12    Q.  (By Mr. Berk)  Did you ever see your son that
13  evening or early morning hours?
14    A.  Rephrase that.
15    Q.  Sure.  You stated that you had come over to the
16  house with the intention of having either ambulance
17  personnel or the police come to the house.
18    A.  Right.
19    Q.  Before the police came, had you spoken -- leave
20  aside the telephone call -- spoken to your son at your
21  mother's house?
22    A.  Before or after I called the police?
23    Q.  That's what I'm trying to determine.
24    A.  It was after I called the police.
25    Q.  And after you called the police, where did you

Page 47

1  speak to your son?
2    A.  It was when the police came walking down the
3  driveway and my son came walking out of the bushes he was
4  hiding in.
5    Q.  So until the police started -- did you say walking
6  down?
7    A.  Yeah, because they parked on the street.
8    Q.  So as you've described it to me, that's up to
9  where the house is off the street, and then you go around
10  the back.  Is that where you're talking about?
11    A.  No.  The police were walking down the driveway.
12  My son was walking away from the bushes, and I was coming to
13  meet the police.
14    Q.  All right.  So the police officers are walking
15  away from the street?
16    A.  Yes, towards the house.
17    Q.  And you're walking towards the street --
18    A.  Correct.
19    Q.  -- in the driveway?
20    A.  Correct.
21    Q.  And then your son comes out from the bushes?
22    A.  Yes.
23    Q.  All right.  How far was he from you at that point?
24    A.  Oh, about 50 feet.
25    Q.  So up until this time, you had not had any

Page 48

1  interaction with your son?
2    A.  No.
3    Q.  And how many officers were coming up the driveway?
4    A.  There was two at that time.
5    Q.  At any time before this, was your son in the
6  vehicle, your vehicle with you, heading towards the Getty
7  Station?
8    A.  No.
9    Q.  Did you tell the police at any time before they
10  came to the premises that your son was in the vehicle and
11  you were heading to the Getty Station?
12    A.  I don't recall saying that.  I recall telling the
13  police that I would get my son in the car and bring him to
14  the Getty Gas Station.
15    Q.  Have you listened to the dispatch calls?
16    A.  No.
17    Q.  Have you ever listened to the dispatch calls?
18    A.  No.
19    Q.  Have you ever listened to the conversations you
20  had with the police officers that have been recorded?
21    A.  No.
22    Q.  Were you aware that they had been recorded?
23    A.  Of course.
24    Q.  And from the day of this incident until today, you
25  have not listened to any of those?

Page 49

1    A.  No.
2    Q.  And why is that?
3    A.  Because I haven't listened to them.  Nobody gave
4  them to me to listen to.
5    Q.  Are you aware of what's on them?
6    A.  Probably everything that I said and everything
7  that they said.
8    Q.  Are there any transcripts of it?
9    A.  I don't know.
10    Q.  You haven't read any transcripts?
11    A.  I have nothing.
12    Q.  So he comes out of the bushes.  Do you say
13  anything to him or does he say anything to you?
14    A.  I don't remember.
15    Q.  Do you recall him -- was there a conversation with
16  anyone as you're coming up the driveway, the police are
17  coming up the driveway, and your con son is coming out of
18  the bushes.
19    A.  I asked them where the ambulance was and how come
20  they weren't taking my son because he was running around
21  like an idiot.
22    Q.  What does that mean, he was running around like an
23  idiot?
24    A.  He was drunk and out of control.
25    Q.  The last I knew, he came out of the bushes.

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 50

1   A.  Yes.
2   Q.  So you're saying he came running out of the
3   bushes?
4   A.  Yeah, pretty much.
5   Q.  Well, describe what he was doing.
6   A.  Why am I getting arrested.  He automatically
7   assumed he was going to get arrested.  And I asked the
8   officers where the ambulance was because I do recall asking
9   for an ambulance to take my son to the hospital.
10  Q.  And how far were you from the officer or officers
11  when you had this conversation?
12  A.  Up close and personal.
13  Q.  So, in other words, closer than we are across this
14  table?
15  A.  Oh, yeah.
16  Q.  And this was about the middle of the driveway?
17  A.  If I recall, yeah.
18  Q.  Was your son talking in an elevated tone?
19  A.  My son was drunk.
20  Q.  Was he yelling?
21  A.  At that time, no.
22  Q.  Was he using profanity?
23  A.  Probably.
24  Q.  Were you using any profanity towards him?
25  A.  Towards my son?

Page 51

1   Q.  Yes.
2   A.  No.
3   Q.  Did you use any profanity towards him during this
4   incident that took place during the course of this evening?
5   A.  No.
6   Q.  Did you use any profanity towards the police
7   officers at any time?
8   A.  After I was choked, yes, I did.
9   Q.  Before you were choked, do you use any profanity
10  against anybody?
11  A.  No, I did not.
12  Q.  All right.  What happened?  Your son is running
13  around.  Is he running around more towards the -- the
14  backyard area or more towards the front of the street area?
15  A.  The backyard.
16  Q.  Okay.
17  A.  Because at that point he already whipped all of
18  his drugs and alcohol that the cops weren't even interested
19  in.
20  Q.  Well, you wanted your son to get help.
21  A.  Yes.
22  Q.  So where did he whip the drugs and alcohol?
23  A.  They were all in the backyard.
24  Q.  And how do you know that?
25  A.  Because I saw him do it.

Page 52

1   Q.  And when did he do that?
2   A.  When the cops were in my brother's face and mine.
3   Q.  We're not there yet.  I have two officers in the
4   driveway with you your son running around.
5   A.  Yes.
6   Q.  Is that when he threw stuff in the backyard?
7   A.  That's when he walked into the backyard, yes, and
8   started getting rid of all his paraphernalia.
9   Q.  But you're talking to the officers?
10  A.  We were walking and talking because I'm not going
11  to let my son -- now that I have him in my eyesight -- I'm
12  not going to let him go run around eight acres of land and
13  go commit harry carry.
14  Q.  And you were walking up with the officers?
15  A.  Yes.
16  Q.  Where was Walter?
17  A.  In the house.
18  Q.  So he hadn't come out yet?
19  A.  There was no need for him to.
20  Q.  Whether there is a need or not, he had not come
21  out?
22  A.  Nope.
23  Q.  All right.  What did you observe your son do at
24  this point?
25  A.  He whipped a bottle of vodka out of his pocket.

Page 53

1   Q.  And what did he do with it?
2   A.  He threw it.
3   Q.  And where did he throw it?
4   A.  Wherever it landed.  He just threw it.
5   Q.  Was Joey outside?
6   A.  Yes.
7   Q.  Where was he sitting?
8   A.  He was standing by the back steps.
9   Q.  And could you see him from where you were walking
10  up the driveway the entire time --
11  A.  Could I see Joey?
12  Q.  -- or is it blocked by the corner of your mother's
13  house?
14  A.  Oh, no.  I could see him walking up the driveway
15  to where they were.  Yes, I could see him.
16  Q.  And what were you telling the officers that you
17  wanted done?
18  A.  I wanted my son to be brought to the hospital.
19  Q.  And any particular hospital?
20  A.  Well, I believe I asked for Bristol Hospital, but
21  he ended up in New Britain.
22  Q.  Why Bristol Hospital?
23  A.  Because it's closer to my house.
24  Q.  Did you ever say to the officers that's where his
25  doctors are?

