EXHIBIT H

COPY

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
* * * * * * * * * * * * * *
MARYANNE ZADROWSKI,          )
                             )
            Plaintiff,       )
                             )   Civil Action No.
       -vs-                  )   3:09-CV-1367 (MRK)
                             )
TOWN OF PLAINVILLE, et al.,  )
                             )
            Defendants.      )
* * * * * * * * * * * * * *
```

DEPOSITION OF: BRIAN MULLINS

DATE:       April 20, 2010

TIME:       10:19 a.m.

HELD AT:    GORDON, MUIR and FOLEY, LLP
            Ten Columbus Boulevard
            Hartford, Connecticut 06106

BRANDON SMITH REPORTING & VIDEO, LLC

Reporter: Bethany A. Carrier, LSR #071

44 Capitol Avenue         Six Landmark Square - 4th Floor
Hartford, CT 06106        Stamford, CT 06901
(860) 549-1850            (203) 316-8591
(800) 852-4589            (800) 852-4589

---

Page 2

1                  A P P E A R A N C E S

2   Representing the Plaintiff:

3   SPINELLA & ASSOCIATES
     One Lewis Street
4    Hartford, Connecticut  06103
       By: A. PAUL SPINELLA, ESQ.
5          (860) 728-4900

6   Representing the Defendants:

7   GORDON, MUIR and FOLEY, LLP
8    Ten Columbus Boulevard
     Hartford, Connecticut  06106
9      By: JON BERK, ESQ.
            jberk@gmflaw.com
10         (860) 525-5361

11

12  Also Present:

13  RICHARD MARQUES

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 3

1              S T I P U L A T I O N S

2

3       It is stipulated by counsel for the parties that

4   all objections are reserved until the time of trial,

5   except those objections as are directed to the form of

6   the question.

7

8       It is stipulated and agreed between counsel for

9   the parties that the proof of the authority of the

10  commissioner before whom this deposition is taken is

11  waived.

12

13      It is further stipulated that any defects in the

14  notice are waived.

15

16      It is further stipulated that the deposition may

17  be signed before any notary public.

18

19

20

21

22

23

24

25

---

Page 4

1                        INDEX
     EXAMINATION
2
     Witness Name                                  Page
3
     BRIAN MULLINS
4
        Direct By MR. SPINELLA ..................... 5
5
        Cross By MR. BERK ........................ 103
6
        Re-Direct By MR. SPINELLA ................ 106
7
        Re-Cross By MR. BERK ..................... 107
8
        Re-Direct By MR. SPINELLA ................ 107
9
10                  B. MULLINS EXHIBITS
                      For Identification
11
     Exhibit   Description                    Page No.
12
     Exhibit 1  Use of force policy ........... 38
13
     Exhibit 2  Arrest records for Richard .... 38
14              Bright and Walter Zadrowski
15   Exhibit 3  CD of dispatch calls .......... 38
16   Exhibit 4  Training records of Lt. ....... 38
                Mullins
17
     Exhibit 5  Personnel records of Lt. ...... 38
18              Mullins.
19   Exhibit 6  Documents .................... 48
20   Exhibit 6-A Review Training Report ....... 54
21   Exhibit 6-B Review Training Report ....... 54
22
23   ** Exhibits attached to deposition original transcript.
24
25

Case 3:09-cv-01367-TPS   Document 53-10   Filed 06/10/11   Page 3 of 30
Zadrowski v. Town of Plainville

Page 5

```
 1              (The deposition commenced at 10:19 am)

 2

 3              BRIAN MULLINS, Deponent, of the

 4    Plainville Police Department, 19 Neal Court,

 5    Plainville, Connecticut 06062, being first duly sworn

 6    by Bethany A. Carrier, a Notary Public within and for

 7    the State of Connecticut, was examined, and testified

 8    on his oath as follows:

 9

10              DIRECT EXAMINATION

11

12    BY MR. SPINELLA:

13        Q    Good morning, Officer.  My name is Paul

14    Spinella.  I am the attorney for the plaintiff in this

15    case that brings us here today.

16              Could you state your full name for the

17    record, please.

18        A    Brian Mullins.

19        Q    Okay.  And have you ever had your deposition

20    taken before?

21        A    Yes.

22        Q    How many times?

23        A    I can remember once.

24        Q    And that was in connection with what?

25        A    It was a civil case.  I think it was
```

Page 6

```
 1    approximately 1990.

 2        Q    And did that arise out of your position as a

 3    police officer?

 4        A    Yes.

 5        Q    And tell me a little bit about that case.

 6        A    A woman filed a civil action against the Town

 7    of Plainville claiming an injury to her wrist because

 8    handcuffs were put on her too tightly.

 9        Q    And how was that case disposed of?

10        A    I don't know.

11        Q    Was it settled?

12        A    I believe so.

13        Q    Well, did it go to trial?

14        A    No.

15        Q    And how long ago was that case brought?

16        A    I think it was approximately 1990.

17        Q    Have you ever been sued in any -- at any

18    other time in your capacity as a police officer?

19        A    I may have been named among others.  I can't

20    remember right now of any other cases in particular.

21        Q    Well, you don't remember being sued at any

22    other time?

23        A    I believe there was once when I was a patrol

24    officer, and that probably would have been 19 -- early

25    1980s.
```

Page 7

```
 1        Q    So that was before the other -- the previous

 2    lawsuit --

 3        A    Yes.

 4        Q    -- that you mentioned?

 5        A    Yes.

 6        Q    I should -- before we get any further, just

 7    let me talk about a few of the ground rules.  It's been

 8    a while since you've been deposed before.

 9              We're speaking for a written record.  That

10    means you have to speak clearly.  Can't just shake your

11    head, you have to say "yes" or "no," otherwise we're

12    going to assume that you understand the question that's

13    being asked.  And if you don't, you need to say so.

14              If we need to break at any time, you need to

15    talk to your lawyer, we're -- you're free to do so,

16    just say so and we'll stop the proceedings.

17              And also, we can't talk over each other.  I

18    have a tendency to do that myself.  I ask that you not

19    do it also.  That's because we have a court reporter

20    here and she's taking this down.  She has a difficult

21    job and she needs to take down everybody's testimony

22    and do it in a clear fashion.  The only way she can do

23    that is if we don't talk over one another.

24              Getting back to our previous line of

25    questioning.  You say that there was another lawsuit,
```

Page 8

```
 1    you think, prior to the one in 1990?

 2        A    Yes.

 3        Q    And do you remember anything about that

 4    case?

 5        A    Yes.

 6        Q    Tell me about it.

 7        A    A gentleman took a civil action regarding --

 8    another officer and I had taken a gun from him that was

 9    in his bedroom and the issue was whether the search was

10    legal or not.

11        Q    And so he brought a lawsuit?

12        A    Yes.

13        Q    And what happened with that case?

14        A    I don't know.

15        Q    Well, wasn't it of any interest to you?

16              MR. BERK:  Objection to form of the

17    question.

18    BY MR. SPINELLA:

19        Q    You can answer.

20        A    It was of interest to me, yes, but I didn't

21    inquire into it.

22        Q    Okay.  Any other cases where you've been sued

23    in your capacity as a police officer?

24        A    I think I was named, among several officers,

25    in a matter where he -- a man drowned in a local lake.
```

4/20/2010       Brian Mullins
Case 3:09-cv-01367-TPS    Document 53-10    Filed 06/10/11    Page 4 of 30
Zadrowski v. Town of Plainville
4/20/2010       Brian Mullins

**Page 9**

```
 1   Large pond, small lake.
 2        Q    And when was that suit brought?
 3        A    That was in the 1980s.  I don't know exactly
 4   when.
 5        Q    And what happened with that case?
 6        A    That case was dismissed.
 7        Q    Okay.  Why is that so clear in your mind and
 8   the other two are not?
 9        A    Because I was just --
10             MR. BERK:  Objection to form.  Go
11   ahead.  You can't tell him what you and I discussed.
12   He can't answer it without talking -- invading the
13   attorney-client privilege.
14   BY MR. SPINELLA:
15        Q    So is that true, in order to answer that
16   would require you to disclose what you discussed with
17   your lawyer?
18             MR. BERK:  Paul, let's put it this way:
19   without waiving privilege, we were having a
20   generalized conversation about something, and then it
21   led to a specific recollection and he was surprised at
22   the judge, he did not know why the judge had dismissed
23   the claim, and we had a general discussion about
24   municipal liability, judgments and discretion.  So I
25   was simple explaining to him the law in that area.
```

**Page 10**

```
 1             MR. SPINELLA:  All right.  I get it.
 2   I'll move on.
 3   BY MR. SPINELLA:
 4        Q    Let's talk a little bit about your own
 5   background.  Where were you born and raised?
 6        A    I was born in Southington and was raised the
 7   majority of my life in Bristol, Connecticut.
 8        Q    And before we go any further, just so that we
 9   can -- the record is clear about it, those are the only
10   three lawsuits that you remember?
11        A    Yes.
12        Q    Okay.  Now, I'm sorry, you said Suffield was
13   where you were born and raised?
14        A    Southington.
15        Q    Southington.  And you attended high school
16   there?
17        A    In Bristol.
18        Q    And when did you graduate?
19        A    1972.
20        Q    Okay.  And what did you do after that?
21        A    I went to college and worked part time at a
22   supermarket.
23        Q    Where?  What supermarket?
24        A    Stop & Shop.
25        Q    And where did you go to college?
```

**Page 11**

```
 1        A    At various institutions, but originally it
 2   was Central Connecticut.
 3        Q    And did you graduate from a college?
 4        A    Yes.
 5        Q    Where?
 6        A    I graduated from the University of
 7   Connecticut with a Bachelor's degree, at Wesleyan
 8   University with a Master's degree.
 9        Q    When did you graduate from the University of
10   Connecticut?
11        A    It was in the late 1980s.
12        Q    Okay.  You said you graduated from high
13   school in '72?
14        A    Yes.
15        Q    And so you graduated from college in the late
16   1980s?
17        A    Correct.
18        Q    All right.  Well, let's talk about your
19   employment history during that time.  After you
20   graduated from high school, you worked at Stop & Shop
21   you said?
22        A    For a few years, yes.
23        Q    And then what did you do?
24        A    I worked in a factory for a short period of
25   time.  I worked in an insurance company for -- I think
```

**Page 12**