14 (Pages 50 to 53)

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 54

```
 1      A.  His doctor is there, yes.
 2      Q.  What doctor is that?
 3      A.  Dr. Behjet, and Ricky has a heart problem.
 4      Q.  But this is not a doctor that had treated him for
 5  psychological problems?
 6      A.  He's never been treated for psychological problems
 7  prior.
 8      Q.  Or alcoholism or drug abuse?
 9      A.  No.
10      Q.  So is it dark out?
11      A.  Oh, yeah.
12      Q.  And are there lights off the house that enable you
13  to see?
14      A.  Yep.
15      Q.  And was your son going in and out of darkness as
16  he's running around?
17      A.  He could have.
18      Q.  Well, were you able to see him all of the time?
19      A.  Yeah.
20      Q.  So you're walking back with the officers.  Do you
21  know the names of either of those officers?
22      A.  I have no idea.
23      Q.  All right.  And what did those officers say to
24  you?
25      A.  Not much.
```

Page 55

```
 1      Q.  Okay.
 2      A.  I asked them for an ambulance, and they didn't
 3  have one there.  That was the whole purpose of the phone
 4  call.
 5      Q.  Well, didn't you ask that the officers respond to
 6  the scene?
 7      A.  I asked for the officers and an ambulance to bring
 8  my son to the emergency room because he's threatening to
 9  kill himself.
10      Q.  You asked the police to come?
11      A.  Because my son is threatening to kill himself;
12  that would be an ambulance and officers.
13      Q.  Do you know police codes?
14      A.  No idea.
15      Q.  The officers that were walking with you, were
16  they -- what was their demeanor towards you?
17      A.  At that time?
18      Q.  At that time.
19      A.  Pretty much shut up, and I'm going to do what I
20  have to do here.
21      Q.  Is that what they said to you?
22      A.  No.  That was their demeanor.
23      Q.  What happened next?  Your son is running around in
24  the back?
25      A.  I'm asking for them to get control of my drunk,
```

Page 56

```
 1  intoxicated, out of control son.
 2      Q.  And you were expecting them to tackle him?
 3      A.  Whatever it took.
 4      Q.  Ma'am, there's no reason to get angry at me.
 5      A.  No, no.  This is where the anxiety is coming in.
 6      Q.  So how far from the back of the house are you now
 7  with the officers?
 8      A.  We are right at the back door.
 9      Q.  And did anyone join you at the back door other
10  than Joey?
11      A.  My mother.
12      Q.  Was she outside?
13      A.  Yes.
14      Q.  What happened next?
15      A.  They wanted to talk to my brother.
16      Q.  What happened next?
17      A.  Joey went inside the house and got my brother, and
18  my brother came outside the house.
19      Q.  And where was he standing in relationship to --
20      A.  Right at the back steps.
21      Q.  And did he have a conversation with the officers?
22      A.  Yes.
23      Q.  And were you participating in that conversation?
24      A.  Yes, I was.
25      Q.  There were four of you now; your brother, yourself
```

Page 57

```
 1  and the two officers?
 2      A.  Yes.  And I believe at that time another officer
 3  could have been on his way over.  I'm not sure.  I don't
 4  remember.
 5      Q.  At this time when you were standing in the back
 6  with your brother, had you made any call other than the
 7  first one?
 8      A.  What kind of call?
 9      Q.  To the police.
10      A.  Oh, I don't know.  I made a lot of calls that
11  night.  I can't tell you what time I made them.
12      Q.  Okay.
13      A.  I can tell you that I was standing next to my
14  brother and my son is still jumping around out of control.
15  The whole reason why I called the officers is because I have
16  an intoxicated teenager that, first of all, shouldn't even
17  be drinking.  He's not old enough.  I don't know even how he
18  got the alcohol.  They weren't concerned about any of that.
19  They were concerned about me and my brother, and my son was
20  jumping around, that's the reason why I called the officers
21  there.
22      Q.  They were concerned about you and your brother?
23      A.  They were concerned about me and my brother.  They
24  did not get control of my son.  They did not -- nobody was
25  there talking to him.  Nobody was doing anything with him.
```

Page 58

1   He was jumping around like a raped ape, and me and my
2   brother were over here getting grilled by the police.
3       Q.  Like a what?
4       A.  A raped ape.  Jumping around like an idiot, like a
5   monkey.
6       Q.  So they talked to your brother.  What did you hear
7   in the conversation?
8       A.  That my son came home drunk and my brother
9   gestured that if you want to kill yourself, go ahead.
10      Q.  And did you participate in this conversation at
11  all?
12      A.  Yes.
13      Q.  And what did you say in this conversation?
14      A.  The officer asked me if I condone the way my
15  brother talked to my son, and I said yes because I
16  understand what my brother is doing.  You don't understand.
17  You're taking what he's saying out of context.
18      Q.  But you did learn at that point that your brother
19  had the rifle in his hand at one point?
20      A.  No.  My brother did not have the rifle in his
21  hand.
22      Q.  Did you ever hear your brother ever say that he
23  had the rifle in his hand, "his hand" being Walter's?
24      A.  I never heard my brother say that, no.
25      Q.  So the first you learned about it was when I read

Page 59

1   this from the statement of your brother?
2       MR. SPINELLA:  Oh, come on.
3       THE WITNESS:  Can you read to me the part of the
4   statement where it says my brother was holding the
5   rifle in his hand?
6       Q.  (By Mr. Berk)  Sure.  "I have a .22 rifle in my
7   garage which I keep by my work bench unloaded.  I took the
8   rifle off the bench and held it in front of Richard.  I
9   said, Here, is this what you want?"
10      A.  Okay.  That's the first time I ever knew my
11  brother had a gun in his hand.
12      Q.  It is from this statement --
13      A.  Correct.
14      Q.  -- which you had not seen before today.
15      A.  Correct.
16      Q.  All right.  What happened next?
17      A.  The police officers handcuffed my brother.
18      Q.  Did you say anything?
19      A.  Why are you arresting him.
20      Q.  And did you get any response?
21      A.  He's just being brought up to the car, that's what
22  I was told.
23      Q.  Okay.
24      A.  He's not under arrest.
25      Q.  And was he?

Page 60

1       A.  But yet he's handcuffed.
2       Q.  And did they take him up to the police car?
3       A.  Yes, they did.  They stood him on the street for a
4   half an hour while all of the neighbors were standing out
5   there watching.
6       Q.  Did you go up with them to the end of the street?
7       A.  No, I didn't.
8       Q.  When the officers were at the end of the street
9   with Walter, where were you?
10      A.  Asking for a sergeant and a lieutenant to come
11  down to the house and take care of the officers that
12  couldn't answer any questions.
13      Q.  So you made a phone call?
14      A.  Yeah, and I asked for a sergeant or a lieutenant,
15  and I got both.
16      Q.  On the phone?
17      A.  Oh, no, at the house.
18      Q.  Did you speak to the sergeant or the lieutenant
19  before they actually physically came to the house?
20      A.  No.
21      Q.  So the first time that you actually talked to the
22  lieutenant or the sergeant was when they came physically to
23  your house, your mother's?
24      A.  Yes.
25      Q.  I said your house.  I misspoke.  I mean your

Page 61

1   mother's house.
2       A.  Yes, yes.
3       Q.  Did your son have a cell phone?  I'm sorry.  Your
4   son Ricky, did he have a cell phone?
5       A.  Yes.
6       Q.  Do you know if he threw it away that night?
7       A.  I don't know.
8       Q.  All right.  Did you ever ask Joey or direct Joey
9   to retrieve anything that Ricky had thrown?
10      A.  Yeah.  I told Joey to go find out what his brother
11  is throwing over there because the cops evidently didn't
12  care because Ricky was throwing it around, and I'm seeing
13  it.  And they're paying attention to me and my brother
14  instead of the one whose the reason why they're there.
15      Q.  And what did Joey retrieve?
16      A.  A bottle of vodka.
17      Q.  And what did he do with the bottle of vodka?
18      A.  He put it on my car.
19      Q.  Was that your car?
20      A.  It's registered to my boyfriend.
21      Q.  I'm sorry.  When I say "your" --
22      A.  The car that I drove there, yes.
23      Q.  All right.  What was your son arrested at one
24  point during the evening?
25      A.  Ricky?

Page 62

1   Q.  Yes.
2   A.  He was arrested after my brother was arrested.
3   Q.  Was he arrested at one point in the evening?
4   A.  I don't understand the question.
5   Q.  Your son Ricky was arrested --
6       MR. SPINELLA:  She just said that.
7   Q.  (By Mr. Berk) -- arising from the incident?
8   A.  From this incident?
9   Q.  Yes.
10  A.  Yes, he was.
11  Q.  Thank you.  So at this point when Walter is
12  handcuffed and taken to the end of the driveway, there are
13  two police officers at the house?
14  A.  Yes.
15  Q.  And you said that you made a call to the police
16  asking for a sergeant or lieutenant to come?
17  A.  Yeah.  Even the chief of police I could have asked
18  for.
19  Q.  And the reason for that was?
20  A.  Because I wanted somebody who was on the force
21  longer than a couple years that had some experience and
22  would handle the situation other than the way it was being
23  handled.
24  Q.  Okay.
25  A.  Because they were out of control, not me.