```
 1   it was two years.
 2        Q    Okay.  What factory did you work at?
 3        A    It was called Stanley Industrial Components.
 4   I don't believe it exists anymore.
 5        Q    And how long did you work there?
 6        A    Six months to a year.
 7        Q    Okay.  And following that, you did what
 8   again?
 9        A    I was employed by an insurance company.
10        Q    What company?
11        A    It was the Covenant Life Insurance Company,
12   which does not exist anymore.
13        Q    And how long did you work there for and what
14   did you do?
15        A    It was between two and three years.  I don't
16   think it was quite three years.  I was -- I started as
17   a clerk, it was a clerical position, and when I left I
18   was the supervisor of the -- it was basically filing
19   area that controlled the incoming and outgoing supplies
20   to agents and employees within the company itself.
21        Q    Okay.  And what year was it that you left
22   there?
23        A    It was when I -- 1978.
24        Q    All right.  Then what did you do?
25        A    I was employed by the Town of Plainville as a
```

Page 13

1   police officer.

2       Q    So you began your employment when exactly?

3   What year?

4       A    1978.

5       Q    And have you been employed continuously by

6   the Plainville Police Department since that date?

7       A    Yes.

8       Q    And was there any time where -- was there any

9   hiatus, any time where you went and did something

10  else?

11      A    No.  I -- I've been employed part time at

12  other -- but I have never stopped, ceased being a

13  police officer.

14      Q    Well, have you worked continuously in a

15  full-time capacity with a police department since

16  1978?

17      A    Yes.

18      Q    And you say that during that time you worked

19  part time at other jobs?

20      A    I have.

21      Q    Tell me about that.  What other jobs?

22      A    I coached a cross country team and a track

23  team at a local high school for several years.  I

24  taught at a community college for several years.

25      Q    What did you teach?

---

Page 14

1       A    Several different subjects.  Criminology,

2   sociology, juvenile delinquency.

3       Q    Okay.  You say a community college.  Could

4   you give me a name, please?

5       A    Northwestern Connecticut Community College.

6       Q    And how many years have you taught at

7   Northwestern?

8       A    I think it was approximately three years.  It

9   may be four.  It was intermittent.

10      Q    Okay.  During what period?

11      A    I would say approximately 2000, I think it

12  was a couple of years there.  And then more recently I

13  think between 2006, 2008.

14      Q    Okay.  Any other part-time jobs?

15      A    No.

16      Q    Now, let's talk about your educational

17  history.  You graduated from UConn in the late 1980s,

18  you said?

19      A    I believe so.

20      Q    All right.  So you went to night school, is

21  that it?

22      A    I went nights and days.

23      Q    Well, how could you do that if you were

24  employed full time as a police officer?  How could you

25  go during the day?

---

Page 15

1       A    I used my time off, and there were times when

2   I was assigned to the night shift.

3       Q    All right.  When did you start at UConn?

4       A    It was in the late '80s.  I have to add

5   something.

6       Q    Sure.

7       A    I did get a degree from the community

8   college, too.

9       Q    What community college?

10      A    Tunxis Community College.

11      Q    What year?

12      A    That would have been mid to late '80s.

13      Q    All right.  So then you went to UConn after

14  that?

15      A    Correct.

16      Q    And how many years did it take you to

17  complete your Bachelor's degree at UConn?

18      A    It was two or three.  That's each semester,

19  plus summers.

20      Q    And what was your major in?  What did you

21  graduate with a degree in?

22      A    The degree is general studies, but I had an

23  individualized major of history and philosophy.  But

24  that's working with the school.

25      Q    All right.  And you have a Master's degree

---

Page 16

1   also?

2       A    Yes.

3       Q    From where?

4       A    Wesleyan University.

5       Q    And what is that in?

6       A    It's in social science.  It's actually called

7   a Master's of liberal studies, concentrations social

8   science.

9       Q    And when did you start there?

10      A    That was, I think, 2003.

11      Q    And when did you graduate?

12      A    I think it was 2006.  It may have been '5.

13  '5 or '6.

14      Q    All right.  Now, did you do that in order to

15  advance your position in the police department?

16      A    In part.

17      Q    Tell me what that means.

18      A    The majority -- the main reason that I did it

19  was out of intellectual curiosity, just personal

20  choice.

21      Q    And how did it advance your position in the

22  department?

23      A    It didn't.

24      Q    Now, let's talk about your career as a police

25  officer.  When you were first employed -- well, let's

1   talk about first of all the hiring process.  Did you
2   undergo any psychological testing?
3        A    I don't remember.  Yes.  Yes, I do.  Yes, I
4   did.
5        Q    Tell me what you remember about that.
6        A    I remember taking a written test and having a
7   brief interview with a psychologist.
8        Q    How long was that interview?
9        A    It wasn't very long.
10       Q    Did you undergo training at the police
11  academy?
12       A    Yes.
13       Q    And that was for how long?
14       A    I believe at the time the course was ten
15  weeks.  Nine or ten weeks.
16       Q    Okay.  Well, what is your rank now, by the
17  way?
18       A    Lieutenant.
19       Q    Now, tell me about -- when you first started
20  you were a patrolman?
21       A    Correct.
22       Q    And how long were a patrolman for?
23       A    Seven or eight years.  Seven years.  Seven
24  years.
25       Q    Then what did you do?

1        A    I was promoted to the rank of corporal.
2        Q    And how long were you a corporal for?
3        A    Two years, approximately.
4        Q    How big a department is the Plainville Police
5   Department now, by the way?
6        A    I believe we have 35 sworn officers and
7   approximately ten or twelve civilian employees.
8        Q    You were a corporal for two years and then
9   what did you do?
10       A    I was promoted to sergeant.
11       Q    And how long were you sergeant?
12       A    Approximately four years.
13       Q    And then what?
14       A    I was promoted to lieutenant.
15       Q    And when was that?  What year?
16       A    It was '92 or '93.  1992 or '93.  One of
17  those two years.
18       Q    And you've been a lieutenant ever since?
19       A    Yes.
20       Q    And what is the next position above
21  lieutenant?
22       A    Captain.  At the time there was no captain's
23  position, but since I was promoted they have made the
24  rank of captain also.
25       Q    How many lieutenants are there on the

1   department?
2        A    One.
3        Q    You're the only lieutenant?
4        A    Yes.
5        Q    So the next highest ranking officer, other
6   than the captain?
7        A    And the police chief.
8        Q    And the police chief.  Right.  Okay.
9             Now, tell me about your duties as a
10  lieutenant.  What are they comprised of?
11       A    I'm the commander of the detective division
12  and I -- you know, as part of those duties, I also
13  oversee the dissemination of records.  I assist patrol
14  officers in -- mainly in investigative matters.  And I
15  conduct internal affairs investigations at the
16  discretion of the chief.
17       Q    Was there a IAD investigation in this case?
18       A    No.
19       Q    Was there a complaint filed, a civilian
20  complaint?
21       A    No.
22       Q    When a lawsuit is filed, is it customary to
23  have an IAD investigation?
24       A    Not always.  That would be up to the police
25  chief.

1        Q    Well, what criteria does he use?
2             MR. BERK:  Objection to form.
3   BY MR. SPINELLA:
4        Q    To the extent that you know.
5        A    I think it would depend on the circumstances.
6        Q    What does that mean?
7        A    If ranking officers in the department felt
8   that there was a potential criminal or violation of the
9   rules and regulations, it wouldn't be automatic.
10       Q    Well, who would make the decision?
11       A    The police chief.
12       Q    Well, isn't it customary for you to have some
13  input?
14            MR. BERK:  Objection to form.
15       A    Yes.
16  BY MR. SPINELLA:
17       Q    Okay.  And so when a lawsuit is filed, from
18  what I understand you're saying, from -- an
19  investigation may or may not occur depending upon what
20  the police chief and the lieutenant decide?
21            MR. BERK:  Objection to form.
22  BY MR. SPINELLA:
23       Q    Correct?
24       A    Any supervisor would have input into it if
25  there was a concern that a crime may have been

Page 21

1  committed or an officer may have violated the rules and
2  regulations.
3      Q    I understand that.  But my question is:  The
4  decision as to whether or not an investigation should
5  take place when a lawsuit is filed arises from decision
6  making made by the police chief in conjunction with
7  you?
8          MR. BERK:  Objection.  Form.
9  BY MR. SPINELLA:
10     Q    Correct?
11     A    Not always.  Sometimes yes, but not always.
12     Q    Well, what does that mean?  Explain yourself.
13     A    The chief can initiate an internal
14  investigation with or without my input.  And I'm not
15  privy to every citizen complaint or lawsuit,
16  necessarily.
17     Q    Well, was there any review process that took
18  place at all in this case as to whether or not an IAD
19  investigation should take place?
20     A    I can only answer for myself.
21     Q    Well, answer.
22     A    I felt that -- I was there and I saw the
23  paperwork that was done and I didn't personally feel
24  that any internal affairs investigation was
25  necessary.

---

Page 22

1      Q    Well, with all due respect, sir, don't you
2  see a conflict of interest in that circumstance?
3      A    That's why I said that the police chief makes
4  the decision.
5      Q    Well, my question was:  Was there any review
6  of this case by anyone as to whether or not an IAD
7  investigation should take place?
8      A    I can only answer for myself.  I didn't think
9  it was necessary and I didn't do it.
10     Q    You know it's a yes or no answer.  Was there
11  a investigation --
12         MR. BERK:  He said he didn't know what
13  was in the minds of other people, Paul.
14         MR. SPINELLA:  No, that's not what I'm
15  asking.  I'm asking as to a factual event.  I'm not
16  asking you to conjecture about anything.
17  BY MR. SPINELLA:
18     Q    To the extent that you know, was there any
19  investigation or decision made as to whether or not an
20  IAD investigation should take place in this case?  Was
21  that -- was that decision made by anyone?
22     A    There was no internal affairs investigation,
23  so the answer is no.
24     Q    Okay.  Don't you see a conflict of interest
25  in that circumstance?

---

Page 23

1          MR. BERK:  Object to form.
2      A    No.
3  BY MR. SPINELLA:
4      Q    Well, you say that you don't see any need to
5  have conducted an IAD investigation, but you're
6  directly implicated in these events, you're being
7  accused of doing something wrong.  Doesn't that create
8  a conflict of interest?
9          MR. BERK:  I'm going to object to the
10  form of the question because then your next series of
11  questions went about people other than you.  You ask
12  about the captain --
13         MR. SPINELLA:  You can conjecture about
14  what my next series is.  I'm asking him --
15         MR. BERK:  I'm talking about your past
16  series.
17         MR. SPINELLA:  I'm asking him directly
18  --
19         MR. BERK:  There is no reason to raise
20  your voice, Paul.  Let's have a civil discourse.
21         MR. SPINELLA:  It is civil.  I'm asking
22  him directly whether or not he sees a conflict of
23  interest.
24         MR. BERK:  For what?  He didn't
25  investigate it.  He told you that.

---

Page 24

1          MR. SPINELLA:  Pardon me?
2          MR. BERK:  He said he didn't
3  investigate.
4          MR. SPINELLA:  I know.  He said he
5  didn't investigation.  He customarily is involved in
6  these investigative decisions.  In this case, he saw
7  nothing wrong.  He's involved in the events himself.
8  My question is very direct:
9  BY MR. SPINELLA:
10     Q    Don't you see a conflict of interest in that
11  circumstance?
12     A    No.
13     Q    Why is that?
14     A    Because I don't make the final decision if an
15  internal investigation is conducted.
16     Q    Well, you're part of the process, correct?
17     A    Yes.  Oftentimes, but not always.
18     Q    All right.  In this particular case you
19  testified just a few minutes ago that you saw no need
20  to conduct an IAD investigation because you saw
21  nothing -- you saw nothing wrong that was done.  My
22  question is:  Don't you see a conflict of interest in
23  making that conclusion when you, yourself, are involved
24  in these events?
25     A    But I don't make the ultimate decision.  And

Page 25

```
 1   so there's no conflict.  I can -- I can -- that's my
 2   professional judgment, whether I'm involved or not, but
 3   I don't make the final decision whether there's an
 4   internal affairs investigation or not.
 5      Q    Well, wasn't there at least an inquiry made
 6   in this case by somebody as to whether or not an IAD
 7   investigation should be made?
 8      A    I can't answer for others.
 9      Q    Well, to the extent that you know.
10      A    There was no internal affairs
11   investigation.
12      Q    And my question is:  Why not?
13           MR. BERK:  He told you he doesn't know,
14   Paul.  He can't speak for other people.
15           MR. SPINELLA:  Well, he's speaking for
16   himself.
17           MR. BERK:  He's now said it three times.
18   You reminded me last time about asking the same
19   question.
20           MR. SPINELLA:  Now, wait a minute.
21   This is a small world.  He just testified that there
22   are two people that are involved in these -- wait a
23   minute.  Let me finish -- there are two people
24   involved in these IAD decisions, himself and the
25   captain.  Well, you're shaking your head no.  Who else
```

Page 26

```
 1   is involved then?
 2           MR. BERK:  Paul, let's go back to your
 3   question.
 4           MR. SPINELLA:  No, no, I have a
 5   question that I'm asking now.
 6   BY MR. SPINELLA:
 7      Q    Who else is involved in these decisions?
 8      A    I have told you that the supervisors, which
 9   would be the rank of sergeant, can sometimes have
10   involvement in it.
11      Q    How would that come about?
12      A    A shift commander, for instance, could bring
13   an issue forward to me, the lieutenant, or the captain
14   or the police chief.
15      Q    Okay.  But who has the ultimate decision
16   making as to whether or not an inquiry should be
17   made?
18      A    The police chief.
19      Q    Okay.  In conjunction with who?
20      A    The captain.
21           MR. BERK:  Objection to form.
22      A    The lieutenant, any sergeant, any corporal,
23   any police officer, any citizen.
24   BY MR. SPINELLA:
25      Q    Did you ever make a formal declaration of any
```

Page 27

```
 1   kind, either written or orally to the captain or to
 2   anybody else stating that an IAD investigation should
 3   not take place in this case?
 4      A    Could you repeat that?
 5           MR. SPINELLA:  Get that read back,
 6   please.
 7
 8           (The testimony was read.)
 9
10      A    No.
11   BY MR. SPINELLA:
12      Q    Were you asked your opinion by the police
13   chief or the captain or any other police officer as to
14   whether or not an IAD investigation should take place
15   in this case?
16      A    No.
17      Q    Was that unusual, due to the fact that a
18   lawsuit was brought?
19           MR. BERK:  Objection to the form of the
20   question.  Paul, you're going to be treading in
21   attorney-client privilege very soon.
22           MR. SPINELLA:  Why?  What does that
23   have to do with attorney-client privilege?
24           MR. BERK:  You said a lawsuit.  I get
25   involved in these cases right away.
```

Page 28

```
 1           MR. SPINELLA:  All right.
 2   BY MR. SPINELLA:
 3      Q    Other than an attorney, other than any --
 4   let's put aside any conversations you had with an
 5   attorney.
 6      A    Could you repeat what you asked me?
 7           MR. SPINELLA:  Can I get it read back,
 8   please.
 9
10           (The testimony was read.)
11
12      A    Not necessarily.
13   BY MR. SPINELLA:
14      Q    What do you mean by that?
15      A    I think it's because I answered you before,
16   it's not an automatic thing to discuss whether or not
17   an internal affairs investigation should be
18   conducted.
19      Q    When a lawsuit is brought?
20      A    Yes.
21      Q    So you're saying that -- well, let me ask you
22   this:  In the usual case where a lawsuit was brought,
23   is there any sort of decision -- is there any sort of
24   review process that takes place as a matter of
25   routine --
```

Page 29

```
 1              MR. BERK:  Objection.  Form.
 2  BY MR. SPINELLA:
 3      Q    -- by the police --
 4              MR. SPINELLA:  I haven't even finished
 5  the question.
 6              MR. BERK:  You stopped talking so I
 7  said something.
 8              MR. SPINELLA:  Pardon me?
 9              MR. BERK:  You said "by the police," so
10  you stopped talking.
11              MR. SPINELLA:  Okay.  I haven't
12  finished my question.
13              MR. BERK:  I'll be more than happy to
14  wait until you finish the question.
15              MR. SPINELLA:  Thank you.
16  BY MR. SPINELLA:
17      Q    Is there any -- let me state the question
18  again.
19          Is there any sort of routine process that
20  takes place, routine decision making -- let's assume a
21  lawsuit is filed subsequent -- against a police officer
22  in the department.  Is there some sort of
23  decision-making process that routinely takes place by
24  the police chief, the captain, yourself, or anyone else
25  in the department as to whether or not an IAD
```

Page 30