Page 63

1   Q.  Well, you talked about their demeanor.  Is that
2   correct?
3   A.  Uh-huh.
4   Q.  And they talked to your brother and you heard what
5   was said in that conversation.  Is that correct?
6   A.  Yeah.
7   Q.  And it included about the rifle?
8   A.  Uh-huh.
9   Q.  Is that correct?
10  A.  Uh-huh.
11  Q.  And included that your son was suicidal?
12  A.  Okay.
13  Q.  Is that correct?
14  A.  Uh-huh.
15  Q.  You heard that?
16  A.  Yeah.
17  Q.  And the source of a possible rifle was your
18  brother, they heard that, and made an arrest?
19  A.  So why was my kid still jumping around?
20  Q.  I'm going to get there in just a second.  So they
21  made that arrest.
22  A.  Okay.
23  Q.  Is that correct?
24  A.  No, because I asked them what he was being
25  arrested for, and they didn't have any charges yet.  They

Page 64

1   couldn't tell me what he was being arrested for.
2   Q.  They arrested your brother.
3   A.  They put handcuffs on him.
4   Q.  On your brother --
5   A.  Yes.
6   Q.  -- after that conversation?
7   A.  Yes.
8   Q.  All right.  And there were two officers there?
9   A.  Two or three, at that time.  I'm not sure.  There
10  was definitely two.
11  Q.  And they went down to the back to the end of
12  driveway?
13  A.  No.  One of the officers went to the end of the
14  driveway, and I believe there were still two standing there.
15  Q.  And did your brother say anything to the officers
16  when he was arrested?
17  A.  What am I being arrested for.
18  Q.  Did he raise his voice at all?
19  A.  Not at all.  My brother never raised his voice,
20  never.
21  Q.  I didn't suggest he did.  I'm just asking the
22  question.
23  A.  Nope.  He never raised his voice.
24  Q.  Did you raise your voice?
25  A.  Possibly.

Page 65

1   Q.  Do you consider yourself hot tempered?
2   A.  When I get upset, yeah.
3   Q.  When you get upset, do you lose it?
4   A.  Not all of the time.
5       MR. SPINELLA:  Objection.  You can answer.
6   Q.  (By Mr. Berk)  All right.  So Walter is arrested,
7   and your son is still running around the backyard?
8   A.  Yep.
9   Q.  What happened next?  You asked for a sergeant and
10  a lieutenant?
11  A.  Yep.
12  Q.  What happened next?
13  A.  Well, at that time, that is when the officers went
14  over and were talking to my son and searched him and pulled
15  out a marijuana bowl and a bag of marijuana that they put in
16  their top right pocket.  I don't remember what officer did
17  that, but he did.  He put it in his top right pocket.
18  Q.  And this was the officer that had already been
19  there?
20  A.  Yes.  And mind you, my son was never charged for
21  possession of that, so where did it go?
22  Q.  I don't know.  You wanted your son arrested?
23  A.  No.  I wanted my son to be brought to the
24  hospital.
25  Q.  So when you had called asking for a sergeant or a

Page 66

1  lieutenant, do you recall if you were angry on the phone?
2     A.  Of course I was angry.  They were arresting my
3  brother for no reason.
4     Q.  Did you use profanity against the police?
5     A.  I very well could have.
6     Q.  Was your mother a witness to this conversation
7  with Walter before he was arrested?
8     A.  Oh, yeah.  She was a witness to everything.
9     Q.  By the way, when the officers came back and went
10  upstairs to get the other guns, how long were they in the
11  house to get those other guns?
12     A.  About 30 seconds.
13     Q.  So they went in and they went out?
14     A.  Oh, yeah.  They ran because we were crazy.
15     Q.  Who was crazy?  You were crazy?
16     A.  Yeah.  That's what they said.
17     Q.  So they were in and out.  They left with the guns.
18  Was that the only time they were in your mother's house?
19     A.  That's the only time they were in that house.
20     Q.  They didn't ransack anything or push anything
21  over, they just got the guns that Walter gave them?
22     A.  They ran after me when I went in the house after
23  being choked trying to get a glass of water and tried to
24  push the door down.
25     Q.  Ma'am, you just told me they came in and out in 30

Page 67

1  seconds.  They got in and out as fast as they could.
2     A.  You're asking me a question, and I'm answering it.
3     Q.  I did.  And my question is, did they ransack the
4  house in this 30 second period?
5     A.  No.
6     Q.  So they went in and they went out?
7     A.  Uh-huh.
8     Q.  Yes?
9     A.  Yes.
10     Q.  Do you remember the names of the either of the
11  officers?
12     A.  I have no clue.
13     Q.  All right.  So a sergeant and a lieutenant did
14  come?
15     A.  Yes.
16     Q.  And did you speak with them at any point?
17     A.  Yes.
18     Q.  Where did you speak with them?
19     A.  In the middle of the driveway.
20     Q.  So when you say "middle," about halfway from the
21  street, halfway to the back of the house?
22     A.  Yes.
23     Q.  How did you know that they had arrived?
24     A.  Because I saw them walking down the driveway.
25     Q.  Could you tell from a distance that they were not

Page 68

1  patrol officers?
2     A.  Who else would be coming to my mother's house a
3  that time?
4     Q.  Ma'am, I don't know.  If that's the answer --
5     A.  I knew that there were officers coming.
6     Q.  If that's the answer to the question, that's the
7  answer to the question.
8     A.  I mean, I knew they were officers coming.
9     Q.  All right.  And did you walk down to where they
10  were?
11     A.  I walked down meeting them halfway.
12     Q.  And where was your son when --
13     A.  Right next to me.
14     Q.  Let me just finish the question.
15     A.  Okay.
16     Q.  Where was your son Richard at the time that you
17  started walking down to them?
18     A.  Right next to me.
19     Q.  So he was more towards the backyard?
20     A.  No.  He was standing right next to me walking with
21  me towards the lieutenant and the sergeant.
22     Q.  When did Richard or Ricky leave where the officers
23  were in the backyard?
24     A.  When the sergeant and the lieutenant came.
25     Q.  So they were with Ricky in the backyard?

Page 69

1     A.  Uh-huh.
2     Q.  And then they took some things out of his pocket?
3     A.  Uh-huh.
4     Q.  And then when you saw the sergeant and the
5  lieutenant, you started walking down and your son joined
6  you?
7     A.  Yes.
8     Q.  Why did he join you?  Did you ask him to?
9     A.  No.
10     Q.  Was he --
11     A.  Because he wanted to know why his uncle was being
12  arrested, too.
13     Q.  Is that what he said?
14     A.  Yes.
15     Q.  Did he use any profanity?
16     A.  Probably.
17     Q.  Did he use any profanity to you?
18     A.  Never.
19     Q.  Did he use any profanity to his uncle for offering
20  him a rifle?
21     A.  Never.
22     Q.  Did he engage in any statement or any profanity
23  like, You told me to fucking kill myself?
24     A.  I don't know.  I wasn't standing there when he was
25  talking to the police.

18 (Pages 66 to 69)

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 70

1    Q.  When he was walking down with you, did he say that
2  to you?
3    A.  No.
4    Q.  Did you overhear that at any time?
5    A.  No.
6    Q.  So that would be totally incorrect about what he
7  said about his uncle while you were within earshot?
8    A.  I don't understand what you're saying.
9    Q.  Sure.  You did not overhear him, hear him by
10  earshot, that his uncle told him to go ahead and shoot
11  himself with a rifle?
12    A.  Did I hear Ricky say that?
13    Q.  Yeah.
14    A.  Yes, I did.
15    Q.  Was that in the first phone call?
16    A.  It wasn't in a phone call at all.
17    Q.  Where was it?
18    A.  It was in the backyard when the officers were in
19  my brother's face and I'm trying to find out what's going on
20  with Ricky over there, and I was trying to hear everything
21  all at once.
22    Q.  And when you overheard Ricky saying, You offered
23  me a gun, you told me to shoot myself, was that before or
24  after Walter was arrested?
25    A.  That was while my brother was in handcuffs being

Page 71

1  escorted up to the front of the street.
2    Q.  At the same time?
3    A.  No.  My brother was already in handcuffs walking
4  to the street.
5    Q.  All right.  At the time that he was in handcuffs
6  walking up, you overheard your son say that he had offered
7  me a gun and told me to go ahead.  You heard him say that?
8    A.  Yep.
9    Q.  Now are you and your son screaming at each other
10  at any point before the sergeant and lieutenant come?
11    A.  Probably.
12    Q.  What do you recall screaming at each other?
13    A.  I don't recall.
14    Q.  Do you know how your son got to and from the house
15  that night if he was out with alcohol?
16    A.  He was with his friends.
17    Q.  So he didn't drive himself?
18    A.  No.  He doesn't have a license.
19    Q.  And why doesn't have he have a license?
20    A.  Because it was suspended.
21    Q.  And why was it suspended?
22    A.  Because he was driving without a license.
23    Q.  Got you.  So you go up to these people.  Was it
24  two sergeants, a sergeant and a lieutenant?
25    A.  It was a sergeant and a lieutenant.