```
 1  investigation should take place?
 2              MR. BERK:  Objection.  Form.
 3      A    I'm sorry, you're going to have to repeat
 4  that because you added something at the end there that
 5  I'm not sure I can answer yes or no.
 6              MR. SPINELLA:  Could you read that
 7  back, please?
 8
 9          (The testimony was read.)
10
11      A    Yes.
12  BY MR. SPINELLA:
13      Q    Okay.  Tell me about that.
14      A    The documentation of the case would be
15  reviewed.
16      Q    By who?
17      A    By one or all of the parties that you just
18  mentioned.
19      Q    Could you state that for the record,
20  please?
21      A    The documents associated with the case would
22  be reviewed by one or more of the following people:
23  The police chief, the lieutenant, one or
24  more sergeants, one or more corporals, in some cases a
25  patrol officer or other patrol officers.  There may
```

Page 31

```
 1  even be times that the town manager in his or her
 2  capacity as the director of safety would be involved in
 3  some way, either verbally or review documents.
 4      Q    Okay.  Did any of that take place in this
 5  case?
 6      A    Yes.
 7      Q    Okay.  Now, let's talk about that.  Who
 8  reviewed this case as to that -- as to whether or not
 9  an IAD investigation should take place?
10      A    I reviewed the case.  I believe the police
11  chief and the police captain reviewed the case.  I had
12  discussions with most of the officers involved in the
13  case, and there may have been other discussions or
14  reviews that -- with which I'm not familiar or have
15  knowledge of.
16      Q    Let's talk about this.  These discussions
17  that you had, was that part of an investigation or an
18  inquiry as to whether -- conducted by you as to whether
19  or not an IAD investigation should take place?
20      A    No, that wasn't my reasoning.
21      Q    Well, what was your reasoning?
22      A    To see if the documentation presented was the
23  totality of the circumstances.  If there was not
24  something else that occurred during this incident that
25  was not down in writing the way that could be of
```

Page 32

```
 1  significance.
 2      Q    Okay.  The purpose -- you're an intelligent
 3  man.  The purpose obviously of this line of questioning
 4  and this inquiry is to learn whether an inquiry was
 5  made by one or more people, possibly you, as to whether
 6  or not an IAD investigation should take place.  When I
 7  asked you if you conducted questioning of that type,
 8  you said yes.  Now you're telling me that it had
 9  nothing to do with whether or not an inquiry as to
10  whether or not an IAD investigation should take place,
11  but simply it was a series of questioning done by you
12  to ensure the completeness of your investigation.  Is
13  that what you're saying?
14      A    It was not done in the sense of a formal --
15  whether a formal internal affairs investigation was
16  needed.  That was not my primary motivation.
17      Q    Was it a motivation?
18      A    It's always a possibility.  Always.
19      Q    Okay.  Was it a possibility -- was it part of
20  your motivation in this case?
21      A    I can't say that I was considering it, but if
22  I were to learn something dramatically different than
23  what was documented, there might be a need for one.
24      Q    You said that the captain and the --
25  previously and the police chief made an inquiry as to
```

Page 33

```
 1    whether or not an IAD investigation should take place.
 2    Do you remember that testimony?
 3        A.   No.
 4        Q.   You don't remember that?
 5        A.   It didn't happen.
 6        Q.   What didn't happen?
 7        A.   They didn't inquire into whether an IAD,
 8    internal affairs investigation should take place.
 9        Q.   When I asked you whether or not that sort of
10    inquiry was made in this case, you said yes, and you
11    listed the captain and the police chief as two people,
12    other than yourself.  Now you're saying that neither
13    one of them did that?
14        A.   They looked into the case in that they
15    reviewed the file.  There was no discussion that I was
16    privy to regarding whether an internal affairs
17    investigation would take place.
18        Q.   Okay.  When I asked you, and I asked you a
19    very specific question previously, whether or not that
20    sort of inquiry took place in this case, you
21    specifically stated that the captain and the police
22    chief undertook that inquiry.  Now you're telling me
23    that they did not?
24             MR. BERK:  Objection to form.
25        A.   I don't know what you're looking for.  I've
```

Page 34

```
 1    answer your questions truthfully.
 2             MR. SPINELLA:  You know, Jon, we can do
 3    this the easy way or the hard way.
 4             MR. BERK:  Excuse me?
 5             MR. SPINELLA:  He's got to answer these
 6    questions in a straightforward fashion.
 7             MR. BERK:  And he has.
 8             MR. SPINELLA:  He has not.  He's just
 9    said two contradictory things.
10             MR. BERK:  I'm sorry, I'm not here to
11    testify.  What would you like me to do, Paul, give you
12    the answers?
13             MR. SPINELLA:  I would like you to
14    instruct your witness that he has an obligation to
15    answer these questions in a straightforward manner.
16             MR. BERK:  Then what I'm going to do
17    is -- you've asked him who would conduct an IAD.
18             MR. SPINELLA:  No, I asked him who
19    would.  Who did is what I asked.
20             MR. BERK:  Who would.  He said it would
21    be the chief or the captain.  You then asked him
22    what --
23             MR. SPINELLA:  No, I asked him who did
24    conduct it.
25             MR. BERK:  Paul, you're asking me to
```

Page 35

```
 1    help you.  I'm trying to understand
 2             MR. SPINELLA:  I'm not asking you to
 3    help me.  I'm asking you to instruct --
 4             MR. BERK:  Then don't turn to me --
 5             MR. SPINELLA:  I'm asking you to
 6    instruct your client to answer these questions.
 7             MR. BERK:  Don't you tell me what to do
 8    with my client.  You want an answer to the question.
 9    Where you're getting him confused is what knowledge he
10    has of what they specifically did or didn't do to
11    determine whether an IAD should go forward.  He says
12    he doesn't know what they did substantively.  That's
13    why --
14             MR. SPINELLA:  Jon, we can go back and
15    look at this record.
16             MR. BERK:  That's fine.
17             MR. SPINELLA:  But I asked him very
18    clearly who --
19             MR. BERK:  Next question.
20             MR. SPINELLA:  -- who conducted the
21    investigation in this case or the inquiry, and he
22    said, and it wasn't speculative --
23             MR. BERK:  Next question.
24             MR. SPINELLA:  -- that the captain and
25    the police chief did.
```

Page 36

```
 1             MR. BERK:  Next question.
 2             MR. SPINELLA:  Now he's saying they
 3    didn't do it.
 4             MR. BERK:  Next question.
 5    BY MR. SPINELLA:
 6        Q.   Did the captain and the police chief conduct
 7    an inquiry as to whether or not an IAD investigation
 8    should take place in this case?
 9        A.   Not that I know of.
10        Q.   Did you have discussion with them whatsoever
11    as to whether or not such an inquiry should take
12    place?
13        A.   I did not have any discussion with the police
14    chief or the captain regarding an internal affairs
15    investigation.
16        Q.   Okay.  Did you have a discussion with any
17    member of the police department as to whether or not an
18    IAD should take place?
19        A.   No.
20        Q.   Now, you mentioned previously -- you referred
21    to three lawsuits that you remember that were filed
22    against you in conjunction arising out of your duties
23    as a police officer.  Do you remember that?
24        A.   I don't think they were filed directly
25    against me.
```

Page 37

1    Q   Well, were you a named party at least?

2    A   I was a named party in the three that I can

3  remember that I described.

4    Q   So that's not a lawsuit filed directly

5  against you if you're a named party?

6    A   I guess so.  I don't know.

7    Q   You don't know.  Okay.  Just to make the

8  clear, there are no other lawsuits that you remember?

9    A   No.

10    Q   All right.  Now, you brought along your

11  personnel file in this case?

12    A   Copies of my personnel file, yes.

13    Q   Well, okay.  Copies of your personnel file.

14         MR. BERK:  We brought what you and I

15  discussed yesterday, Paul.  What we have here are

16  the -- one folder is the training and one is the

17  personnel.  I also brought, pursuant to the

18  subpoena -- your request, there is the disk on the

19  calls.  This is the use of force material.  And you've

20  asked for another -- well, you asked for a copy of all

21  of the materials associated with the arrest of Richard

22  Bright and Walter Zadrowski.

23         MR. SPINELLA:  Okay.  I appreciate

24  that.  Why don't we just get all of these marked as 1,

25  2, 3, 4, and 5.

---

Page 38

1        MR. BERK:  That's fine.  This is an

2  original.  We've got to go back with this.  So I'll

3  make copies of whatever you want.

4        THE WITNESS:  It's going to take you a

5  long time.

6        MR. BERK:  My office will do it.

7

8       (B. Mullins Exhibit 1:  Marked for

9         identification.)

10

11      (B. Mullins Exhibit 2:  Marked for

12         identification.)

13

14      (B. Mullins Exhibit 3:  Marked for

15         identification.)

16

17      (B. Mullins Exhibit 4:  Marked for

18         identification.)

19

20      (B. Mullins Exhibit 5:  Marked for

21         identification.)

22

23        MR. BERK:  In compliance with a

24  conference that I and Attorney Spinella had over the

25  last couple days, Number 1 is the -- what do you call

---

Page 39

1  this?  The use of force --

2        THE WITNESS:  -- policy.

3        MR. BERK:  Policy is 1.  Number 2 are

4  the arrest records for Richard Bright and Walter

5  Zadrowski.  Number 3 is a copy of dispatch received

6  calls and outgoing calls, that's on a CD.  Number 4 is

7  the training records for Lieutenant Mullins.  And

8  Number 5 is the personnel records for Lieutenant

9  Mullins, which we have supplied.  And again, it may

10  contain some medical information which we're claiming

11  as -- to the extent that it does, that all those

12  materials should be protected and not included when we

13  make copies of this material.

14        MR. SPINELLA:  Okay.

15  BY MR. SPINELLA:

16    Q   Now, Lieutenant, have you ever had an

17  experience as a police officer where you exercised

18  force in such a way as the object of the force, that is

19  to say the person involved -- and I'm talking about in

20  your capacity as a police officer -- required medical

21  care?

22    A   Yes.

23    Q   More than once?

24    A   Yes.

25    Q   How many times?

---

Page 40

1    A   Two or three.

2    Q   Okay.  Let's talk about the first time.  Do

3  you remember when that occurred?

4    A   Let's see.  I remember an incident in the --

5  this is probably around 1984, 1985, that area.

6    Q   And tell me about that.

7    A   I was on patrol after midnight and approached

8  a car.  And in the car a woman, who was hitting a man

9  repeatedly in the chest, and I asked the woman to stop

10  that; she was hysterical.  She left the car and ran

11  into the roadway, Cooke Street.  And in the course of

12  my trying to drag her out of the roadway for her own

13  safety, she separated her shoulder.

14    Q   Was there a complaint filed in that case?

15    A   No.  Not that I know of.

16    Q   Okay.  Tell me about the second time.

17    A   I remember it was probably the mid to late

18  1980s.  I was sent to a large fight outside a bar room

19  in a parking lot.  And when I arrived, the back-up

20  officer was not there yet, and there was several

21  fights, and one of which I approached on foot, exited

22  my car, approached on foot, and one of the combatants

23  turned and punched me in the face.  And I punched back.

24  And then someone interceded and held him and I believe

25  both of us were treated for injuries in that

Page 41

1    incident.

2        Q    Was there a complaint filed in that case?

3        A    No.

4        Q    And tell me about the third time.

5        A    I don't remember a third time.  There may

6    have been a third time, but --

7        Q    Have you ever had an experience in your

8    capacity as a police officer where you discharged a

9    weapon -- I should say a firearm?

10       A    No.

11       Q    Now, at any time in the course of your career

12   as a police officer, have you been the subject of any

13   internal affairs investigation?

14       A    I can remember once, and I don't -- I guess

15   it was an internal affairs investigation, yes.

16       Q    Tell me about that.  When did it take

17   place?

18       A    This was -- I'm estimating in the early

19   1980s, and it had to do with an emergency medical

20   service at the time.  The Plainville Police Department

21   ran the ambulance service for the town and there was a

22   transportation to the hospital where I think three or

23   four officers were involved in the treatment and

24   transport of a patient.  And a bystander complained

25   that he thought -- he or she, I don't even know who the

Page 42

1    bystander was, complained, as I recall, that we took

2    too long leaving the scene, or something along those

3    lines.  But I do remember the then lieutenant

4    interviewing me as to the circumstances surrounding

5    that medical call.

6        Q    And what was the result of that?

7        A    There was no action taken.

8        Q    Okay.  Any other investigations that you were

9    the object of?

10       A    No.

11       Q    Have you ever been sanctioned by the

12   Plainville Police Department for any reason?

13       A    I received a letter of reprimand in the --

14   once again, I would say the early 1980s over a minor

15   motor vehicle accident where I hit the side of the bay

16   door of a service station.  And the reprimand was of

17   the nature of we will keep this in force for one year,

18   and if you are not involved in any accidents for a

19   year, it will be pulled from your file.

20       Q    Okay.  Because I notice that's not in here.

21       A    I assume it was pulled from my file because I

22   wasn't involved in any other accidents.

23       Q    Okay.  Anything else?

24       A    No.

25       Q    Any other time where you were sanctioned by

Page 43

1    the police department?

2        A    No.

3        Q    Have you ever been the subject of a

4    citizens's complaint, other than what you've described

5    so far?

6        A    I don't remember any.  I would say no, to my

7    knowledge.

8        Q    Okay.  If there was a citizen's complaint,

9    wouldn't it be in your personnel file or is that kept

10   somewhere else?

11       A    No, if there was a formal complaint filed in

12   some kind of investigation, I assume it's in the file.

13   I don't -- you know, I don't work in human resources.

14   They take care of that.

15       Q    I'm sorry, what?

16       A    Human resources controls the personnel files.

17   I don't have anything to do with what's in there.

18       Q    Well, my question is:  To your knowledge,

19   would there be another file that personnel keeps?

20       A    No.  I asked them for the complete personnel

21   file.

22       Q    Okay.  Now, this is your training file, the

23   green file?

24       A    Yes.

25       Q    Have you received any training with respect

Page 44

1    to -- with respect to encounters with -- police

2    encounters with possible suicides or incapacity --

3    people that are otherwise mentally incapacitated?

4        A    Yes.

5        Q    And tell me what training that was and when

6    and where it took place.

7        A    I don't recall.

8        Q    Well, you say yes.  Why do you say yes if you

9    don't recall?

10       A    Because that's part of our mandated training

11   that we receive periodically.

12       Q    Well, do you have any specific memory of any

13   training of that type?

14       A    I'm sure it's in that file.  I can remember

15   lectures.  I can't tell you when or even where.

16       Q    Well, why don't you take a look through the

17   file and show me where it exists.

18            MR. BERK:  Paul, when you use the term

19   "mental incapacity," you want to include intoxication

20   within that definition?

21            MR. SPINELLA:  No, I don't.  Well, let

22   me put it this way.  I want to do it in separate

23   categories.

24            MR. BERK:  All right.  Lieutenant,

25   listen, because --

Page 45