Page 72

1    Q.  And how did you know that?
2    A.  Because they told me.
3    Q.  Did they show you any identification?
4    A.  No.
5    Q.  Did they have any identification on their
6  clothing?
7    A.  They were wearing uniforms.
8    Q.  Both of them were wearing a uniform?
9    A.  Yes.
10    Q.  All right.  And can you describe those individuals
11  to me?
12    A.  Yeah.  One was older with dark hair, and the other
13  one was younger, bald head, taller than me.
14    Q.  And were you aware of either of their names at
15  that point?
16    A.  No.
17    Q.  Did they have any tags on at that point that you
18  saw?
19    A.  They could have.  I didn't -- I don't know.
20    Q.  So you were in the middle of the driveway.  What
21  happened there?
22    A.  I asked them why my brother was under arrest.
23    Q.  And what, if anything, did they say to you?
24    A.  He said that they were bringing him downtown.  I
25  said, What are his charges?  And he said, We'll figure that

Page 73

1  out later.
2    Q.  Which one said that?
3    A.  The sergeant.
4    Q.  The one who is taller than you?
5    A.  Yes.
6    Q.  And what is your son Ricky doing at this point?
7    A.  Telling them to let his uncle go because he didn't
8  do anything wrong.
9    Q.  Was your son Ricky under arrest at this time?
10    A.  Yeah.  At that time, the sergeant told the other
11  two officers to handcuff him and put him in the ambulance or
12  cruiser or whatever -- cruiser.
13    Q.  So up to that point, your son had not been
14  arrested --
15    A.  No.
16    Q.  -- until after you had the conversation with the
17  two?
18    A.  Up to that point, my son -- the only time he
19  gained control was when he stood next to me because nobody
20  else got control of the situation.
21    Q.  All right.  When your son was with you during
22  this conversation was he -- did he appear to you to be
23  intoxicated?
24    A.  Of course.
25    Q.  Was he agitated?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 74

1    A.  Very.
2    Q.  Was he loud?
3    A.  Yes.
4    Q.  Was he non-civil?
5    A.  Yeah.
6    Q.  He's not standing there just making small talk?
7    A.  Right.
8    Q.  He's loud.  He's abusive to you and to the
9  officers?
10   A.  Not to me.
11   Q.  Was he abusive to the officers?
12   A.  He didn't touch them.
13   Q.  Did he tell the police officers at any time to
14  fuck off?
15   A.  Yep.
16   Q.  Did he tell them many times to fuck off?
17   A.  Yep.
18   Q.  And did he yell this at the officers?
19   A.  Yes.
20   Q.  And after he was arrested, did he continue to yell
21  at the officers?
22   A.  I don't know.  I wasn't --
23   Q.  Did you hear it?
24   A.  I wasn't in the car with him.
25   Q.  I said as they were walking down the driveway,

Page 75

1  could you hear him continuing to use profanity?
2    A.  It's possible.
3    Q.  Do you recall if he did or he didn't?
4    A.  It's possible.
5    Q.  Did you hear him say to the officers, I'm going to
6  find out where you live and come fuck you and your family
7  up?
8    A.  No, I did not.
9    Q.  All right.  Where physically was your son
10  arrested?
11   A.  In the middle of the driveway.
12   Q.  You're talking to the officers in the middle of
13  driveway.  As they're looking at you, are they looking
14  towards your backyard or are they looking to the street?
15   A.  The officers?
16   Q.  Yes.
17   A.  They're looking towards the backyard.
18   Q.  And you, as you're talking to them, are looking
19  towards the street?
20   A.  Yes.
21   Q.  Your son, was he to your immediate right or to
22  your immediate left?
23   A.  I believe he was on my right.
24   Q.  And then at some point, which officer said that
25  you were under arrest to your son?

Page 76

1    A.  The sergeant told the officers to put him under
2  arrest and bring him up front.
3    Q.  Were these either of the officers who had arrested
4  your brother?
5    A.  I don't know.  There was like five of them there.
6  I don't know.
7    Q.  All right.  And did your son voluntarily submit to
8  the officers?
9    A.  Of course not.
10   Q.  I'm sorry?
11   A.  Of course not.
12   Q.  What did he do?
13   A.  They handcuffed him and he was jumping around.
14   Q.  Did they handcuff him in this group where you were
15  at with the lieutenant and the sergeant and you with your
16  son to your right?
17   A.  Yes.
18   Q.  All right.  So they came over to that area and
19  they handcuffed him?
20   A.  Yes.  And I believe that he put his hands out and
21  he said, If you're going to arrest my uncle, you're going to
22  have to arrest me, too.
23   Q.  But that's the exact area where he was?
24   A.  Where my son was, yes.
25   Q.  He didn't try to run away from them?

Page 77

1    A.  No.
2    Q.  So he is put in cuffs.  What's the next thing that
3  happened with him?  Did he continue with profanity and
4  yelling?
5    A.  I don't know.  They brought him to the front.
6    Q.  Again, when you're saying "the front" --
7    A.  Down to the road.
8    Q.  And are you still in that middle area?
9    A.  Oh, no.
10   Q.  Where are you now?
11   A.  Now I'm flipping my cell phone and trying to get
12  ahold of my attorney.
13   Q.  And who is your attorney?
14   A.  Peter Soulsby.
15   Q.  What is the last name?
16   A.  Soulsby, S-O-U-L-S-B-Y.
17   Q.  And what is his telephone number?
18   A.  I don't know it offhand.
19   Q.  When you were calling him that night, did you know
20  his telephone number?
21   A.  I have it in my phone, yes.  I just push a number
22  and I --
23   Q.  It's on quick dial --
24   A.  No, it's --
25   Q.  -- speed dial, rather?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 78

1   A.  No.  It's under Peter.
2   Q.  So you don't have to remember it.  You have a
3   phone book for --
4   A.  Right.  I have to go to contacts and --
5   MR. SPINELLA:  It's on the phone directory, Jon,
6   on a cell.
7   Q.  (By Mr. Berk)  I know what you're talking about.
8   You press P or Peter and you scroll down?
9   A.  Yes.  So it's not like number one or a number two
10  no.  I have to look for his name and dial it.
11  Q.  Sure.  It's alphabetical.
12  A.  Right.
13  MR. BERK:  That's all.  I'm very techno savvy
14  here, Paul.
15  Q.  (By Mr. Berk)  And where did you initiate this
16  call to the attorney?
17  A.  In my mother's driveway.
18  Q.  Had you walked back to the rear of the --
19  A.  I started walking back to the rear, yes.
20  Q.  So your back is now to the street and the front of
21  you is towards the back of your --
22  A.  Yes.
23  Q.  -- the back of your mother's yard?
24  A.  Yes.
25  Q.  And the car that you had driven up --

Page 79

1   A.  Uh-huh.
2   Q.  -- had you reached that point yet?
3   A.  Yes.  I was at the back of my car.
4   Q.  And what happened next?
5   A.  I heard an officer running behind me.
6   Q.  What happened next?
7   A.  He grabbed me by my neck and told me I wasn't
8   fucking calling nobody.
9   Q.  And which officer was that?
10  A.  The sergeant.
11  Q.  How far was that from where you had been in the
12  middle of the roadway?
13  A.  I wasn't in the middle of the roadway.
14  Q.  The middle of the driveway.
15  A.  About 50 feet.
16  Q.  So after your son was arrested, you had moved
17  about 50 feet up towards the back of your mother's house?
18  A.  Because the officers didn't stop talking to me.
19  They were walking.  They were pushing me in the backyard.
20  They were walking me in the backyard.
21  Q.  What were you discussing, the three of you?
22  A.  Why my brother was under arrest, and they could
23  not tell me why, what charges he had.
24  Q.  And they continued to walk with you?
25  A.  No.  They were walking at me, making me walk

Page 80

1   backwards.  So I turned around and I said, Well, I'm calling
2   my lawyer because something's not right here.  And when I
3   did that, I started walking to my car, the officer ran
4   behind me -- because my mother's driveway is stone -- and I
5   heard the footprints running, and he grabbed -- and I was
6   going to run, but I said, no, I'm not going to run because I
7   didn't do anything wrong --
8   Q.  Okay.
9   A.  -- and he slammed me up against my car.  He told
10  me I wasn't fucking calling anybody.  He took the side of
11  beef that he has for an arm and he choked me to the point
12  where I couldn't breathe, and he did that for about a
13  minute.  The officers were standing right there watching
14  this happen.
15  Q.  Did you pass out?
16  A.  No, I did not.
17  Q.  Did this incident occur as the sergeant was trying
18  to keep you away from where your son was being arrested?
19  A.  My son was arrested in handcuffs up at the street.
20  It happened in the backyard.  He slammed me against my car.
21  Q.  I understand what you have testified to.
22  A.  Okay.
23  Q.  Now I'm asking you whether something different
24  happened.  Did this incident occur as you were coming down
25  the driveway to where your son was arrested and the officer

Page 81

1   is keeping you away from where your son was arrested?
2   A.  No.
3   Q.  Do you know what the name of the lieutenant or
4   sergeant is that did what you just said?
5   A.  No.
6   Q.  Did you complete the call to your attorney?
7   A.  I left my attorney three or four voicemails that
8   the Plainville sergeant just fucking choked me is what I
9   left on his voicemail, and that's when I got yelling and
10  swearing and abusive because I did nothing wrong and he
11  choked me.
12  Q.  So before that, you hadn't used any swearing or
13  abusive language?
14  A.  No.
15  Q.  That is correct?
16  A.  That is correct.
17  Q.  Now, you said that you left this on your
18  attorney's voicemail.  How do you know that?
19  MR. SPINELLA:  I want to take a break for a
20  minute.
21  MR. BERK:  Sure, Paul.
22
23  (Off record conference)
24
25  MR. SPINELLA:  Back on the record.