```
1    BY MR. SPINELLA:
2        Q    It seems to me it would be separate
3    categories here.  First of all, people that are -- that
4    threaten suicide, that's number one.  Number two would
5    be people that are psychologically or psychiatrically
6    impaired.  And under that I would include the -- well,
7    mentally disabled in some way.  That's the second
8    category.  And then the third category would be people
9    who are intoxicated, but that's a separate category
10   from the other two.  Do you understand what I'm
11   saying?
12       A    Yes.  I can actually speak to the last one.
13   We just received an update on the difference between
14   intoxication and incapacitation.  And by "difference,"
15   I mean how to handle the person as far as transporting
16   them to a medical facility.
17       Q    Okay.  Why don't you take a look through your
18   file, keeping those three categories in mind.
19           MR. BERK:  So can he pull all the
20   papers at once and then break them down into piles?
21           MR. SPINELLA:  Yes.
22   BY MR. SPINELLA:
23       Q    And by the way, can I add one other category?
24   I hope you haven't gotten too far into this.  Also
25   training with respect to use of force.
```

Page 46

```
1        A    Okay.  I mean, part of that is regular
2    firearms training.  That's discussed as part of our
3    firearms training.  Do you want me to pull all the
4    firearms related things here?
5        Q    Yes.  Okay.
6
7            (Recess: 11:27 am to 11:42 am.)
8
9            MR. BERK:  Paul, Lieutenant Mullins did
10   the best he could.  As he said to you, there is much
11   overlap in general, and some of it very generalized
12   with respect to what they refer to.  But --
13           MR. SPINELLA:  Okay.  That's fine.
14   Thank you.
15   BY MR. SPINELLA:
16       Q    Lieutenant, let's start with training with
17   respect to threatened suicides.  Is there a category in
18   these papers here?
19       A    Well, it's usually listed under -- or would
20   be listed under domestic violence, human relations.  I
21   think I did see one that said something about
22   suicide.
23       Q    Okay.  What I'm asking for, just so that we
24   can be clear here, I want to know if there is any
25   training records in this pile of paper here that refers
```

Page 47

```
1    specifically to training for officers in the field who
2    are asked to deal with attempted suicide situations.
3    Is there anything that's specifically labeled as
4    that?
5        A    No.  But the course outlines probably are
6    somewhere --
7        Q    Well, I'll give you a chance to respond, but
8    let's do this a step at a time.
9        A    That's fine.
10       Q    Is there anything, so the record is clear
11   here, that specifically is identified as a training
12   session?  And by "training session," I mean at least
13   one hour or more?  Well, let -- forget the time period.
14   Let me just say training session that is specifically
15   identified as providing training for officers in the
16   field who are asked to deal with attempted suicides.
17   Is there anything like that?
18       A    I didn't see anything labeled specifically
19   that.
20       Q    So the answer is no, there is not?
21       A    No.
22       Q    Okay.  Can I take a look at that?  Well, when
23   you're through.
24       A    That's the overlap stuff.  These are legal
25   updates, which would deal with statutes --
```

Page 48

```
1        Q    We'll get to it, Lieutenant.  Let's do it a
2    step at a time.
3            MR. BERK:  It's okay.  We're identifying
4    for the record what we're looking at.  It's a pile of
5    about 20 pages in front of you.
6    BY MR. SPINELLA:
7        Q    Now, you mentioned -- let's go to the next
8    step here.  You mentioned that --
9            MR. BERK:  Paul, I'd like to mark that
10   packet as 6.
11           MR. SPINELLA:  As what again?
12           MR. BERK:  6.
13           MR. SPINELLA:  Yes.  Okay.
14
15           (B. Mullins Exhibit 6:  Marked for
16            identification.)
17
18           MR. BERK:  There is a page here that
19   references suicide, Paul.
20   BY MR. SPINELLA:
21       Q    Okay.  Your lawyer just said that there is a
22   page related to suicide.  Do you want to look at this
23   and show me where?
24           MR. BERK:  405.
25           MR. SPINELLA:  All right.  Let me see
```

Page 49

```
 1   it.
 2        A    Yes.  I think --
 3   BY MR. SPINELLA:
 4        Q    Go ahead.
 5        A    This is part of the breakdown on what
 6   police/human relations training would consist of these
 7   elements, and one of which is youth suicide
 8   prevention.
 9        Q    Can I see it, please?
10             MR. BERK:  Paul, it's also in this
11   document, too, if you'd like it.
12   BY MR. SPINELLA:
13        Q    Well, you gave me a piece of paper that --
14   it's certification date of 1982, and on the back of it
15   there's 800 -- 900 -- well, categories from 101 to 902.
16   And one of these categories deals with youth suicide
17   prevention, but there's no breakdown here as to whether
18   or not that was actually taught in this course.  Do you
19   have a specific memory of whether --
20             MR. BERK:  Hold on.  When you asked him
21   the question, the question you said is:  Can you point
22   me to anything on the document?
23             MR. SPINELLA:  I'm asking -- Jon, I
24   haven't even finished my question.
25             MR. BERK:  No, because you went through
```

Page 50

```
 1   this, you said to him:  Is there anything on this
 2   piece of paper --
 3             MR. SPINELLA:  I withdraw the question.
 4   I'm going to ask a new question.
 5             MR. BERK:  No.  You asked him if there
 6   was any --
 7             MR. SPINELLA:  I'm going to withdraw
 8   the question.
 9             MR. BERK:  Excuse me, sir.
10             MR. SPINELLA:  I've withdrawn the
11   question.
12             MR. BERK:  I have a statement to make.
13   They're --
14             MR. SPINELLA:  I withdraw the
15   question.
16             MR. BERK:  Fine.  I have something to
17   state for the record.
18             MR. SPINELLA:  Well, I'm asking a new
19   question.  If you object to the new question, state it
20   for the record.  I withdraw the question.
21             MR. BERK:  Paul, I'm going to put a
22   statement on the record.  You asked him if any of this
23   paperwork used the word "suicide."  You looked through
24   it, he looked through it --
25             MR. SPINELLA:  I withdraw the question.
```

Page 51

```
 1   You're making -- if you want to redirect, you can do
 2   that.
 3             MR. BERK:  No.  Do you want to see
 4   where it also talks about suicide in this document
 5   that you went through?
 6             MR. SPINELLA:  You are not the
 7   witness.
 8             MR. BERK:  Well, we're trying to get
 9   the facts out.
10             MR. SPINELLA:  You can redirect if
11   you'd like.
12             MR. BERK:  It's inaccurate.
13             MR. SPINELLA:  You can redirect.
14             MR. BERK:  As an officer of the court,
15   I'm pointing it out to you.
16             MR. SPINELLA:  Okay.  You can redirect.
17   May I see that, please?
18             MR. BERK:  I thought you were finished
19   with it?
20   BY MR. SPINELLA:
21        Q    Okay.  Now, I'm going to show you this one
22   piece of paper with respect to a certification date of
23   1982.  And your lawyer just testified as to the fact
24   that the back of it relates to a subject area that
25   lists a course category or a section category of youth
```

Page 52

```
 1   suicide prevention.  Do you want to take a look at
 2   that?
 3             MR. BERK:  I object to the form of the
 4   question.
 5             MR. SPINELLA:  Okay.
 6   BY MR. SPINELLA:
 7        Q    Could you show him the document, please?
 8             MR. BERK:  I can.  I object to the form
 9   of the question.
10             MR. SPINELLA:  Okay.  The record is
11   noted.  Could you show him the document?
12        A    Okay.  What did you want me to tell you about
13   this?
14   BY MR. SPINELLA:
15        Q    Why don't you turn around to the back of that
16   page.
17        A    Yes.
18        Q    Now, first of all, what are these
19   categories -- do you have any -- well, let ask you
20   this:  Do you remember this course at all?  I think
21   it's 1982.
22        A    1990.  No, I don't.
23        Q    Okay.  Do you have a specific --
24             MR. BERK:  Can we mark that as 6-A,
25   please?
```

**Page 53**

```
1            MR. SPINELLA:  If you want to have that
2     marked when you redirect, that's fine.  I'm not asking
3     it.
4            MR. BERK:  Paul, you just asked him to
5     testify from a document.
6            MR. SPINELLA:  It's part of a
7     pamphlet.
8            MR. BERK:  Paul, I've been doing this
9     for 35 years.  When you ask about a document, it's for
10    identification.
11           MR. SPINELLA:  It's part of a packet.
12           MR. BERK:  We're not going to know
13    which one, neither are you.
14           MR. SPINELLA:  Let me finish my
15    question, then we can have it marked.
16    BY MR. SPINELLA:
17       Q    So you have no specific memory of that
18    course?  Is the answer no?
19       A    No.
20       Q    Okay.  And do you have a specific memory of
21    whether or not that particular category of youth
22    suicide prevention was taught to you?
23       A    No.
24       Q    Okay.
25           MR. SPINELLA:  Can we get that marked?
```

---

**Page 54**

```
1
2            (B. Mullins Exhibit 6-A:  Marked for
3            identification.)
4
5            MR. SPINELLA:  Let's get this marked,
6     too.
7
8            (B. Mullins Exhibit 6-B:  Marked for
9            identification.)
10
11    BY MR. SPINELLA:
12       Q    Okay.  And I'm going to show you 6-B.  And
13    that is a -- that refers to a -- well, let me refer to
14    6-A again.  You know, when they give a category here of
15    Number 6, domestic violence, do you see that?
16       A    Uh-huh.
17       Q    Does that mean that that's the category that
18    was taught in that course?
19       A    Yes.
20       Q    Okay.
21       A    6 refers to patrol procedures.
22       Q    Okay.  And that does not refer to youth
23    suicide, does it?
24       A    In this particular -- on this particular
25    document, no.
```

---

**Page 55**

```
1            MR. BERK:  Object to the form of the
2     question.  If you're referring to human relations, and
3     on the back it says suicide, Paul.  Roman numeral
4     IV.
5            MR. SPINELLA:  Jon, you know, this is
6     redirect.  You get a chance to redirect.  You don't
7     get a chance to testify.  I have been doing this as
8     long as you have --
9            MR. BERK:  You have inaccurate
10    information.
11           MR. SPINELLA:  But you get a chance to
12    redirect.  If you feel it's inaccurate, you redirect,
13    but you can't testify.
14           MR. BERK:  We're going to be here
15    forever.
16           MR. SPINELLA:  You know that.
17           MR. BERK:  Objection.  Document speaks
18    for itself.
19    BY MR. SPINELLA:
20       Q    Now, is there a domestic violence category on
21    the back of this document?
22           MR. BERK:  Objection.  The document
23    speaks for itself.
24    BY MR. SPINELLA:
25       Q    You can answer.
```

---

**Page 56**

```
1        A    Yes.  Would be a qualified yes.
2        Q    Where is that?  Under what section?
3        A    607, patrol procedures, domestic
4     complaints.
5        Q    Domestic complaints.  Okay.  And Number 405
6     is youth suicide prevention, correct?
7        A    Yes.
8        Q    Is that listed on the front of the
9     document?
10           MR. BERK:  Objection.
11       A    No.
12    BY MR. SPINELLA:
13       Q    Okay.  And with respect to Plaintiffs' B, why
14    don't you take a look at this, sir.  It lists category
15    5.  What does that say, category 5, what is that?
16       A    Criminal investigations.
17       Q    Okay.  And is that listed on the back of the
18    document?
19       A    Yes.
20       Q    And what number is that?
21       A    It's a head of a category.
22       Q    Does it have a number -- it's a head of a
23    category?
24       A    Yes.
25       Q    Okay.  And you see youth suicide
```

4/20/2010

Brian Mullins

Page 57

```
1    prevention?
2        A    Yes.
3        Q    Is that in the same category?
4        A    No.
5        Q    Okay.  And by the way, do you have a specific
6    memory with respect to Plaintiff's 6-B of being taught
7    anything about youth suicide prevention in this
8    particular course?
9        A    May I see it again, please?
10       Q    Sure.
11       A    I don't remember any.
12       Q    Okay.  Now, by the way, did the Plainville
13   Police Department have any special --
14            MR. BERK:  Paul, if you're done with
15   those, can I keep them separate?
16            MR. SPINELLA:  Sure.
17   BY MR. SPINELLA:
18       Q    Did it have any specialized training with
19   respect to dealing with attempted suicides in the
20   field?
21       A    I have received training regarding suicides
22   and suicidal persons, and that would be part of that
23   training.  But you're narrowing it down, so --
24       Q    You know, we spent a lot of time going
25   through these documents.  Can you point that training
```

4/20/2010

Brian Mullins

Page 58