Page 82

1    Q.  (By Mr. Berk)  Ma'am, you indicated that you had
2  seen several doctors.  Do you know what the charges were for
3  all of those visits?
4    A.  I don't.
5    MR. SPINELLA:  We'll get those to you.
6    Q.  (By Mr. Spinella)  Were some of them paid by
7  insurance?
8    A.  Yes, on my HUSKY insurance.
9    Q.  And is that something that you pay for, the
10  insurance itself?
11    A.  No, because of my income and the kids and
12  everything.
13    Q.  Do you know if there are any state liens that are
14  applicable to this lawsuit?
15    A.  No.
16    Q.  Have you ever been involved in any other accidents
17  before or after in which you sustained a physical injury?
18    A.  Before this, yes.
19    Q.  And what was that?
20    A.  I was rear-ended in 2002.
21    Q.  And what happened to you?
22    A.  I had some back injury.  I don't remember the
23  degree of -- it was minimal.
24    Q.  Do you remember the doctor that you treated with?
25    A.  It was Dr. Behjet.

Page 83

1    Q.  So he's treated you for a long time?
2    A.  Oh, yeah.
3    Q.  So we could look at his records and that would
4  give us an idea of prior physical injuries?
5    MR. SPINELLA:  He's going to compare it to what
6  she was before.
7    MR. BERK:  Compare?
8    MR. SPINELLA:  He's making a comparison.
9    MR. BERK:  I got you, but you're going to get us
10  all of the records.
11    MR. SPINELLA:  Yeah.
12    MR. BERK:  Paul I, don't anticipate it, but if for
13  any reason it would lead to follow-up questions, just
14  with Behjet, I'm going reserve my right.
15    MR. SPINELLA:  Sure.
16    Q.  (By Mr. Spinella)  Did you make a claim against
17  anyone for that back injury?
18    A.  Yes.
19    Q.  And did you recover monies?
20    A.  Yes.
21    Q.  And who was your attorney?
22    A.  Butler, Norris & Gold.
23    Q.  Do you remember who over at that firm?
24    A.  I believe it was Lee Gold and Peter Soulsby.
25    Q.  And were you given any impairment to your back?

Page 84

1    A.  A disability?
2    Q.  Yes.
3    A.  Yes, but it was minimal.  I don't remember how
4  much of a percentage it was.
5    Q.  Who gave that to you?
6    A.  Dr. Behjet.
7    Q.  Did you hurt your neck in that accident?
8    A.  I had whiplash.
9    Q.  Did he give you a permanency to your neck also?
10    A.  I don't know.
11    Q.  Did you receive treatment for your neck also in
12  that accident, from that accident?
13    A.  I did have physical therapy for my back.
14    Q.  And did you have that for the neck also?
15    A.  All they did was do electrodes on my -- from my
16  shoulders down.
17    Q.  But where you indicated before where your neck was
18  hurting you was from the bottom of your neck going downward
19  between your shoulder blades?
20    A.  Where the injury is now?
21    Q.  Yes.
22    A.  It's from the bottom of my neck going upwards.
23    Q.  Oh, going upwards, not going downwards?
24    A.  No.
25    Q.  Again, we can get his records for accuracy.

Page 85

1    A.  Yep.
2    Q.  And do the injuries you sustained to your back and
3  neck from that 2002 injury affect the way you were getting
4  about on a day-to-day basis?
5    A.  No.
6    Q.  Have you had any other accidents since then?
7    A.  No.
8    Q.  Any slips?  Any falls?
9    A.  No.
10    Q.  Anything like that?
11    A.  No.
12    Q.  Have you ever been arrested before?
13    A.  Yes.
14    Q.  And when were you arrested?
15    A.  2000.
16    Q.  And what were you arrested for?
17    A.  Me and my children's father were living in a house
18  in North Haven and the landlord said that we damaged it, so
19  we were arrested for criminal conspiracy to commit criminal
20  something.
21    Q.  What happened to the charges?
22    A.  I received probation for three years with a
23  three-year suspended sentence.  Probation was terminated
24  like within a year because restitution was paid.
25    Q.  And how much was restitution?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 86

1    A. I don't recall.
2    Q. Was it greater than or less than $1,000?
3    A. It was more than $1,000.
4    Q. Greater or less than $10,000?
5    A. Oh, less than that.
6    Q. Have you been arrested for anything else?
7    A. Yes, issuing a bad check.
8    Q. And when was that?
9    A. Oh, God, I don't know. Over ten years ago.
10   Q. And what was the outcome of that charge?
11   A. Restitution.
12   Q. Were you arrested for anything else?
13   A. No, I don't think so.
14   Q. Breach of the peace? Assault? Anything along
15   those lines?
16   A. I don't believe so.
17   Q. Have you ever had D.C.F. investigate you or your
18   family?
19   A. Yes.
20   Q. And when was that?
21   A. When they were little. I don't know the year.
22   It's when the kids were really little.
23   Q. And why were they investigating?
24   A. Because the kids' grandmother came over and -- the
25   kids' father's mother came over and she was drinking and

Page 87

1    there was no milk in the house for her to give the cat, so
2    she called D.C.F. and said I had no milk in the house.
3    Q. And what happened to the investigation?
4    A. They came to the house and they never came back.
5    Q. Have you been the subject of any other
6    investigations and/or criminal matters?
7    A. Uh-uh.
8    Q. Now, at the time that your son was arrested, were
9    you angry with your son?
10   A. Yeah. I was mad at him for drinking.
11   Q. And did you yell at him?
12   A. Oh, I'm sure I did.
13   Q. Now, did you know what the charges -- your son is
14   being arrested --
15   A. Uh-huh.
16   Q. -- has been arrested. Did you know what the
17   charges were as to your brother before this officer put you
18   up against the car?
19   A. No.
20        MR. SPINELLA: You have asked this about five
21   times. You know, I don't know want to be disrespectful
22   here, but --
23        MR. BERK: Paul, I think you --
24        MR. SPINELLA: We have gone over this stuff over
25   and over again.

Page 88

1        MR. BERK: No. Paul, I disagree.
2    Q. (By Mr. Berk) You have now been put up against
3    the car. Is that correct?
4    A. Yep.
5    Q. You said you were being held for about a minute?
6    A. Yep.
7    Q. My question is, by that time, you were not aware
8    of why your brother had been arrested?
9    A. No.
10   Q. You weren't aware that he was arrested for
11   reckless endangerment by the time you were thrown up against
12   the car?
13   A. No. The officers didn't even know what he was
14   going to be arrested for until they got him to the station
15   and got him to write a statement. That's what the sergeant
16   told me.
17   Q. Now, I think you said -- do you know why the
18   individual let you go when you were up against the car?
19   A. I don't know why he let me go.
20   Q. Did he tell you to calm down?
21   A. No.
22   Q. Did he tell you to not interfere with the officers
23   making the arrest?
24   A. No. He told me I wasn't fucking calling nobody.
25   Q. And you said you called the attorney three times?

Page 89

1    A. Yes.
2    Q. All right. And you said you left a voicemail?
3    A. Yes.
4    Q. And how do you know what the voicemail said on it
5    A. Because I know I told him that I was just choked
6    by the police.
7    Q. Do you have those recordings?
8    A. I don't.
9    Q. Do you know if it's been turned over to your
10   attorney?
11   A. I don't know.
12        MR. BERK: Off the record.
13
14        (Off record conference)
15
16        MR. BERK: Back on the record.
17   Q. (By Mr. Berk) Now, when you were placed up
18   against the car, had you made your first call to the
19   attorney yet?
20   A. No.
21   Q. And when you made the call to the attorney, you
22   used your cell phone?
23   A. Yes.
24   Q. The one we have the number for?
25   A. Yes.