```
1    out to me in these documents?
2        A    Well, many of the documents include human
3    relations.
4        Q    Well, where?  You tell me which ones.
5        A    This one.  This one.
6        Q    Well, this is 6-A -- wait a minute.  Did we
7    go through this already?
8        A    No.
9            MR. BERK:  That's the cover sheet for
10   the entire document exhibit.
11       A    This one.  This one.  As I said, it's just
12   part of our regular in-service training.  It's
13   required.
14            MR. SPINELLA:  Okay.  Let's get all of
15   these marked separately.  We're going to go through
16   each one.
17   BY MR. SPINELLA:
18       Q    Are you saying every single one of these
19   papers --
20       A    Human relations is part of the training in
21   everything I'm handing you.
22       Q    You know, you're handing me stuff where --
23   first of all, that is outlined in yellow.  For example,
24   the last one you just handed me, where does it say
25   human relations on it?
```

Zadrowski v. Town of Plainville

4/20/2010

Brian Mullins

Page 59

```
1        A    In the top section, human -- the yellow are
2    the courses I did not partake of in that.
3        Q    Okay.  Why don't you hold on to them and give
4    me everything at once.
5        A    All right.
6        Q    Okay.  Now, you're saying in these packet of
7    documents that you handed me, that in every course or
8    every reference to human relations there was -- part of
9    that was dedicated to teaching an officer how to deal
10   with attempted suicides in the field?
11       A    I don't know if it's 100 percent of the time,
12   but it's part of that category.
13       Q    Well, do you know -- do you have a specific
14   memory -- you know, you gave me a bunch of documents
15   that refers to human relations, along with a series of
16   other areas of police procedure that apparently were
17   being taught.  Do you have a specific memory as to any
18   of these classes being taught about suicides?
19       A    I can remember lectures on suicides.
20       Q    You can or cannot?
21       A    I can.  And I can remember part of the
22   medical training dealing with suicidal persons.
23       Q    The medical training?
24       A    Yes.  And because -- and I can remember
25   suicidal part of firearms training involved so as --
```

Zadrowski v. Town of Plainville

4/20/2010

Brian Mullins

Page 60

```
1    facing or dealing with suicidal people.  Can I give you
2    specific dates?  I don't think so.
3        Q    So you just have a general memory as to the
4    category human relationship -- human relations being
5    taught something about suicides?
6        A    I can remember some specifics, but I can't
7    place them as far as when.
8        Q    Well, why wouldn't it be a separate category
9    by itself?
10            MR. BERK:  Objection to form.
11   BY MR. SPINELLA:
12       Q    Isn't it important enough?
13            MR. BERK:  Objection to form.
14   BY MR. SPINELLA:
15       Q    Huh?
16            MR. BERK:  Is that a question?
17            MR. SPINELLA:  Yes.
18            MR. BERK:  Paul, can I have you --
19       A    How can I answer that question?
20            MR SPINELLA:  I'm going to be referring
21   to them, Jon.
22   BY MR. SPINELLA:
23       Q    Go ahead.  I'm sorry.  What?
24       A    I don't know how to answer that question.  If
25   you want to ask it again, I'll consider it.
```

Page 61

```
1      Q    You'll consider it?
2      A    Consider what I'm going to answer.
3      Q    Whether you're going to answer?
4           MR. BERK:  No, what he's going to
5    answer.
6      A    What I'm going to answer.
7    BY MR. SPINELLA:
8      Q    You want me to ask the question again, is
9    that what you're saying?
10     A    I believe that's what I'm asking.
11     Q    I'm asking you why it's not a separate
12   category by itself?
13     A    I don't know.
14     Q    Now, what did they teach you about dealing
15   with suicides in the field?
16     A    Suicides or suicidal people?  I mean, there
17   is an investigation that needs to commence if you
18   find --
19     Q    Suicidal people.  People who are attempting
20   suicide.
21     A    You have to approach with caution.  You need
22   to consider your own personal safety.  Oftentimes there
23   is a -- the involvement of alcohol and/or other illegal
24   drugs that can contribute to the person's mental state.
25   That you should try to talk to the person and calm the
```

Page 62

```
1    situation in a confident, nonaggressive manner.
2         I mean, there are a lot of other
3    ramifications, depending on the actions of the person.
4    If the person becomes violent, you have to assert
5    yourself.  You may have to assert yourself in a
6    physical way.
7      Q    Now, is there any written policy in the
8    Plainville Police Department about dealing with
9    attempted suicides in the field?
10     A    No.
11     Q    None?
12     A    No.
13     Q    And is there any written manual of any kind
14   that's distributed to the officers as to how they
15   should conduct themselves?
16     A    A manual specifically on that subject only?
17     Q    Yes.
18     A    No.
19     Q    And is there a special unit in the Plainville
20   Police Department comprised of specially trained
21   officers, either one or more, that are trained
22   specifically to deal with the issue of attempted
23   suicides in the field?
24     A    Some officers receive specialized training in
25   the investigations of suicide.  But in dealing with
```

Page 63

```
1    suicidal people, there is no special unit.
2      Q    Okay.  You say some officers receive special
3    training --
4      A    Yes.
5      Q    -- on this subject.  And by "special
6    training," you mean what?  They're sent out of town
7    somewhere?
8      A    Could be.  Could be.
9      Q    Well, I'm asking you not what could be.  What
10   actually happened?
11     A    Sometimes, yes; sometimes, no.
12     Q    Sometimes, yes; sometimes, no.  What does
13   that mean?
14     A    It means sometimes the training can be held
15   in the town of Plainville, and sometimes it's held
16   outside the town of Plainville.
17     Q    Who are these officers that receive special
18   training?
19     A    I couldn't name them right now.  I don't
20   know.
21     Q    You don't know?  Well, how do you know that
22   they exist?
23     A    Well, I know they exist -- some of them have
24   worked in the division in which I am -- I command.
25     Q    All right.  Well, how big is that division?
```

Page 64

```
1      A    It's five or six.
2      Q    Yet you can't tell me their names?
3      A    I can tell you some names of officers I know
4    have received specialized investigative training.
5      Q    No, I'm talking about special training about
6    dealing with suicidal people in the field.  Who are
7    they?
8           MR. BERK:  That's not the question you
9    asked.
10     A    That's not the question you asked.
11          MR. SPINELLA:  I thought it was.
12          MR. BERK:  Well, you asked
13   specialized --
14          MR. SPINELLA:  I'm asking now.
15          MR. BERK:  Paul --
16          MR. SPINELLA:  I'm asking that question
17   now.
18          MR. BERK:  He told you there was none,
19   and that they got specialized training in the
20   investigation of a suicide.  That's what you've been
21   asking.
22   BY MR. SPINELLA:
23     Q    I'm asking about people, if they exist,
24   within the department who have received specialized
25   training with how to deal with suicidal people in the
```

```
                                            Page 65
1   field?

2              MR. BERK:  Asked and answered.  Go

3   ahead.

4   BY MR. SPINELLA:

5       Q    Do they exist?

6       A    I don't know.

7       Q    You don't know.

8       A    I don't know.

9       Q    So that means that they -- you just don't --

10  what, you just don't have any idea?

11      A    I'm not familiar with every officer's

12  individual training.

13      Q    Okay.  Well, let me ask you this:  Do you

14  know of any officers on the Plainville Police

15  Department who have received specialized training of

16  that type?

17      A    I don't know.

18      Q    That means you don't know of any?

19      A    I don't know of any.

20      Q    Okay.  And in this exhibit, I guess it's

21  Number 1, department --

22             MR. SPINELLA:  Do you want to take

23  this?

24             MR. BERK:  Yes.

25  BY MR. SPINELLA:
```

```
                                            Page 66
1       Q    -- the Plainville Police Department general

2   orders, there is nothing about dealing with suicides,

3   is there?

4              MR. BERK:  Objection to form.

5       A    I don't think it speaks specifically to that,

6   no.

7   BY MR. SPINELLA:

8       Q    Okay.  Well, I looked through that and I

9   couldn't -- number one, and I couldn't find any.  Would

10  I be wrong?

11             MR. BERK:  Paul, you can't testify.

12  Objection to the form of the question.

13  BY MR. SPINELLA:

14      Q    Well, do you want to look through it?

15      A    Yes.

16      Q    There is an index, so that should probably

17  make it easier.

18             MR. BERK:  Let the record reflect that

19  Attorney Spinella has left the room.

20

21             (Recess:  12:14 pm to 12:16 pm.)

22

23  BY MR. SPINELLA:

24      Q    Are you through yet?

25      A    Some of this is missing.
```

```
                                            Page 67
1              MR. BERK:  Whatever.  You'll have to

2   get it from Paul.  What pages?  Paul, he's pointing to

3   General Order 16.

4              THE WITNESS:  I'd like to look at that

5   before I answer it, if you have it.

6   BY MR. SPINELLA:

7       Q    Okay.  Are you through with looking through

8   this?

9       A    Yes.

10      Q    Okay.  Did you find anything that deals

11  specifically with suicides?

12      A    No.

13             MR. BERK:  Would you like me to obtain

14  that for you?

15             MR. SPINELLA:  Yes.  Sure.  Well, I

16  guess it's not important.

17  BY MR. SPINELLA:

18      Q    Now, turning to the issue of the use of

19  force.  Leaving aside the category of firearms.  Is

20  there anything in this exhibit that shows training with

21  respect to the use of force?

22      A    Which exhibit to which you refer?

23      Q    The training documents we've been looking at.

24      A    Some of them deal with the use of force,

25  nonlethal.
```

```
                                            Page 68
1       Q    Okay.  And which ones would they be?  I

2   thought they were separated out?

3       A    Again, part of it is the routine -- I

4   shouldn't say "routine" -- our in-service training.

5   And part of it also is the firearms --

6       Q    I said leaving aside the firearms.

7       A    Part of firearms is also use of force.  We go

8   through the use of force continuum and things of that

9   nature.

10      Q    Let me go through it again.

11      A    We call it firearms training, but that's part

12  of the training.

13      Q    What do you mean by that?

14      A    Part of firearms training often involves

15  discussions in classroom on the use of force, including

16  nonlethal use of force.

17      Q    Okay.  Is there anything that's specifically

18  identified as the use of force without a firearm?

19      A    There may be.  I'd have to look through it

20  again.

21      Q    I thought that's what you've done already?

22      A    I didn't know that was one of the categories,

23  use of force.

24      Q    I thought I was clear about that.  Before I

25  left the room that was identified again as another
```

Page 69

```
1   category, the fourth category.
2       A    Okay.  Well, I mean anything with the use of
3   force is --
4            MR. BERK:  He's got the exhibit.
5       A    Oh, you're talking about the policies?
6   BY MR. SPINELLA:
7       Q    No, I'm talking about your training.
8       A    That's the policies you handed me.  This is
9   the firearms section specifically, and in some of
10  the --
11      Q    I'm not talking about firearms.
12      A    I know.  But --
13      Q    I'm talking about anything that's identified
14  as the use of force, other than by firearms.
15      A    All right.  And I've told you more than once
16  that when I say "firearms," I mean firearms training,
17  and part of that training may include and sometimes
18  includes nonlethal use of force.
19      Q    Let me say it again.  Is there anything
20  that's identified in that training, other than
21  firearms, as specifically being training having to do
22  with the use of force, leaving aside the category of
23  firearms, please?
24           THE WITNESS:  You have that Exhibit 6 I
25  need.  Thank you.
```

Page 70

```
1            MR. BERK:  Let me note the document
2   speaks for itself.  Can I see the copy that was made
3   for you?  Paul, what number was that, 5, on the manual
4   stuff?
5            MR. SPINELLA:  The manual is this
6   one.
7            MR. BERK:  I just want to look at the
8   last page.  Paul, I want to show you something.  For
9   some reason -- and I have to apologize for this, I
10  didn't do the copying -- see what the last one there
11  is?  It's 14.  This goes up to 18.
12           MR. SPINELLA:  So what are you saying?
13           MR. BERK:  Well, when my office made
14  the copy up, as I instructed them to do -- this is the
15  original manual -- it has, for whatever reason, and it
16  does refer to use of force.
17           MR. SPINELLA:  But I'm referring to
18  training right now.
19           MR. BERK:  All right.  Well, I still
20  apologize, to you, Paul, because that's not a complete
21  document.  He had asked for Rule 16.  It is in the
22  original, it's not in this copy.
23           MR. SPINELLA:  I got you.  All right.
24           MR. BERK:  I will correct that.
25           MR. SPINELLA:  You know, maybe we can
```

Page 71

```
1   take a break for 15 minutes, Jon.  I want to get
2   something to drink here.
3            MR. BERK:  Paul, there is a cafeteria
4   on the second floor, which has a wide variety of
5   things.
6            MR. SPINELLA:  I'll be back in 15
7   minutes.
8            MR. BERK:  What is he specifically
9   looking for?  Training?
10           MR. SPINELLA:  Training in use of
11  force.
12
13           (Recess: 12:25 pm to 12:41 pm.)
14
15           MR. BERK:  As I stated earlier, for
16  some reason when Exhibit 1 was copied for Attorney
17  Spinella, everything from General Order Number 13
18  through General Order 18 was not copied.  I have now
19  added that to the packet of 1.  And the only reason I
20  bring it up, and the way I found it was that when
21  Lieutenant Mullins stated that he was not able to
22  review General Order 16.  And Attorney Spinella didn't
23  have any objection to me putting it in the back of the
24  packet, which is there.  And again, I apologize for
25  that oversight.
```

Page 72