Page 90

1　Q.　So we can check those records?
2　A.　Oh, definitely.
3　Q.　At one point, the officer let you go?
4　A.　Yep.
5　Q.　Do you know why he let you go?
6　A.　I don't know why he let me go.
7　Q.　And after he let you go, how soon after that did
8　you make the phone calls?
9　A.　Quick enough for me to walk around the car, grab
10　the phone from my son, and make the phone calls.
11　Q.　All right. When you say "your son," your son Joey
12　had your phone at this point?
13　A.　Yes, because when the officer was trying to snap
14　it out of my hand, I threw it to him so he could make the
15　phone call.
16　Q.　So Joey saw what went on?
17　A.　Definitely.
18　Q.　And did Joey call the attorney?
19　A.　Yes.
20　Q.　And did he leave a voicemail, to the best of your
21　knowledge?
22　A.　I don't think he did.
23　Q.　And then when you got the phone back, did you
24　leave a voicemail?
25　A.　Yes, I did.

Page 91

1　Q.　And what was the purpose of leaving the voicemail?
2　A.　So he can call me back.
3　Q.　And why did you want him to call you back?
4　A.　Because I did not know why -- if it was legal for
5　the officers to handcuff my brother and bring him to the
6　cruiser without giving him a charge or reading him his
7　rights or choking me and slamming me against the car and
8　letting me go for no apparent reason and telling my mother
9　that they're going to shoot her dog if they don't get into
10　the house because they want to search the house for guns.
11　And I told them they had to get a warrant. I wanted him to
12　answer all of those questions for me.
13　Q.　There was a dog there?
14　A.　In the house, yes.
15　Q.　What kind of dog?
16　A.　German shepherd.
17　Q.　A German shepherd?
18　A.　Yes.
19　Q.　And how old is the shepherd?
20　A.　She's dead now.
21　Q.　She was an elder dog?
22　A.　Very elder. The back legs were out.
23　Q.　I've got two of them. Who made these threats
24　about shooting the dog?
25　A.　The lieutenant.

Page 92

1　Q.　And where was that conversation, before or
2　after --
3　A.　After I was choked.
4　Q.　And did you go up to lieutenant and tell him what
5　had happened?
6　A.　The lieutenant watched it happen.
7　Q.　That's not what I asked you. I said, after he let
8　you go, did you go up to the lieutenant and talk to him
9　about this episode?
10　A.　No.
11　Q.　Other than calling your attorney, did you do
12　anything else to report this episode?
13　A.　I went to my doctor.
14　Q.　Other than that, did you call police
15　headquarters --
16　A.　No.
17　Q.　-- to report it?
18　A.　No. After being treated like that, why would I go
19　there?
20　Q.　So the answer is no, you didn't call police
21　headquarters?
22　A.　No, I didn't. Or I could have when I called to
23　find out what the charges were for my brother. I could have
24　on voice recording saying the officers just choked me.
25　Yeah, I could have said that.

Page 93

1　Q.　But beyond that --
2　A.　No. I didn't call and talk to the chief or
3　nobody.
4　Q.　Did you ask for anyone?
5　A.　No.
6　Q.　So you called the attorney. You don't get him on
7　the phone?
8　A.　Right.
9　Q.　What happened next?
10　A.　The lieutenant threatened to throw my mother off
11　the stairs if we didn't let them in the house to go search
12　the house for guns. The lieutenant threatened to shoot my
13　mother's dog if we let her out. They wanted to get in that
14　house, then they let themselves into my brother's garage.
15　Q.　Well, hold on. Hold on. Did any police officer,
16　other than when they brought your brother back in the early
17　morning hours, go into your mother's house?
18　A.　Not into the house, no. The garage, yes.
19　Q.　I'm just talking about the house right now.
20　A.　Okay.
21　Q.　And so that I'm clear, you made some comments
22　about what they said about the dog, what they were going to
23　do to your mother --
24　A.　Uh-huh.
25　Q.　-- but despite all of those comments, none of the

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 94

1  officers went into the house at that point?
2      A.  No.  They didn't have a warrant.
3      Q.  Ma'am, they didn't go into the house?
4      A.  No.
5      Q.  Now, you mentioned that somebody went into the
6  garage.
7      A.  Yes.
8      Q.  And who went into the garage?
9      A.  Two officers.  I don't know which ones.
10     Q.  Was this after your son and your brother had been
11  arrested?
12     A.  Yes.
13     Q.  And what, if anything, did they find in the
14  garage?
15     A.  They sent my at the time 17-year-old son to go in
16  the garage and get them the gun.
17     Q.  Was there --
18     A.  The same gun that they didn't want in the hands of
19  my then 18 or 19-year-old boy, but they wanted the
20  17-year-old to carry a gun out of the garage and hand it to
21  them.
22     Q.  Your older son, though, was intoxicated --
23     A.  Okay.
24     Q.  -- is that correct?
25     A.  Yep.

Page 95

1      Q.  He was volatile?
2      A.  Uh-huh.
3      Q.  He was loud?
4      A.  Uh-huh.
5      Q.  Is that right?
6      A.  Yep.
7      Q.  And he threatened to kill himself?
8      A.  Okay.
9          MR. SPINELLA:  I object.
10     Q.  (By Mr. Berk)  Your younger son, did he threaten
11  to kill himself?
12     A.  He's 17 and is a minor.
13     Q.  Did he threaten to kill himself?
14     A.  Not at that time.
15     Q.  Right.  Was he intoxicated?
16     A.  No.
17     Q.  Was he loud and abusive?
18     A.  No.
19     Q.  All right.  So he was totally different than your
20  older son?
21     A.  They manipulated a 17-year-old to go into the
22  garage illegally and get a gun, the very gun they didn't
23  want in the hands of the intoxicated 18-year-old.
24     Q.  Got you.  But the 17-year-old wasn't intoxicated
25  nor suicidal?

Page 96

1      A.  It's doesn't matter.  He's not old enough to carry
2  a gun.
3      Q.  And what do you base that on?
4      A.  He's 17.
5      Q.  And there is a law against carrying a gun on your
6  grandmother's property?
7      A.  There's a law in the State of Connecticut that you
8  cannot carry a gun, yes.
9      Q.  Unloaded on your own property?
10     A.  Did my son know it was unloaded?
11     Q.  I thought you told me they weren't loaded.
12     A.  They weren't, but did my son know that?
13     Q.  I see.
14     A.  Did the officers know that?
15     Q.  So no one knew?
16     A.  I knew it wasn't loaded.
17     Q.  So no one besides yourself --
18     A.  And my brother.
19     Q.  -- and Walter knew whether there was ammunition in
20  this gun or not?
21     A.  Right.
22     Q.  Did you finally find out what your brother was
23  arrested for?
24     A.  Yes.
25     Q.  And from whom did you learn that?

Page 97

1      A.  The sergeant.
2      Q.  The sergeant at the scene or the sergeant back at
3  headquarters?
4      A.  The sergeant called me from the police station.
5      Q.  And until you got that telephone call from the
6  sergeant, you didn't know what your brother had been
7  arrested for?
8      A.  No.
9      Q.  And the sergeant called you in response to you
10  leaving a message for him?
11     A.  No.  I demanded to know what my brother was being
12  charged with, and I demanded that we be allowed an attorney
13  in the room with him, and none of that happened.
14     Q.  And do you remember the name of the sergeant you
15  spoke to?
16     A.  I thought it was Sergeant Cyr.
17     Q.  I'm sorry?
18     A.  Sergeant Cyr.
19     Q.  Cyr like C-Y-R?
20     A.  Yeah, but I could be wrong.
21     Q.  And when you were on the phone, you thought it was
22  Sergeant Cyr?
23     A.  I thought that's what he said.
24     Q.  Did you report to this sergeant that you had been
25  choked and assaulted by a police officer at the scene?