```
1   BY MR. SPINELLA:
2       Q    Now, I'd like to refer your attention to
3   October 27th, 2008.  Were you on duty on that day?
4       A    Yes.
5       Q    And do you remember what time you started?
6       A    I know I worked the patrol shift, 4:00 to
7   12:00.  I believe I worked my regular detective slot
8   prior to that.  But if you tell me the day, I can't
9   remember.
10      Q    And what would your duties consist of on that
11  day?
12      A    Are you talking about the 4:00 to 12:00
13  patrol shift?
14      Q    Well, whatever you were doing that day.  What
15  would it consist of?
16      A    Well, during the day my duties would be as
17  the commander of the detective division.  To oversee
18  the investigative function of the police department and
19  all that goes with it.
20      Q    So what time did you start work that day?
21      A    I believe it was 8:00.
22      Q    So you worked two shifts you're saying?
23      A    Yes.
24      Q    And the second shift was what?
25      A    4:00 to 12:00.  4:00 to midnight.
```

Case 3:09-cv-01367-TPS   Document 53-10   Filed 06/10/11   Page 20 of 30

Page 73

```
1      Q    And what did you do on that shift?
2      A    I acted as the shift commander.
3      Q    Okay.  And that's a pretty long day.  I mean,
4  was that customary for you?
5      A    No.
6      Q    And why was it that you worked two shifts on
7  that day then?
8      A    Well, overtime became available on the
9  patrol -- in the patrol division, which I was eligible
10 for, and I chose to take it, to take the shift on
11 overtime.
12     Q    Okay.  Now, when you say that you were in
13 charge of the shift, did you patrol in a cruiser?
14     A    Yes.
15     Q    By yourself?
16     A    Yes.
17     Q    And what sorts of things would you do?
18     A    Well, basically it would -- be my role would
19 be to oversee the operation of that patrol shift in all
20 its facets.
21     Q    Okay.  So were you constantly on the move or
22 were you in the department building?
23     A    Both.  Back and forth.  If I'm needed inside,
24 I stay inside.  And I also patrol on my own and go to
25 where I'm needed.
```

Page 74

```
1      Q    Now, at some point you went to 129 Shuttle
2  Meadow Road?
3      A    Yes.
4      Q    And tell me when you first became aware of
5  the need to go there.
6      A    I spoke on the phone with a woman identifying
7  herself as Maryanne Zadrowski, and she demanded that a
8  supervisor report to the scene.  And simultaneously
9  with that call, I know because I could actually hear
10 Sergeant Marques, who was coming on duty for the
11 midnight shift, speaking to someone on the phone about
12 going to the scene or being required to go to the
13 scene.  And it sounded as if he was speaking to one of
14 the police officers on the scene.
15     Q    And what was he saying?
16     A    That he would be there shortly.
17     Q    Well, you were in the department then when
18 you got the call?
19     A    Yes.
20     Q    Department building?
21     A    Yes.
22     Q    And how did that call come to you?
23     A    The dispatcher told me that the person on the
24 phone wanted to speak to the supervisor.
25     Q    Okay.  So tell me what was -- exactly what
```

Page 75

```
1  was said on that phone call.
2      A    I remember discussing the situation with
3  Maryanne Zadrowski and telling her that the officers
4  there will handle the situation as they deem
5  appropriate.  And that it -- I would determine if it
6  was necessary for me personally to respond to the
7  scene.
8           And she stated that the officers at the scene
9  were -- and I don't remember her exact words, that they
10 were not handling it the way she liked and she demanded
11 that the supervisor respond.
12     Q    How long was the call?
13     A    I would estimate the call at approximately
14 two minutes.
15     Q    Now, was any of that taped?
16     A    Yes.
17     Q    And is that on the disk that was provided to
18 me?
19     A    Yes.
20     Q    And after the call -- you say that Officer
21 Marques was on the line?
22     A    Sergeant Marques was reporting for his
23 midnight shift.  He was the oncoming shift commander.
24     Q    So where was he?
25     A    He was in the adjacent office.
```

Page 76

```
1      Q    And what did he say?
2      A    I didn't hear his exact words.  I remember
3  him speaking on the phone in a manner that led me to
4  believe he was speaking to one of the officers on the
5  scene.
6      Q    So what was it?  A party line?  I don't
7  understand.
8      A    Well, there are several lines into the police
9  department.
10     Q    So he got on the same call that you were
11 on?
12          MR. BERK:  Objection to the form.
13 BY MR. SPINELLA:
14     Q    I'm just trying to understand.  Did he or
15 didn't he?
16     A    No.
17     Q    Was he on that phone call?
18     A    No.
19     Q    All right.  I'm not understanding this.  Was
20 he talking to you directly?
21     A    No.
22          MR. BERK:  Objection to form.  He
23 wasn't talking to him at all.
24          MR. SPINELLA:  You object to the form
25 all you want.  I'm not trying -- I'm just trying to
```

Page 77

1  understand what went on here.
2  BY MR. SPINELLA:
3     Q   Tell me where he -- I still don't understand
4  this.  Who did he talk to?
5     A   I don't know specifically which officer he
6  was speaking to.
7     Q   So he was talking on another phone call --
8  line to another officer?
9     A   He was speaking on another -- on another
10  phone in an adjacent office to where I was.  And yes,
11  he was on another line speaking to someone, and I don't
12  remember his exact words.
13     Q   Well, how did -- what part of the
14  conversation did you hear?  You heard him speaking into
15  the phone?
16     A   I could hear him speaking, yes.
17     Q   So is that what you're talking about?
18     A   Yes.
19     Q   Having -- so you overheard Marques talking on
20  the phone to somebody at the scene?
21     A   I inferred that it was someone at the scene
22  from the content of his conversation.
23     Q   And what was he saying?
24     A   That he realized it was something about a
25  difficult situation and that he would respond

---

Page 78

1  personally.
2     Q   Okay.  So what did you do after the call was
3  over?
4     A   I had a conversation with Sergeant Marques,
5  and he said because it was right around midnight, he
6  said, I'll take care of it and go down there.  You can
7  go home.
8        And then I told him, I don't think I could leave
9  you with this.  It sounds like a -- you know, it's kind
10  of a messy situation down there.  There was talk of --
11  I could hear on the radio of a firearms involved, and I
12  could hear voices in the background when the officers
13  transmitted on the radio, it sounded like they needed
14  assistance from a supervisor.
15        Sergeant Marques confirmed to me that one of
16  the -- he had spoken to one of the officers, and the
17  officer had requested he go to the scene.  So I said,
18  I'm going to go there with you.  And we drove to the
19  scene together.
20     Q   Okay.  Now, when you got there, tell me what
21  you saw.
22     A   Well, first I saw Officer Mike Bisnov
23  standing next to a parked police cruiser in the roadway
24  right outside the residence.  And I could see in the
25  back seat of this cruiser was a man.  And Officer

---

Page 79

1  Bisnov stated he was instructed to stand by the cruiser
2  and watch the person inside the back who was under
3  arrest.
4     Q   And who was that person under arrest?
5     A   Well, I later learned it was -- his first
6  name was Walter, I think his name is Zadrowski also.
7     Q   Okay.  And who told -- can you spell
8  Bisnov?
9     A   B-i-s-n-o-v.
10     Q   And who told him to stand by the car?
11     A   I don't know.
12     Q   Well, who -- who were the officers on the
13  scene when you got there?
14     A   I believe Officer Stephen Chase, Officer
15  Shane Phillips, Officer Brian Cybulski, Officer Greg
16  Arvai.
17     Q   Anybody else?
18     A   I can't remember right now.
19     Q   Who was in charge?
20     A   Well, there really was nobody in charge, but
21  in a situation like that it would generally fall to the
22  senior officer --
23     Q   Who was that?
24     A   -- to give directions, if necessary.
25     Q   Who was that?

---

Page 80

1     A   Officer Chase would be the senior officer out
2  of the ones I mentioned.
3     Q   Do you know what his rank was?
4     A   He's a patrol officer.
5     Q   Okay.  What else did you see?
6     A   Well, I saw a -- I could hear screaming and
7  yelling and I saw a darkened driveway and officer -- or
8  Sergeant Marques and I began to walk down the driveway
9  toward the people that -- where the screams were coming
10  from.
11     Q   And then what happened?
12     A   I saw the officers speaking with a young man
13  that I later identified as Richard Bright, and they
14  were trying to calm him down.  He was screaming, you
15  know, very loud at the officers.  And actually
16  screaming toward the people in the backyard area.  And
17  I could see people in the dark standing toward the
18  backyard also.
19     Q   Okay.  Then what happened?
20     A   At -- the officers didn't appear to be
21  successful in calming Richard down.  And I could hear a
22  female that I later was Maryanne Zadrowski, I could
23  hear her screaming at the officers.
24     Q   Who was she screaming at?
25     A   I don't think she was directing her screams

Page 81

```
1    towards any one officer, it was just the police in
2    general.
3         Q    And what was she saying?
4         A    I mean, it was every profanity you could
5    think of.  And a lot of it had to do with why her
6    brother had been arrested.  And, I mean, things of that
7    nature.
8         Q    Okay.  And then what happened?
9         A    At a point in time, and it was very short
10   period of time, I could hear Richard Bright start to
11   direct what I considered to be threatening remarks, you
12   know, about beating up the officers and harming the
13   officers, doing physical harm to the officers.  And he
14   was saying it in a very graphic and direct way.
15        Q    What was he saying?
16        A    He was saying, I'll kick your ass.  You're
17   not taking me anywhere.  You know, he used the F word
18   repeatedly.
19        Q    Then what happened?
20        A    I heard him direct toward Officer Greg Arvai
21   some threats towards his family.  I'll find out where
22   your family is and things of that nature.  And I don't
23   remember the exact comments, I just remember that as
24   far as I was concerned, it had now changed from general
25   profanities and loud, to direct threats of physical
```

Page 82

```
1    violence.  And at that point, he was placed under
2    arrest.
3         Q    Threats of physical violence against people
4    not on the scene, correct?
5         A    No, directly at the police officers who were
6    speaking.
7         Q    And what were the threats?  Tell me exactly
8    what he said.
9         A    I remember him telling Officer Arvai he was
10   going to kick his ass.  I could remember him making a
11   comment about finding out where his family lived.
12        Q    People not on the scene, correct?
13        A    Correct.  Yes, in that case.
14        Q    Anything else?
15        A    There were a lot of -- it was just a
16   continuing stream of profanity and threats coming
17   out.
18        Q    Okay.  Was -- he was a resident of that
19   property?
20        A    I don't know.
21        Q    Never bothered to find out?
22        A    Well --
23             MR. BERK:  Objection to form.
24   BY MR. SPINELLA:
25        Q    You could answer.  Did you bother to find
```

Page 83

```
1    out?
2         A    I found out later.
3         Q    Yes.  What did you find out?
4         A    That he had been staying there temporarily,
5    but that he actually resided in Terryville.
6         Q    Okay.  But he was living there at the time,
7    correct?
8         A    Actually, I think -- I know Maryanne
9    Zadrowski said he wasn't living there.  But according
10   to him and Maryanne Zadrowski's brother, Walter, he had
11   stayed there for several days.
12        Q    Okay.  Other than the yelling and the -- what
13   you perceived to be a verbal threat, had he committed
14   any other crime or any crime?
15        A    I would say no.
16        Q    Okay.  Now, what happened after he was taken
17   into custody?
18        A    Well, he was handcuffed at the scene and the
19   shouting and screaming from Maryanne Zadrowski -- and
20   there are other people making comments and saying
21   things, but her voice stood out because of the
22   profanities and the volume of it.
23             I was concerned that she was exacerbating the
24   situation in the sense that we were trying to calm
25   Richard down and determine if he needed to go directly
```

Page 84

```
1    to the police station for booking or was it serious
2    enough for him to have to go directly to the hospital
3    because of the statements that he had threatened to
4    commit suicide earlier, prior to us arriving.  So --
5         Q    Well, so you knew that you were going there
6    in order -- that it was a potential suicide situation?
7    You never mentioned that until now.
8         A    That was one of the factors I had
9    mentioned, that -- and I believe it was when I
10   discussed it with Sergeant Marques prior to leaving.
11        Q    Okay.  So prior to leaving you knew --
12        A    The station, yes.
13        Q    -- that there was a potential suicide risk,
14   correct, and that's why you were going to the
15   property?
16        A    That wasn't the only reason.  But I knew that
17   someone at the scene had threatened to commit
18   suicide.
19        Q    But what other reason were you going there
20   for?
21        A    Because there was -- the officers were,
22   according to what Sergeant Marques related to me, and
23   would be corroborated with my discussion with Maryanne
24   Zadrowski on the phone, the officers at the scene were
25   having difficulty controlling the situation.
```

```
 1      Q    Well, what situation was there?  That's what
 2  I'm getting at.  What was the situation, other than a
 3  person that was threatening to kill himself?
 4      A    Well, the person was not submitting to the
 5  police authority or the calm -- attempts to calm this
 6  person down.
 7      Q    Well, when you got there he was seated in the
 8  back seat of the car and he was subdued, right?
 9          MR. BERK:  Objection to the form of the
10  question.
11  BY MR. SPINELLA:
12      Q    Right?
13      A    No.
14          MR. BERK:  Objection to the form of the
15  question.
16  BY MR. SPINELLA:
17      Q    Okay.  What did you see?
18      A    I said that Walter Zadrowski was seated in
19  the cruiser.
20      Q    Okay.
21      A    Richard was standing -- was not handcuffed
22  and was acting in a manner consistent with somebody
23  very aggressive, profane, loud, uncooperative, and
24  ultimately making direct verbal threats to officers
25  within a few feet of him.
```