Page 98

1  A. No.
2  Q. Why not?
3  A. Because I lost all of my faith in the Plainville
4  Police Department. Why would I tell them that one of their
5  own choked me and they all stood there watching it happen.
6  Q. So the answer is you didn't?
7  A. No.
8  Q. Now, the sergeant that you talked to, what did you
9  talk to him about?
10  A. What my brother's charges were.
11  Q. Anything else?
12  A. Yeah. He told me that they were going to bring my
13  brother home, and that my brother was going to give him the
14  guns for safe keeping.
15  Q. And did you know why they were taking them for
16  safe keeping, because of what?
17  A. I have no idea, because my son was no longer going
18  to be there. There was no reason for them to leave the
19  house.
20  Q. So you didn't know that it was related to the fact
21  that your son had threatened to shoot himself?
22  A. My son was no longer there.
23  Q. I know, but my question to you is, the fact that
24  your brother had voluntarily agreed to get the guns out of
25  the house, you don't know, as you talked to the sergeant,

Page 99

1  whether or not it was related or not related to the issue of
2  him threatening to kill himself?
3  A. No. I have no idea why it was, and he didn't
4  voluntarily do anything. He was forced to do it.
5  Q. Let me try to put the question differently, then.
6  When you were speaking to the sergeant, you were not aware
7  the reason that they were taking the guns was to be extra
8  sure because of the threats that your son Ricky had made to
9  kill himself?
10  A. No. He said it was for safety.
11  Q. Right. Safety.
12  A. My son wasn't there.
13  Q. But whether your son was there or not, it was for
14  safety to make sure nothing happened?
15  A. What could happen? My son wasn't there.
16  Q. When did your son get out of jail?
17  A. A week later. Oh, get out of the jail?
18  Q. My question was going to be, your son was
19  arrested. When was he released?
20  A. A few days later out of New Britain General
21  Hospital.
22  Q. And what was he treated for in the hospital?
23  A. Psychiatric. They evaluated him.
24  Q. And did he return to your brother's house?
25  A. No. He came home to me.

Page 100

1  Q. Has he been to your brother's house since this
2  incident in October of 2008?
3  A. Yes.
4  Q. When did you learn that your brother had a clip on
5  him?
6  A. When he came home and told me that it was in his
7  pocket.
8  Q. So this is after he's been returned by the police
9  officers?
10  A. Yes.
11  MR. SPINELLA: Jon, you have already asked all
12  about the clip already.
13  MR. BERK: Paul, you know what I'm going to say,
14  you may --
15  MR. SPINELLA: All of this is the same material.
16  I don't know if I understand the point of repeating it
17  three times. You asked about this clip a bunch of
18  times already.
19  MR. BERK: Off the record.
20
21  (Off record conference)
22
23  MR. BERK: Back on the record.
24  Q. (By Mr. Berk) Was that the last phone call that
25  you had with the Plainville Police Department when you

Page 101

1  talked to the sergeant?
2  A. That night?
3  Q. Yes.
4  A. Yes.
5  Q. Who is the first person after the incident
6  occurred that you complained to about being assaulted by the
7  police?
8  A. My mother, my brother, my attorney.
9  Q. Okay.
10  A. And my doctor.
11  Q. And when was that?
12  A. My attorney that -- as soon as they let me go,
13  right then and there that I was choked.
14  Q. Did you talk to the attorney that evening?
15  A. No, I did not.
16  Q. Okay.
17  A. I left him a voicemail.
18  MR. SPINELLA: Wait, wait, wait. Anything that
19  you say or said to your attorney is completely
20  privileged, and I'm going to object and instruct you
21  not to answer that. Any response falls within the
22  privilege.
23  MR. BERK: Right.
24  MR. SPINELLA: And I think we're getting
25  dangerously close to that, Jon.

26 (Pages 98 to 101)

Page 102

1     MR. BERK: I'll tell you where we are, Paul.
2     Q. (By Mr. Berk) When did you first talk to your
3  attorney.
4     A. The next morning at 7:30.
5     Q. Do you remember what day of the week that was?
6     A. No. Maybe a Thursday or a Friday. I don't know.
7     Q. You told me why the officer came up upon you
8  because you had asked -- that you were going to call your
9  attorney, and that's when he came up and threw you up
10  against the car.
11     A. Yes.
12     Q. But my question is, other than that, was that the
13  sole reason? You said, I'm going to call my attorney?
14     A. Yeah.
15     Q. It wasn't because you had asked why your brother
16  was arrested. You said you were going to call your attorney
17  and get this all straightened out?
18     A. It was because --
19     Q. I'm going to withdraw the question. Had you used
20  this attorney for any criminal matters before?
21     A. Yes.
22     Q. Any of those involving yourself?
23     A. Uh-huh, yes.
24     Q. And were those anything other than the ones that
25  you have told me about?

Page 103

1     A. In any other matters?
2     Q. Yes.
3     A. Criminal matters?
4     Q. Yes.
5     A. No.
6     Q. So just the two or three that you told me about?
7     A. Yes.
8     Q. Was he the attorney that represented your son or
9  sons for any criminal problems they had?
10     A. He represented my younger son Joey as a juvenile.
11  He did not represent Ricky.
12     Q. When the officer put you up against the car, you
13  told me about the lieutenant being there. Do you recall any
14  other officer observing that?
15     A. Yeah. There were three others standing back there
16  laughing.
17     Q. Standing back there. Back by the --
18     A. By my car.
19     Q. By your car towards the front --
20     A. Facing me.
21     Q. -- where Joey was? That's where Joey was?
22     A. Joey was at the back steps. My mother was at the
23  back steps. There was three officers standing on the
24  passenger's side of my car. I was slammed up against the
25  driver's side of my car, and they were all watching it

Page 104

1  happen with a smile on their face.
2     Q. I just want you -- you have laid it out with your
3  hands, and obviously, you know it much better than I. Your
4  car is parked. The hood of it is furthest up. The trunk
5  area is pointing down?
6     A. Facing down, yes.
7     Q. The officer puts you up against the driver's side
8  of your car?
9     A. Yes.
10     Q. Towards the left, the passenger's side, is how you
11  would go to the back door?
12     A. Kind of, yes.
13     Q. And Joey is standing at where, the front of the
14  car?
15     A. The back door of the house.
16     Q. Which would be, if this is the -- so now we're
17  facing each other, but if this is the back of the car right
18  here, I'm looking at the trunk --
19     A. Okay.
20     Q. -- so it's 6:00, and then 12:00 o'clock is where
21  the front of the car is --
22     A. Yep.
23     Q. -- the back door, where is that? Is that at 3:00,
24  10:00?
25     A. Six, twelve, then three. He's probably at 8:00.

Page 105

1     Q. Eight o'clock?
2     A. Yeah. He's over here.
3     Q. Okay.
4     A. Is that 8:00? Maybe 4:00.
5     Q. Let's just be very careful. Okay? Where I'm at
6  is 6:00. Where you are is 12:00.
7     A. Okay.
8     Q. Is Joey off towards --
9     A. He's at 4:00.
10     Q. Back this way?
11     A. Yes.
12     Q. So he's a little behind you. Okay?
13     A. No. He's -- here's the car. Here's the back.
14  Here's the front.
15     Q. Yes.
16     A. I'm here. The back steps are here.
17     Q. Yes.
18     A. Joey and my mother are here.
19     Q. Got you.
20     A. The officers are right here.
21     Q. So it's like a side entrance to the back of the
22  house?
23     A. Well, the driveway comes down, and then it goes
24  this way.
25     Q. Got you. Now, in respect to the three officers

27 (Pages 102 to 105)

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 106

1  that you were talking about, where were they?
2  **A.  Right at the passenger's side of my car in that**
3  **direct area.**
4  Q.  So, in other words, the officer put you up against
5  the car on the driver's side?
6  **A.  Yes.**
7  Q.  The three officers are directly across from him on
8  the passenger's side?
9  **A.  And the lieutenant is there with them.**
10  Q.  And your son is at the back door just a little bit
11  backwards at the 4:00 position?
12  **A.  Yes, and my mother is with him.**
13  Q.  And your mother is with him.  Do you know if your
14  mother or your -- any of your sons or your brother, other
15  than who was taken by the police department, have they given
16  any written statements to anybody about what happened that
17  evening?
18  **A.  No, they haven't.**
19  Q.  Have you?
20  **A.  No.**
21  Q.  The situation when the officers arrived with your
22  son, and this is following the call to the police department
23  that you made, was it a volatile situation?
24  **A.  No.**
25  Q.  Well, your son was saying he was going to kill

Page 107

1  himself.
2  **A.  Yep.**
3  Q.  He's running around?
4  **A.  No.**
5  Q.  No, he's not running around?
6  **A.  Are you saying before I made the phone call?**
7  Q.  No.  After you made the phone call.
8  **A.  Okay.  After I made the phone call.**
9  Q.  When the officers came.
10  **A.  And when the officers came, okay.**
11  Q.  And your brother gets arrested, at that point was
12  it a volatile situation?
13  **A.  It was a volatile situation as soon as the**
14  **officers got there.  They made it volatile.**
15  Q.  And how did those two officers make it volatile?
16  MR. SPINELLA:  I'm going to object.  You know, all
17  of this is ambiguous.  It's conjecture.  It has nothing
18  to do with her as a fact witness.  In addition, we have
19  gone over this whole circumstance I don't know how many
20  times now.  What do you want her to do to re-describe
21  it.  How?  By conjecturing what's in their mind?  Why
22  they were volatile?  I mean, I just don't get it, Jon.
23  MR. BERK:  Well, I think the answer --
24  MR. SPINELLA:  I mean, if you want to ask her
25  specific factual questions that have not been asked