```
 1      Q    Okay.  And what crime was he arrested for?
 2      A    Breach of peace I believe was the charge.
 3      Q    Breach of peace on his own property?
 4          MR. BERK:  Objection to form.
 5  BY MR. SPINELLA:
 6      Q    Huh?
 7      A    I don't know if that's his property, but that
 8  was irrelevant.
 9      Q    Okay.  So if it's irrelevant how somebody
10  conducts himself on property on which he is a resident,
11  it's irrelevant whether he owns or is domiciled on that
12  property?
13          MR. BERK:  Object to the form of the
14  question.  There is multiple questions.
15  BY MR. SPINELLA:
16      Q    Is it relevant to the charge of breach of
17  peace whether the arrestee is domiciled or on the
18  property where he is arrested?
19      A    Not in this circumstance.
20      Q    Okay.  Why not?
21      A    Because he made direct threats, and that's
22  why he was arrested.  He was not arrested for the
23  noise, per se.
24      Q    Is it --
25      A    He was arrest for directly threatening police
```

```
 1  officers.
 2      Q    Okay.  Is it a crime to swear at a police
 3  officer?
 4      A    No.
 5      Q    Is it a crime to raise your voice at a police
 6  officer?
 7      A    That depends on the context of where you
 8  are.
 9      Q    Is it a crime to speak in hypotheticals to a
10  police officer that if you do such and such, then I'm
11  going to react in a certain way, is that a crime?
12          MR. BERK:  Objection to the form of the
13  question.
14  BY MR. SPINELLA:
15      Q    Is that a crime?
16          MR. BERK:  Objection to the form of the
17  question.
18  BY MR. SPINELLA:
19      Q    You can answer.
20      A    It depends on what is said and what the
21  capacity of the person is.
22      Q    All right.  Let's talk about this
23  circumstance.  What if he says hypothetically, If you
24  arrest me, then I will react in a violent way?  If he
25  says that, is that a crime?
```

```
 1          MR. BERK:  Objection to form.
 2      A    No.
 3  BY MR. SPINELLA:
 4      Q    It isn't?  Is your answer no?
 5      A    No.
 6      Q    Okay.  And didn't you testify previously that
 7  that, in effect, is what this individual said in this
 8  circumstance, that if hypothetically you arrest me,
 9  then I will react in a certain way, didn't you say
10  that?
11      A    No.
12      Q    Okay.  Let the record speak for itself.
13          MR. BERK:  Objection.  You ask
14  questions, not make comments.
15          MR. SPINELLA:  It is a comment intended
16  to move things along here.
17  BY MR. SPINELLA:
18      Q    Now, after he was taken into custody, by that
19  I mean -- was it Maryanne's son that was taken into
20  custody, correct?
21      A    He was handcuffed at the scene and then I had
22  to make a decision as to whether he would be
23  transported first to the police department or directly
24  to the hospital.
25      Q    Okay.  And what decision did you make?
```

Page 89

```
 1       A    Ultimately I decided to have him transported
 2  to the police department, booked, and then sent to the
 3  hospital.
 4       Q    Why did you make that decision?
 5       A    Because I think we have the facilities to
 6  make sure he does not commit suicide and harm himself,
 7  particularly while he's being booked.  And also there
 8  was a practical matter.  If he went to the hospital
 9  first, we would have to maintain an officer with him,
10  and that could be up to 24 hours before he's even
11  examined by a physician.  So there was the capacity
12  that we had to handle the situation and the practical
13  matter of the difficulties in assigning a police
14  officer.
15       Q    So you thought it was more important to have
16  him booked than to have him medically treated?
17            MR. BERK:  Objection to the form of the
18  question.
19       A    I didn't see that as an issue, the choice --
20  that wasn't the way my thinking was.  He was not at
21  risk when -- of harming himself while he was being
22  booked.
23  BY MR. SPINELLA:
24       Q    Well, how do you know that?  Are you a
25  medical doctor?
```

Page 90

```
 1       A    No, because we would have an officer with him
 2  during the booking process.
 3       Q    Well, you didn't know, as a matter of
 4  medicine or psychiatry whether or not he had the intent
 5  to do himself harm, did you?
 6       A    No.
 7       Q    But certainly there was reasonable cause to
 8  believe that was the case, right?
 9       A    Any time a person makes a statement about
10  killing themselves, we take it -- the possibility
11  exists, yes.
12       Q    Sure.  Sure.  And the possibility certainly
13  existed, given the telephone call at the dispatch in
14  the very beginning, certainly the possibility existed
15  that this was a psychiatric who is psychologically
16  imbalanced person capable of doing himself great harm,
17  correct?
18            MR. BERK:  Objection to the form.
19       A    Yes.
20  BY MR. SPINELLA:
21       Q    Yet, you taught -- you chose, going back to
22  my original question, to have him booked rather than to
23  have a doctor see him first?
24       A    Correct.
25            MR. BERK:  Object to the form.
```

Page 91

```
 1  BY MR. SPINELLA:
 2       Q    Is your answer yes?
 3       A    Yes.
 4       Q    Okay.  Now, after handcuffs -- handcuffs were
 5  put on him, what happened?
 6       A    These -- the decision about bringing him to
 7  the station or the hospital caused a brief delay while
 8  I considered what to do.  Officers were standing
 9  around.  He was -- Mr. Bright was still yelling threats
10  and Maryanne Zadrowski was screaming and yelling
11  profanities from -- toward the back of the house.
12       Q    Okay.  Then what happened?
13       A    I could see people, more than one, near the
14  back of the house.  And at one point right after he --
15  Mr. Bright was handcuffed, and I was in the process of
16  making the decisions I just described to you, I glanced
17  to my right and saw that Maryanne Zadrowski had moved
18  from the back of the house to much closer to where I
19  was and where the officers were and where Mr. Bright
20  was.  And all the time she was still yelling and
21  screaming profanities.
22            I did observe very briefly Sergeant Marques,
23  who was standing in the driveway, the darkened
24  driveway, physically intercede in preventing her from
25  advancing any further.  And I saw him grab her by the
```

Page 92

```
 1  side, it seemed like to me he was standing on the side
 2  of her and just grabbed her in the shoulder area.
 3       Q    Well, you say it seemed.  Are you sure that
 4  that's what happened?
 5       A    Yes.  That's what I saw.  But I looked --
 6  when I looked, it was a glance, and the actual time I
 7  spent looking at this was probably less than one
 8  second.  So --
 9       Q    Okay.  Then what happened?
10       A    Then I made the decision to have Mr. Bright
11  transported to headquarters for booking.  So -- and I
12  don't remember which officer or officers brought him to
13  one of the police cars.
14       Q    Okay.  Then what happened?
15       A    Then officer Cybulski at one point showed me
16  a rifle -- and this was in a detached garage area -- a
17  rifle that he had found.  And I don't know -- he showed
18  it to me and he said this was -- he told me that this
19  was the rifle that Walter Zadrowski had offered to Mr.
20  Bright in the course of the threat to commit suicide.
21       Q    When he showed you that, were both the males
22  on the scene in custody?  One was in the car and the
23  other one had been handcuffed, right?
24       A    Yes.
25       Q    Then what happened?
```

Page 93

```
 1      A   I don't remember who, but someone stated that
 2 there were more guns in the home.
 3      Q   What police officer said that?
 4      A   I don't remember.  It may have been a police
 5 officer.
 6      Q   Somebody you don't know -- who you don't know
 7 said there were more guns in the house?
 8      A   Correct.
 9      Q   So then what did you do?
10          MR. BERK:  Do not know who it is.
11 BY MR. SPINELLA:
12      Q   You did not know who it is, right?
13      A   No.
14      Q   Okay.  So then what happened?
15      A   I asked either Maryanne Zadrowski or another
16 older woman, who I later learned was Maryanne
17 Zadrowski's mother, if there were guns in the home.
18 And one of them told me that there were rifles in the
19 home.
20      Q   Then what happened?
21      A   I had a discussion on the back porch, back
22 steps -- it's an open step area -- right at the back
23 door with Maryanne Zadrowski's mother.  And she told me
24 that she was the owner of the home and she did not want
25 me going in the home.
```

Page 94

```
 1          And we discussed for a brief period, maybe a
 2 minute, I explained my concerns about the weapons being
 3 on the property with the emotions running this high and
 4 that I would like to take those weapons for
 5 safekeeping.  And she said no.
 6          I turned to a young man who was seated on the
 7 back porch and I asked the young man who was seated
 8 with a young woman -- and he had not said anything -- I
 9 asked the young man, I said, Do you know if there are
10 guns in there?  And if so, could you get them or show
11 me where they are?  And he just shrugged his shoulders
12 and didn't answer me.
13      Q   Then what happened?
14      A   So I -- after thinking about whether this
15 rose to an exigency where I needed to go into the house
16 and just take possession of the guns, I decided it
17 didn't rise to that level with the mother refusing me
18 entrance and the two people, Walter and Mr. Bright,
19 already in custody.
20          I was still concerned that there was a
21 possibility that Mr. Bright would make bond or be
22 released at the station, go to the hospital, and it's
23 possible for a medical doctor to determine he is not a
24 danger and release him.  I thought that was a very slim
25 possibility, so I didn't think that the exigency was
```

Page 95

```
 1 such that I should force entry for the firearms and I
 2 didn't do so.
 3      Q   Then what happened?
 4      A   We left the scene.
 5      Q   Okay.  Did any police officer ever go inside
 6 the home?
 7      A   Not while I was there, but I learned later
 8 they went in.
 9      Q   Who went in?
10      A   I don't know.
11      Q   And for how long?
12      A   I don't know.
13      Q   Did they have consent to go in the house?
14      A   That was my understanding.
15      Q   Well, who would the consent come from if the
16 owner of the house had already told you that she didn't
17 want anybody in there?
18      A   I mean, I'm telling you things that I know
19 from the reports and from other discussions.  I was --
20 I was not working any longer when this occurred.
21      Q   Well, if somebody had said that, would you
22 believe -- if somebody had said that the mother had
23 given them consent, wouldn't you discard that notion as
24 inherently incredible based upon your own experience of
25 her defiance against having anyone enter the house?
```

Page 96

```
 1          MR. BERK:  Objection to the form of the
 2 question.
 3      A   I really don't think I can answer what would
 4 happen at a later point in time if another resident of
 5 the location gave the consent to specifically turn over
 6 the firearms.  I wasn't there.  But I don't know if I
 7 should be commenting on that.
 8 BY MR. SPINELLA:
 9      Q   But you talked previously about how there was
10 another motive in your questioning, and that is whether
11 or not an inquiry as to an IAD investigation should
12 take place.  So I'm asking you as an officer acting in
13 that role, doesn't it seem inherently incredible if
14 some police officer said they had consent to go in the
15 house, when you of your own experience knew that the
16 owner of the house had no intention of letting a police
17 officer in there, wouldn't that have seemed incredible
18 to you?
19          MR. BERK:  Objection.
20      A   I don't think incredible is the right word.
21 No, it wouldn't.  I guess that's my answer.
22 BY MR. SPINELLA:
23      Q   Okay.  What about going into the garage?  Did
24 anybody give -- was there consent by the owner of the
25 house -- any owner of the house to go into the
```

Zadrowski v. Town of Plainville
Brian Mullins

Page 97

```
 1  garage?
 2       A    I don't know.
 3       Q    Well, did you receive consent?
 4       A    No.
 5       Q    Did you have a warrant?
 6       A    No.
 7       Q    And when you were in the garage -- and again,
 8  by your own admission, given the fact that both these
 9  men were in custody -- you said previously they were in
10  custody when you were in the garage -- there were no
11  exigent circumstances, were there?
12       A    I would say yes, and I -- my understanding
13  was officers were in the garage prior to both of them
14  being in custody.
15       Q    Well, you testified previously you didn't go
16  into the house to look for guns because the two men
17  were already in custody.  Doesn't the same thinking
18  apply to the garage?  You already said both men were in
19  custody.  What were the exigent circumstances?  If you
20  didn't have them to go into the house, you didn't have
21  them to go into the garage, did you?
22            MR. BERK:  Objection to the form of the
23  question.  Multiple questions.
24  BY MR. SPINELLA:
25       Q    You can answer.
```

Page 98

```
 1       A    The garage was already the scene of the
 2  actual incident, and the gun that's of evidence was in
 3  there.  And there were other people in a very excited
 4  state right around that area.
 5       Q    Okay.  Well, when you arrived on the scene,
 6  it was your testimony that all of these encounters took
 7  place outside near the driveway.  There was no
 8  testimony previously that any of this took place inside
 9  the garage.
10            MR. BERK:  What took place inside the
11  garage?
12  BY MR. SPINELLA:
13       Q    The encounters that you talked about
14  previously when you came on the scene.
15            MR. BERK:  His encounters?
16            MR. SPINELLA:  Yes.
17       A    I didn't investigate the incident that
18  happened in the garage.
19  BY MR. SPINELLA:
20       Q    Well, did you know that any of this took
21  place inside the garage?
22       A    Yes.  The officers informed me that this took
23  place.
24       Q    When did they inform you of that?
25       A    I don't remember exactly during this.
```

Page 99