Page 108

1  before that does not deal with someone else's state of
2  mind, I'm not going to object, but --
3  Q.  (By Mr. Berk)  Let me approach it this way.  The
4  reason that you first called the police is because you
5  thought this was a dangerous situation for your son.
6  MR. SPINELLA:  But she's testified to that --
7  THE WITNESS:  Yes.
8  MR. SPINELLA:  -- a million times already.
9  Q.  (By Mr. Berk)  So when the officers got there and
10  during the time that they were there, they were trying to
11  calm down the situation.  Is that correct?
12  MR. SPINELLA:  Well, you know, that's --
13  Q.  (By Mr. Berk)  From what you observed.
14  MR. SPINELLA:  That's just conjecture.
15  MR. BERK:  From what she observed, Paul.
16  MR. SPINELLA:  She's testified as to what those
17  cops have done and the minutia of it, you know.  Now
18  you want her to conjecture about what's in their minds,
19  about whether they wanted to calm it down or not.
20  Obviously, she felt that they did not act
21  appropriately.  She said it a million times.
22  MR. BERK:  And I'm attempting to determine the
23  facts upon which she based that.
24  MR. SPINELLA:  Well, no.  I think that you think
25  if you ask the questions maybe two dozen times, finally

Page 109

1  you'll get some kind of response from her that you
2  think might be favorable, and, you know, that's not
3  right.  It just isn't.
4  Q.  (By Mr. Berk)  When the officers came, was your
5  son under control or out of control from what you observed?
6  MR. SPINELLA:  Asked and answered.
7  THE WITNESS:  He was out of control.
8  Q.  (By Mr. Berk)  Thank you.
9  **A.  But the officers didn't get it under control.**
10  **They made it worse.**
11  Q.  And did your son continue to be out of control
12  until he was arrested?
13  **A.  On and off, yes.**
14  Q.  At any time during the evening, did you go into
15  the garage yourself?
16  **A.  No.**
17  Q.  At the time that the officers placed you up
18  against the car, were you screaming or talking in a loud
19  voice to the officer?
20  **A.  I couldn't speak at all.  He was choking me.**
21  Q.  Where did he have each of his arms, ma'am?
22  **A.  Where did he have his arms?**
23  Q.  Yes.
24  **A.  He had this arm back here.**
25  Q.  Left arm?

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

Page 110

1    A.  My left arm up to my neck, and his right arm was
2    around my neck squeezing as hard as he could.
3    Q.  And the front of you, was it against the driver's
4    side of the car?
5    A.  Yes.
6    Q.  At the hood area or at the --
7    A.  Driver's side door.
8    Q.  -- driver's side door?  Was the window open or
9    closed.
10   A.  I don't know.
11   Q.  All right.  So the officer had you facing towards
12   the car itself.  He's behind you.
13   A.  Uh-huh.
14   Q.  He takes the left arm and puts it behind your
15   back?
16   A.  Yes.
17   Q.  And the right arm is where, ma'am?
18   A.  Around my neck.
19   Q.  And was he touching you from shoulder to shoulder?
20   A.  No.
21   Q.  When the right arm was in front, how was it?
22   Describe how it was.
23   A.  It was like he was strangling me.
24   Q.  Did he say anything to you at that -- withdrawn.
25   When he let you go, did you fall to the ground at all?

Page 111

1    A.  No.
2    Q.  Did you turn and say anything to him?
3    A.  No.  I ran in the house to get a drink of water.
4    Q.  And how long were you in the house?
5    A.  Thirty seconds.
6    Q.  And then you came back out?
7    A.  To make sure they weren't hurting my mother.
8    Q.  And were they hurting your mother?
9    A.  They threatened to throw her off the stairs.
10   Q.  Did they hurt your mother?
11   A.  Not physically.  Emotionally, yes.
12   Q.  Up until the present time, have you ever treated
13   with a psychologist, psychiatrist, or other mental
14   therapist?
15   A.  No.
16   Q.  Are you planning to do so?
17   A.  Yes.
18   Q.  And do you have an appointment?
19   A.  No.  I just spoke with my doctor this morning.
20   Q.  Do you know the name --
21   A.  No.
22   Q.  Let me just finish my question.  -- of the
23   individual with whom you will seek treatment?
24   A.  No.
25   Q.  Did you ever witness your brother speak to your

Page 112

1    son directly that night?
2    A.  No.
3    Q.  Did you observe your son speak to your brother
4    directly that night?
5    A.  No.
6    Q.  At any time during the evening, did any police
7    officer say to you to calm down that you recall?
8    A.  No.
9    Q.  At any time did you overhear any of the police
10   officers telling your son to calm down?
11   A.  No.
12   Q.  At the time that you called the police station,
13   did you think that your son was potentially dangerous to
14   himself?
15   A.  Yes.
16       MR. SPINELLA:  Oh, Jon, how many times are you
17   going to ask this?
18   Q.  (By Mr. Berk)  Well, do you think he was
19   potentially dangerous to others?
20   A.  He could have been.
21   Q.  Your brother and your mother still reside at the
22   same address?
23   A.  Yes.
24   Q.  After your son was arrested did you visit him in
25   the hospital or in jail?

Page 113

1    A.  He wasn't in jail.  He was at the hospital.
2    Q.  Okay.
3    A.  And, yes, I did go one time.
4    Q.  And when was that in relation to this incident?
5    A.  A few days.
6    Q.  What, if anything, did he tell you about the
7    incident, if you can recall?
8    A.  I don't even think we talked about the incident.
9    We talked about what was going on with him.
10   Q.  And was he admitted for detoxification?
11   A.  No, they released him.
12       MR. BERK:  Paul, I'm told by those who know much
13   more than I that it's somewhat relatively simple to
14   obtain cell phone records.  So I'll drop you a line as
15   to that.
16       MR. SPINELLA:  Fine.
17   Q.  (By Mr. Berk)  Do you know the names of any of the
18   police officers that you interacted with at your mother's
19   house that evening?
20   A.  The only name that stuck in my head was Mullins.
21       MR. BERK:  Paul, subject to that and getting the
22   answers to the interrogatories, which I guess you will
23   get at one point when she's up to date, I have nothing
24   further.  Thank you very much, ma'am.
25       (Deposition concluded at 3:35 p.m.)

Page 114

```
 1           C E R T I F I C A T E
 2
 3      I, Christine E. Borrelli, a Notary Public and Licensed
 4   Court Reporter for the State of Connecticut, do hereby
 5   certify that the deposition of MARYANNE ZADROWSKI, was taken
 6   before me pursuant to the Federal Rules of Civil Procedure
 7   at the Law Offices of Spinella & Associates, One Lewis
 8   Street, Hartford, Connecticut, commencing at 1:10 p.m. on
 9   Monday, April 12, 2010.
10      I further certify that the witness was first sworn by
11   me to tell the truth, the whole truth, and nothing but the
12   truth, and was examined by counsel, and her testimony was
13   stenographically reported by me and subsequently transcribed
14   as herein before appears.
15      I further certify that I am not related to the parties
16   hereto or their counsel, and that I am not in any way
17   interested in the events of said cause.
18      Witness my hand this 16th day of April, 2010.
19
20
21           _____
             Christine E. Borrelli
22           Notary Public
             CT License No. 117
23
24   My Commission Expires:
     June 30, 2011
25
```

c66d5281-d5ba-4035-8da3-c9f0dac3c78f

1                    CERTIFICATE OF DEPONENT

2

3

4        I, MARYANNE ZADROWSKI, have read the foregoing

5    transcript of the testimony given at the deposition on

6    Monday, April 12, 2010, and it is true and accurate to the

7    best of my knowledge and/or with the changes as noted in the

8    attached errata sheet.

9

10

                           _____

11                          MaryAnne Zadrowski

12

13

         Subscribed and sworn to before me this _____

14

15    day of _____, 2010.

16

                           _____

17                          Notary Public

18    My Commission Expires:

19

20

21    CIVIL ACTION NO:  3:09CV-1367 (MRK)

      MARYANNE ZADROWSKI v. TOWN OF PLAINVILLE, ET AL

22    MARYANNE ZADROWSKI (PM) APRIL 12, 2010

23

24    CB

25

c66d5281-d5ba-4035-8da3-c9f0dac3c78f