```
 1       Q    Okay.  It says in the police report that all
 2  of this took place in the garage; that this young man
 3  who attempted to commit suicide was in the garage while
 4  he was attempting to do so?
 5            MR. BERK:  Object to the form of the
 6  question.
 7  BY MR. SPINELLA:
 8       Q    Does it say that in any of the reports?
 9            MR. BERK:  Object to the form of the
10  question.
11       A    I don't know.  I don't think so.
12  BY MR. SPINELLA:
13       Q    Okay.  Now, after you were denied access to
14  the house, what did you do?
15       A    I left the scene and drove back -- told
16  everybody we're leaving and we drove back to the police
17  department.
18       Q    Now, it's your testimony that you saw
19  sergeant -- that although you saw Sergeant Marques have
20  physical contact with Maryanne Zadrowski, that
21  observation was no more than one second?
22       A    I mean, it was a brief glance and then back
23  to where my focus was.
24       Q    Okay.  Did you say that it was no more than
25  one second, or words to that effect?
```

Page 100

```
 1       A    Yes.
 2       Q    And is that true?
 3       A    Yes.
 4       Q    Now, did anyone discover marijuana on Richard
 5  Bright, any police officer?
 6       A    No.  Not that I'm aware of.
 7       Q    Was Maryanne Zadrowski charged with a
 8  crime?
 9       A    No.
10       Q    Were rifles removed from the garage on
11  Shuttle Meadow Road?
12       A    One rifle -- the rifle that was shown to me,
13  and I believe the officer told me he found it in the
14  garage.  I'm not sure if Walter gave it to him, but I
15  know the circumstances, but he was holding the rifle.
16  He said this was the rifle that he had -- that Walter
17  Zadrowski had offered to Mr. Bright during this threat
18  of suicide.  And I told him that that -- to take that
19  rifle, that particular rifle in as evidence.
20       Q    And that rifle was in the garage?  Is that
21  where it was seized from?
22       A    I saw him holding it and he was in the
23  garage -- yes, in the garage area, yes.
24       Q    Was -- you said someone was told to go into
25  the house to get rifles, a young boy?
```

Page 101

```
 1    A    No, I asked -- I wouldn't call him a young
 2  boy.  A young man was seated on the back steps.
 3    Q    Would it surprise you if I told you he was 17
 4  years old?
 5    A    No.
 6    Q    Okay.  And what did you tell him to do?
 7    A    I asked him if he knew if there was any guns
 8  in there and if he could help me get them out for
 9  safekeeping.  He was sitting right there, and I thought
10  that -- looking for a person that seemed reasonable,
11  that understood the reasons that -- why I wanted these
12  firearms, I thought he would assist me.  He shrugged
13  his shoulders.  He did not respond.  And that was the
14  end of the -- my asking him.
15    Q    Did you tell Barbara Zadrowski, the mother,
16  that if she didn't get out of your way, she would be
17  hurt?
18    A    No.
19    Q    Did any officer do that?
20    A    No.
21    Q    Any officers threaten to shoot a dog?
22    A    No.
23    Q    So just to be clear, you were -- the police
24  officers in this case were called to the scene because
25  Richard Bright was a possible suicide?
```

Page 102

```
 1    A    Yes.
 2    Q    Why was Walter Zadrowski -- well, I guess we
 3  went into that.  I withdraw the question.
 4         Well, let me ask you this:  It was Walter
 5  Zadrowski that was outside the -- or inside the car
 6  when you got there?
 7    A    Yes.
 8    Q    So you didn't observe any of the encounter
 9  with him?
10    A    Correct.
11    Q    Why did you understand him to be -- he to be
12  arrested?
13         MR. BERK:  Objection to form.
14  BY MR. SPINELLA:
15    Q    Why was he arrested, as far as you know?
16         MR. BERK:  Objection to form.
17    A    Well, at some point the officers explained to
18  me that he had offered a firearm to Mr. Bright when Mr.
19  Bright threatened to kill himself.
20  BY MR. SPINELLA:
21    Q    They actually observed him doing that?
22    A    No.  I think they learned that through
23  questioning the people involved.  That's what they told
24  me.
25    Q    Did you observe Sergeant Marques and
```

Page 103

```
 1  Barbara -- and Maryanne Zadrowski in close proximity at
 2  all, other than the time that you described already
 3  after that, did you observe the two of them in
 4  proximity at any point?
 5    A    No.
 6         MR. SPINELLA:  I don't have anything
 7  further.
 8         MR. BERK:  Sir, just a couple of
 9  questions.
10
11              CROSS-EXAMINATION
12
13  BY MR. BERK:
14    Q    The arrest materials I think were --
15         MR. BERK:  Paul, what's the number
16  of that document?  Number 1.
17  BY MR. BERK:
18    Q    Showing you the prosecutor's report.  Does
19  that refresh your recollection as to the charges
20  brought against Richard Bright?
21    A    Yes.
22    Q    And what were the charges brought against
23  Richard Bright?
24    A    Breach of peace, second degree; interfering
25  with an officer, threatening, second degree.
```

Page 104

```
 1    Q    The reason that the police were at this
 2  address in the first place is because Maryanne
 3  Zadrowski asked them to come there because her son was
 4  intoxicated and threatened to kill himself?
 5    A    Yes.
 6    Q    Is one of the reasons that you went to this
 7  residence, along with Sergeant Marques, was because you
 8  had heard that a gun might be involved?
 9    A    Yes.
10    Q    And at the scene, was a gun shown to you?
11    A    Yes.
12    Q    And were you aware whether any of the
13  officers at the scene, after affecting the arrest of
14  Mr. Zadrowski, found any ammunition on him?
15    A    Yes.
16    Q    As Maryanne Zadrowski was walking down the
17  driveway towards the street area, you and the officers
18  were in the process of affecting arrest on Richard
19  Bright?
20    A    Yes.
21    Q    And did you consider it by -- that to be a
22  volatile situation, due to his demeanor and the words
23  coming out of his mouth?
24    A    Yes.
25    Q    And is it standard practice under those
```

Page 105

```
 1    circumstances if you have someone else coming to that
 2    arrest site who is also screaming, to attempt to keep
 3    them away from that site so that the situation doesn't
 4    get out of hand?
 5        A    Yes.
 6        Q    There were a number of questions asked you
 7    about going into the house afterwards.  Are you aware
 8    that Walter Zadrowski, who lives at that address, gave
 9    permission to the police officers to go in and take the
10    guns that he had in the house?
11        A    I did learn that later.
12        Q    And are you aware from listening to the tape
13    that Maryanne Zadrowski was aware that the officers
14    were going to be taking the guns for safekeeping?
15        A    She was informed by that -- by phone that
16    that was going to happen, yes.
17        Q    And she called up -- withdrawn.
18             She didn't speak to you?
19        A    That was based on my listening to her.
20        Q    That they would get a receipt?
21        A    Yes.
22        Q    In fact, in the house they found another
23    three or four guns, correct?
24        A    Yes.
25             MR. BERK:  I have nothing further.
```

Page 106

```
 1
 2                    REDIRECT EXAMINATION
 3
 4    BY MR. SPINELLA:
 5        Q    Just one question.  In order to seize a gun
 6    from -- in a household that is not actually being used
 7    in the commission of a crime, it's our procedure in
 8    this state, is it not, to initiate a formal forfeiture
 9    action in the courts?
10        A    I don't understand the question.
11        Q    Well, before a police officer can seize a gun
12    from a home that's not actually being used in the
13    commission of a crime, a forfeiture action is required,
14    is it not?
15        A    Not always, no.
16        Q    Well, I'm talking about a circumstance where
17    there's -- it's not being used in the course of a
18    crime.  Okay?  I understand that weapons need to be
19    seized maybe in the search of a home ancillary to a
20    valid search warrant, but that wasn't the case here,
21    was it?
22             MR. BERK:  Objection to form.
23    BY MR. SPINELLA:
24        Q    I mean, there was no search warrant, was
25    there?
```

Page 107

```
 1        A    No.
 2             MR. SPINELLA:  I don't have anything
 3    further.
 4
 5                    RECROSS-EXAMINATION
 6
 7    BY MR. BERK:
 8        Q    The owners of those guns gave the officers
 9    permission to take those guns to prevent a possibility
10    of future violence, is that correct, by gun?
11             MR. SPINELLA:  I object to that.
12             MR. BERK:  Sure.
13        A    Yes.
14             MR. BERK:  Thank you.
15
16             FURTHER REDIRECT EXAMINATION
17
18    BY MR. SPINELLA:
19        Q    Is there a statute that you're relying on in
20    giving that statement?
21        A    I answered his question.
22        Q    Yes.  You said yes to that hypothetical.  And
23    I'm asking you for the source of your authority.  Is
24    there a statute that you're relying upon?
25        A    He asked me if the owner of the guns wanted
```

Page 108

```
 1    to voluntarily turn them over to the police for
 2    safekeeping, is that okay?  And the answer is yes.
 3        Q    Well, that wasn't the question.
 4             MR. BERK:  That was my question.
 5             MR. SPINELLA:  Well, it also had
 6    another element in there about anticipating future
 7    harm from those weapons.  Never mind.  I withdraw the
 8    question.
 9             MR. BERK:  Paul, would you like me to
10    make copies of this material?  Some of it -- that's
11    yours.  You can go with that.  That's the disk.
12             The only thing I was going to do, Paul,
13    with your permission, is make copies of the front pages
14    so that I know what was marked as Exhibit 1, 2 --
15             MR. SPINELLA:  And have them attached
16    to the deposition?
17             MR. BERK:  Is that what you would like,
18    Paul?
19             MR. SPINELLA:  Yes.
20             MR. BERK:  Would you like the entire
21    exhibits attached?
22             MR. SPINELLA:  Yes.
23             MR. BERK:  Then I will make copies for
24    the reporter.
25             MR. SPINELLA:  Well, the entire
```

Page 109

```
 1   exhibits attached, what are you --
 2              MR. BERK:  I'm talking about we have
 3   the personnel file, we have the certificates.
 4              MR. SPINELLA:  I don't think -- I mean,
 5   I don't know.  It seems kind --
 6              MR. BERK:  Want to give me a call later
 7   after you think about it, or tomorrow?
 8              MR. SPINELLA:  Let's do this:  Let's
 9   get -- we don't have to get -- the biggest one is the
10   training.
11              MR. BERK:  Correct.
12              MR. SPINELLA:  We don't need that.
13              MR. BERK:  So I'll just do the front
14   cover.
15              MR. SPINELLA:  The front cover.  The
16   rest I'd like to get attached.
17              MR. BERK:  Very good.  I have your
18   card.  What I'll do is make copies of them and get
19   them in the mail to you, okay, you'll get the original
20   stickers and all of that.
21
22              (The deposition concluded at 1:33 pm.)
23
24
25
```

Page 110

```
 1              J U R A T                    BAC
 2
 3
 4
 5
 6
 7
 8
 9
10              _____
11              BRIAN MULLINS
12
13
14
15
16              subscribed to and sworn before me
17   on this _____ day of _____,
18   2010.
19
20
21   My Commission Expires:
22
23
24
25
```

Page 111

```
 1              E R R A T A
 2        I,_____, do hereby certify that the
 3   following corrections and additions are true and
     accurate to the best of my knowledge and belief.
 4
 5   CORRECTION          PAGE     LINE     REASON
 6   _____
 7   _____
 8   _____
 9   _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   DATE                         BRIAN MULLINS
21
22        At_____ in said County of _____,
23   this _____ day of _____, 2010, personally
24   appeared _____, and he made oath to the
25   truth of the foregoing corrections by him subscribed.
```

Page 112

```
 1              STATE OF CONNECTICUT
 2        I, Bethany A. Carrier, LSR 071, a Notary Public,
 3   duly commissioned and qualified in and for the State of
 4   Connecticut, do hereby certify that pursuant to Notice,
 5   there came before me on the 20th day of April, 2010,
 6   the following-named person, to wit:  BRIAN MULLINS, who
 7   was by me duly sworn to testify to the truth and
 8   nothing but the truth; that he was thereupon carefully
 9   examined upon his oath and his examination reduced to
10   writing under my supervision; that this deposition is a
11   true record of the testimony given by the witness.
12        I further certify that I am neither attorney nor
13   counsel for nor related to nor employed by any of the
14   parties to the action in which this deposition is
15   taken, and further that I am not a relative or employee
16   of any attorney or counsel employed by the parties
17   hereto, or financially interested in this action.
18        IN WITNESS THEREOF, I have hereunto set my hand
19   this _____ day of _____, 2010.
20
21              _____
22              Bethany A. Carrier
                Notary Public
23
     My Commission Expires:
24   October 31, 2013
25
```

Page 113

```
 1                    Bethany A. Carrier
               Brandon Smith Reporting Service
 2                    44 Capitol Avenue
               Hartford, Connecticut  06106
 3                    (860) 549-1850

 4
      May 4, 2010
 5

 6    JON BERK, ESQ.
      GORDON, MUIR and FOLEY, LLP
 7    Ten Columbus Boulevard
      Hartford, Connecticut  06106
 8

 9    Dear Mr. Berk:

10
11    Enclosed, please find your copy of the deposition of
      Brian Mullins, taken on April 20, 2010.
12
      The jurat and errata sheets are enclosed. Please note
13    the witness has 30 days to read and sign the
      transcript, as the rules provide.
14
      After the jurat and errata sheets have been signed,
15    send those sheets only to Attorney Spinella for filing,
      along with a copy to all counsel present.
16
      If you have any question, please don't hesitate to
17    call.

18    Sincerely,

19
      Bethany A. Carrier
20

21
22    cc:  A. Paul Spinella, Esq.

23

24

25
```